UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
JOSHUA ZHANG, Individually and on behalf  :
of all other similarly situated,  :
 :
     Plaintiff,  :
 :
v.  :  22-cv-7966 (PKC) (CLP)
 :
GAOTU TECHEDU INC. F/K/A GSX  :
TECHEDU INC., XIANGDONG CHEN, and  :
NAN SHEN,  :
 :
     Defendants.  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANT GAOTU TECHEDU INC.'S
## MEMORANDUM OF LAW IN SUPPORT OF THE
## <u>MOTION TO DISMISS THE AMENDED COMPLAINT</u>

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP

Scott D. Musoff
Robert A. Fumerton
Michael C. Griffin
Judith A. Flumenbaum
One Manhattan West
New York, New York 10001
Phone:  (212) 735-3000

*Counsel for Defendant Gaotu Techedu Inc.*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................. 1

STATEMENT OF FACTS ..................................................................................................... 3

1.   Gaotu's Business ....................................................................................................... 3

2.   Gaotu's Regulatory Environment Prior to the Class Period ..................................... 4

3.   Gaotu Disclosed the Relevant Regulatory Risks ...................................................... 5

4.   In March 2021, Chinese Officials Issue Unprecedented Criticism of the Industry,
     Sparking Widespread Speculation Over Stricter Forthcoming Regulation ............... 7

5.   The Double Reduction Regulations Are Approved in Closed Session on May 21,
     2021 ........................................................................................................................... 9

6.   The Double Reduction Regulations, When Disclosed, Shock the Entire Chinese
     After-School Tutoring Industry ............................................................................... 10

ARGUMENT ....................................................................................................................... 12

I.    PLAINTIFFS FAIL TO PLEAD A MATERIAL MISREPRESENTATION .................. 12

      A.   None of the Challenged Statements Was False or Misleading ........................... 12

      B.   The Company Fully and Accurately Disclosed the Relevant Risks .................... 18

II.   PLAINTIFFS FAIL TO ALLEGE A STRONG INFERENCE OF SCIENTER ............. 20

      A.   Plaintiffs Fail To Plead Motive and Opportunity To Commit Fraud ................... 20

      B.   Plaintiffs Fail To Plead Conscious Misbehavior or Recklessness ...................... 22

III.  PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION .................................................. 25

CONCLUSION .................................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*In re Aratana Therapeutics Inc. Securities Litigation*,
  315 F. Supp. 3d 737 (S.D.N.Y. 2018)................................................................17

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007).....................................................................3, 12, 25

*Banerjee v. Zhangmen Education Inc.*,
  No. 21-CV-9634 (JPO), 2023 WL 2711279 (S.D.N.Y. Mar. 30, 2023).........11, 12, 13, 19

*Board of Trustees of Ft. Lauderdale General Employees' Retirement System v. Mechel OAO*,
  811 F. Supp. 2d 853 (S.D.N.Y. 2011), *aff'd sub nom. Frederick v. Mechel OAO*,
  475 F. App'x 353 (2d Cir. 2012) ................................................................23

*Dagan Investments, LLC, v. First High-School Education Group Co. Ltd.*,
  No. 22-CV-3831 (JGK), 2023 WL 8452223 (S.D.N.Y. Dec. 6, 2023) ...............11, 12, 13

*In re DRDGOLD Ltd. Securities Litigation*,
  472 F. Supp. 2d 562 (S.D.N.Y. 2007)........................................................12

*Dura Pharmaceuticals, Inc. v. Broudo*,
  544 U.S. 336 (2005)................................................................................25

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JPMorgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)....................................................................20

*Garnett v. RLX Technology Inc.*,
  632 F. Supp. 3d 574 (S.D.N.Y. 2022), *aff'd sub nom. Tseng v. De Vries*, No. 22-2727-CV, 2023 WL 8073087 (2d Cir. 2023)...........................................12, 19

*Glaser v. The9, Ltd.*,
  772 F. Supp. 2d 573 (S.D.N.Y. 2011).......................................................20, 24

*Golla v. Neovasc, Inc.*,
  No. 22-361-CV, 2023 WL 2469770 (2d Cir. Mar. 13, 2023)...........................20

*Haping v. 17 Education & Technology Group Inc.*,
  No. 1:22-CV-09843 (LAK) (SDA),
  2023 WL 8716895 (S.D.N.Y. July 20, 2023) .......................................11, 13, 19

*Hirsch v. Arthur Andersen & Co.*,
  72 F.3d 1085 (2d Cir. 1995)....................................................................14, 15

*Kalnit v. Eichler,*
  264 F.3d 131 (2d Cir. 2001)...........................................................................22, 23

*In re Keyspan Corp. Securities Litigation,*
  383 F. Supp. 2d 358 (E.D.N.Y. 2003) ................................................18, 20, 21

*Lentell v. Merrill Lynch & Co.,*
  396 F.3d 161 (2d Cir. 2005)...................................................................................25

*In re Merrill Lynch & Co.,*
  273 F. Supp. 2d 351 (S.D.N.Y. 2003), *aff'd*, 396 F.3d 161 (2d Cir. 2005) ........................3

*Novak v. Kasaks,*
  216 F.3d 300 (2d Cir. 2000)...........................................................................13, 15, 16

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund,*
  575 U.S. 175 (2015)...........................................................................................17

*Singh v. Cigna Corp.,*
  918 F.3d 57 (2d Cir. 2019)..................................................................................12

*Town of Davie Police Officers Retirement System v. City of North Miami Beach Police
  Officers' & Firefighters' Retirement Plan,*
  No. 21-909-cv, 2021 WL 5142702 (2d Cir. Nov. 5, 2021) ............................22

*Woolgar v. Kingstone Cos.,*
  477 F. Supp. 3d 193 (S.D.N.Y. 2020).............................................................21

## STATUTES

15 U.S.C. § 78u-5(c)(1)(A)(i) ...........................................................................17

Defendant[1] Gaotu Techedu Inc. ("Gaotu" or the "Company") respectfully submits this memorandum of law in support of its motion to dismiss the Amended Complaint (the "Complaint" or "AC") (ECF No. 31)[2] pursuant to Rules 8(a), 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and Section 101(b) of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b)(2) (the "PSLRA").

## PRELIMINARY STATEMENT

Plaintiffs bring this putative securities class action based on the same flawed theory that has been rejected by every other court to consider it—that China's biggest private education companies (including Gaotu) should have predicted an unprecedented, industry-wide ban on for-profit after-school tutoring in China.  At the time of its initial public offering ("IPO") in June 2019, Gaotu was one of the largest online after-school tutoring service providers in China.  In 2019 and 2020, Gaotu reported increasing revenue and gross profit, all while navigating a rapidly evolving regulatory environment.  Beginning in or around March 2021, for reasons unrelated to any action by the Company, Chinese authorities began to call for stricter regulation of the entire industry.  In the ensuing months, several news sources speculated on the likelihood of stricter regulations, sparking widely publicized calls for after-school tutoring companies to change their business model.

On May 21, 2021, Chinese authorities approved the so-called "Double Reduction Regulations"—which aimed to reduce the twin burdens of excessive homework and after-school tutoring—in a closed-door session chaired by Chinese President Xi Jinping.  The contents of the

---

[1]    To Defendant's knowledge, the other named Defendants (the "Individual Defendants") have not been served.

[2]    A true and correct copy of the Complaint is attached as Exhibit A to the Declaration of Robert A. Fumerton, dated March 22, 2024 exhibits to which are otherwise cited herein as "Ex. __."  Pincites for all exhibits reference the original pagination at the bottom of the page.  All internal quotation marks and citations are omitted, and all emphases in quotations are added, unless otherwise indicated.

Regulations, however, would not be released for months, causing further uncertainty and panic in the market.  On July 24, 2021, China finally released the full contents of the Double Reduction Regulations, which, for the first time, effectively banned all private after-school tutoring from kindergarten through ninth grade ("K-9"), among other restrictions.  Media outlets called the announcement a "death knell" to the after-school tutoring industry in China.  Although no one foresaw this unprecedented industry-wide ban, Plaintiffs claim Gaotu committed securities fraud by failing to predict and disclose it months before it became public.  For several independently dispositive reasons, Plaintiffs fail to state a claim.

First, Plaintiffs fail to plead a material misstatement or omission.  Plaintiffs allege that six statements made between March 5, 2021 and July 23, 2021 (the "Class Period") misleadingly omitted the potential impact of the as-yet-unannounced Double Reduction Regulations.  However, it is well-established that companies are not required to predict or foresee forthcoming regulations.  That is particularly so here, where the majority of the challenged statements were made ***before the Double Reduction Regulations were even adopted***.  Plaintiffs fail to allege any facts (much less particularized facts) showing the Company had prior knowledge of the Regulations' contents, including the comprehensive ban on private after-school tutoring.  In any event, Gaotu repeatedly disclosed the significant uncertainties arising from the unpredictable and rapidly evolving regulatory environment in which it operated, and even went so far as to warn of the potential ***existential*** threat of these regulatory risks to its business.  As numerous other courts in this Circuit have already held, Chinese education companies like Gaotu had no duty to disclose anything further.

Second, Plaintiffs fail to plead the requisite "strong inference" of scienter.  Plaintiffs point to certain stock sales and changes to Gaotu's business, but they fail to allege particularized facts

showing these actions were taken because of undisclosed information about the Double Reduction Regulations.   Rather, the Complaint itself confirms that Gaotu, like all similarly situated companies, was pragmatically hedging against widely reported rumors of an impending (but unspecified) regulatory crackdown.  Plaintiffs' other vague allegations of widespread discussions, meetings, and communications of unknown aspects of the Regulation—some of which do not even mention Gaotu or the comprehensive ban on private after-school tutoring that Plaintiffs allege was omitted—are plainly insufficient to support a strong inference of recklessness.

Finally, dismissal is warranted because Plaintiffs admit their loss was not caused by the correction of any misstatement or the materialization of any undisclosed risks, but rather by a new industry-wide regulation that caused the prices of *all* U.S.-listed Chinese education stocks to plummet.  The securities laws simply do not provide investors with broad insurance against such market-wide losses.

For these reasons, as further demonstrated below, the Complaint should be dismissed in its entirety with prejudice.

## STATEMENT OF FACTS[3]

### 1.   Gaotu's Business

Gaotu, f/k/a GSX Techedu Inc., commenced its operations in the Chinese education industry in June 2014, and quickly "evolved into the third-largest online K-12 large-class after-school tutoring service provider in China."  (AC ¶ 35; Ex. B, 2020 Annual Report, at 38.)  On June 6, 2019, the Company "achieved a significant milestone by completing its initial public offering"

---

[3]   The facts set forth herein are drawn from the allegations in the Complaint and documents attached as exhibits or incorporated into the Complaint by reference, matters of which judicial notice may be taken, and documents integral to the complaint.  *In re Merrill Lynch & Co.*, 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003), *aff'd*, 396 F.3d 161 (2d Cir. 2005).  The Court may also consider "legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

("IPO"), and its American Depositary Shares ("ADSs") began trading on the New York Stock Exchange.  (AC ¶ 36.)  As of December 31, 2020, the Company's core business consisted of offering online kindergarten through twelfth grade ("K-12") courses, which contributed to 87.5% of its total revenue in 2020 and 92.5% of its paid course enrollments.  (Ex. B at 39.)  In addition to K-12 education, Gaotu offered foreign language courses, courses tailored toward adults preparing for professional qualification exams, and admissions courses, including courses designed to prepare students for national graduate entrance examinations and civil service examinations, among others.  (*Id.* at 38, 41.)  Gaotu also operated Weishi, an interactive learning platform on the Chinese social media platform WeChat.  (*Id.* at 41.)  In 2020, Gaotu received 5,871,000 paid course enrollments—almost tripled the 2,187,000 paid course enrollments received in 2019—and had a total of 392 instructors and 15,291 tutors.  (*Id.* at 39.)  Gaotu's net revenue increased by 236.9% from RMB 2,114,855,000 in 2019 to RMB 7,124,744,000 in 2020, and gross profit increased by 239.6% from RMB 1,578,943,000 in 2019 to RMB 5,362,196,000 in 2020.  (*Id.* at 3.)

2.      **Gaotu's Regulatory Environment Prior to the Class Period**

The private after-school tutoring industry "experienced remarkable growth" in the decade leading up to the Class Period (AC ¶ 33), as it provided additional support to parents and students facing "significant academic and societal pressure" under the Chinese public education system (*id.* ¶ 32; *see also id.* ¶¶ 20-32).  The industry quickly grew from "around 8,700 after-school tutoring institutions" in 2011, to "a staggering 490,000 after-school tutoring institutions" by May 2021.  (*Id.* ¶ 33.)  By 2018, it had become a multi-billion-dollar industry.  (*Id.* ¶ 34.)

In the midst of this rapid growth, starting in 2018, Chinese authorities began implementing various regulations governing the after-school tutoring industry.  For example, on February 13, 2018, Chinese regulators issued Circular 3, which, among other things, imposed licensing and

4

qualification requirements, banned practices such as academic competitions and advanced tutoring (*i.e.*, tutoring ahead of the prescribed in-school curriculum for a specific grade level), and required local authorities to carry out inspections of after-school training institutions to ensure compliance with these new rules.  (Ex. C, IPO Registration Statement at 114; AC ¶ 57.)  In August 2018, Chinese authorities issued Circular 80, which imposed further permitting and safety requirements and additional limitations on curriculum, homework, class duration, and tuition fees at after-school tutoring institutions.  (Ex. C at 114-15; AC ¶ 58.)  Circular 10, issued on November 10, 2018, authorized local governments to enforce Circular 80 and regulate after-school training institutions. (Ex. C at 115; AC ¶ 59.)  In July 2019, regulators issued the Online After-School Training Opinions, which required provincial education authorities to review the filings and the qualifications of online after-school training institutions.  (AC ¶ 61; Ex. C at 115; Ex. B at 50.)

As Chinese authorities began implementing and enforcing these new regulations, numerous noncompliant after-school tutoring institutions were fined or forced to close.  Plaintiffs allege that "in 2019 alone, nearly 12,000 [other] tutoring companies ceased their operations" (AC ¶ 63).  Similarly, "[i]n 2020, an additional over 9,600 tutoring companies shut down or disappeared."  (*Id.*)  Notwithstanding these widespread crackdowns, Gaotu adapted quickly and successfully to the rapidly evolving regulatory environment.  As the Complaint itself admits, at the same time other noncompliant institutions were shuttered in the thousands, Gaotu continued to "thrive[]" (*id.* ¶ 35), completing its IPO in 2019 (AC ¶ 36) and reporting significant year-over-year increases in net revenue, gross profit, and paid course enrollments in 2020 (Ex. B at 3, 38).

**3.    Gaotu Disclosed the Relevant Regulatory Risks**

The Company disclosed all of the above laws and regulations in its IPO Registration Statement (Ex. C at 114-15) and continued to disclose subsequent regulatory developments (*see*

Ex. B at 49-51).  Gaotu also disclosed the risks relating to the uncertain regulatory environment in

which it operated.  For example, in its 2019 and 2020 Annual Reports, the Company warned that:

> ***Uncertainties exist in relation to new legislation or proposed changes in the PRC regulatory requirements regarding online private education, which may materially and adversely affect our business, financial condition and results of operations.***  The private education industry in the PRC is subject to regulations in various aspects. Relevant rules and regulations are relatively new and evolving and could be changed to accommodate the development of the education, in particular, the online private education, markets from time to time.

(Ex. B at 8; Ex. D, 2019 Annual Report at 8 (emphasis in original).)

The Company explicitly warned of the risks that new laws and regulations posed to its

business, including changes to the interpretation of existing laws, and cautioned that it may be

unable to comply with new requirements, notwithstanding its ongoing and continuous efforts to

keep up with a rapidly changing regulatory environment:

> It is uncertain . . . whether and how PRC government authorities would further promulgate new laws and regulations applying [] requirements on various aspects, including but not limited to prepaid funds . . . , teachers' qualification licenses, . . . fee collection, pricing, refunds, course content and homework arrangement, course time arrangement, student enrollment, advertising, and teaching methods . . . Moreover, relevant government authorities have significant discretion in interpreting and implementing these laws, regulations, circulars and opinions, and may conduct inspections on compliance with requirements thereunder. ***There is no assurance that we can comply with any promulgated laws and regulations in a timely manner or at all***, and any failure to comply may subject us to fines, penalties, rectifications and other regulatory measures, and may in turn materially and adversely affect our business, financial condition and results of operations.

(Ex. B at 9; Ex. D, 2019 Annual Report at 8.)

These warnings were not merely hypothetical.  Although, as explained above, Gaotu's

business continued to "thrive[]"  (AC ¶ 35) even as numerous after-school tutoring companies

were forced to shut down due to noncompliance, the Company made clear that it was not immune

from regulatory scrutiny and had been fined due to an advertising-related issue.  For example:

> In December 2020, one of the advertising agencies we worked with used an actor purporting to be an experienced English teacher to advertise one of our courses, and this actor was later found to not have the qualifications she purported to have in the

advertisement at all. In April 2021, we were fined approximately RMB262 thousand (US$42 thousand) by the relevant governmental authority for such misleading content in our advertisement.

(Ex. B at 14.)

Finally, the Company warned that these substantial regulatory uncertainties could pose

nothing short of an existential threat to the viability of its business model:

Given the foregoing, the interpretation and application of the existing laws and regulations and the newly promulgated implementation rules and interpretations, if any, that governs the online private education industry would create **substantial uncertainties regarding the legality of our business operation**, which create risks that we may be found to violate the existing laws and regulations and any newly promulgated implementation rules and interpretations.

(Ex. B at 9; Ex. D, 2019 Annual Report at 9.)

### 4.    In March 2021, Chinese Officials Issue Unprecedented Criticism of the Industry, Sparking Widespread Speculation Over Stricter Forthcoming Regulation

On March 6, 2021—a day after the start of the Class Period—President Xi Jinping

criticized the after-school tutoring industry as "chaotic," noting that the problems "can't be solved

by the education authority alone, and all social aspects and related departments should make joint

efforts to study and solve it."  (AC ¶¶ 66, 86.)  These remarks, which were made during the so-

called annual "Two Sessions" meeting of the National People's Congress and the Chinese People's

Political Consultative Conference from March 4 to 11, 2021, were contemporaneously reported in

the media.  (Ex. E, Mar. 11, 2021 *South China Morning Post* Article.)

Plaintiffs allege that in the following days, the media and the public at large tried to unpack

President Xi's remarks and offered sometimes conflicting proposals on how to address the

underlying issues.  On March 9, 2021, one news source reported that "[s]ome [representatives at

the Two Sessions meeting] even suggested a ban on tutoring institutions."  (AC ¶ 87.)  Other news

media, however, reported that Beijing officials were conducting inspections to ensure compliance

with requirements relating to "qualification of teachers, tuition management, advertising, forms of

contract and pandemic control measures," with a "particular[] focus[] on business licenses and qualifications"—*i.e.*, an enforcement focus that did not suggest a "ban" on the industry, but was aligned with past regulatory actions as disclosed by Gaotu.  (AC ¶ 88; *see* Ex. C at 114-15.)  When the Two Sessions meeting ended on March 11, 2021, media reports warned of an "an impending 'regulatory storm' . . . that . . . 'might be more severe than ever.'"  (AC ¶ 89.)

Notwithstanding these ominous warnings in the public media, the extent of the forthcoming regulations remained unclear for months, causing the entire industry and the public generally to speculate on what was to come.  For example, Plaintiffs allege that "three prominent investment firms . . . who held significant stock in Chinese after-school tutoring companies, including Gaotu, sold most or all of their holdings during the first quarter of 2021."  (AC ¶ 97.)  On March 31, 2021, after the Ministry of Education announced measures to "limit the amount of online learning for primary and secondary school students," a private lobbying group publicly advised online after-school tutoring companies "to proactively transform their business models and extend services to other segments" (*id.* ¶ 89), which numerous companies began to do (*see id.* ¶¶ 114, 118).

On May 7, 2021, Beijing's Party Secretary met with representatives from several after-school tutoring institutions, including Gaotu.  (*Id.* ¶ 90.)  According to official contemporaneous public reports of that meeting, the Party Secretary acknowledged that after-school tutoring "played its role in meeting diversified educational needs," but also "had … its own problems."  (Ex. F, May 7, 2021 Cai Qi Meeting Article at 1.)  He reportedly urged tutoring institutions to "prevent advance teaching," "[s]trengthen supervision of online education, and implement the same standards as offline in terms of teacher qualifications, fund supervision, use of contracts, and course content" and "strengthen industry self-discipline"—*i.e.,* reinforcing the policy objectives exemplified by previously-issued regulations.  (*Id.*; *see* Ex. C at 114-15)

5.      **The Double Reduction Regulations Are Approved in Closed Session on May 21, 2021**

On May 21, 2021, news outlets reported that in a closed-door meeting presided over by President Xi, Chinese authorities approved the Opinion on Further Alleviating the Burden of Homework and After-School Tutoring for Students in Compulsory Education ("Double Reductions Regulations"). (AC ¶ 67.) However, the Regulations themselves were not published for months and their contents remained unknown. Even Plaintiffs acknowledge that the contemporaneous media reporting on the Regulations was vague at best: "According to the government's official news reports," this closed-door session focused on the need to oversee "institutions lacking qualifications, exhibiting disorganized management, exploiting profit opportunities, engaging in false advertisement, or colluding with schools for financial gain"— areas of concern that were no different from those that were the focus of existing regulations. (*Id.*) Nothing in official news reports so much as suggested the effective ban on K-9 after-school tutoring that would be unveiled two months later.

In the days following the meeting, various news outlets continued to speculate on the contents of the Double Reduction Regulations and what, if any, impact they would have on the after-school tutoring industry. For example, some media outlets reported that a district education committee planned to ban after-school tutoring institutions from offering classes during "winter and summer vacations" or "engag[ing] in advertising," among other things. (AC ¶ 94.) Other reports speculated that there would be "bans on online courses for kids six years old or younger," "restrictions on homework and mandatory licensing for all teachers," or "a moratorium on weekend classes." (Ex. G, Beijing's Concerns About Overworked Students Upend the Plans of China's Edtech Startups, Fortune, at 2 (May 31, 2021, 3:52 AM).)

6.     **The Double Reduction Regulations, When Disclosed, Shock the Entire Chinese After-School Tutoring Industry**

On July 23, 2021, the day before the official release of the Double Reductions Regulations, Chinese and English media outlets began to report on "an unverified document" that "appeared to be an official communication detailing new, tougher guidelines for the sector" and potentially a ban on "for profit [tutoring] in core school subjects." (AC ¶¶ 125-28.) As the government had yet to publish the official Regulations and did not confirm the apparent leak, Gaotu accurately disclosed that "[t]he regulations have not been published, and the Company has not received official notification of the regulations," and further noted that "[i]t is the Company's policy not to comment on market speculations." (*Id.* ¶ 168.)

Following widespread reports of the "unverified document" purportedly contemplating a comprehensive ban on the private tutoring industry (*id.* ¶ 125), "all Chinese tutoring companies' shares tanked." (*Id.* ¶ 126.) Gaotu was no exception. That day, its ADS price closed at $3.52 per share, down from $9.58 from the prior day. (*Id.* ¶ 129.)

On July 24, 2021, more than two months after Double Reduction Regulations were adopted, Chinese authorities finally published their full contents. (*Id.* ¶ 91.) The Regulations, for the first time, required that "existing after-school tutoring institutions providing tutoring services on academic subjects for K-9 Education . . . be registered as non-profit[] [institutions]" and prohibited those institutions from "raising funds by listing on stock markets or conducting any capitalization activities," among other draconian restrictions. (*Id.* ¶¶ 68-69.) Commentators called the Regulations a "death knell" to the entire after-school education industry in China. (*Id.* ¶ 71.)

On July 24, 2021, shortly after the Double Reduction Regulations were officially released, the Company promptly issued a Press Release discussing the key requirements of the Regulations in detail, and warned of the material adverse impact on its business:

10

The Company will continue to comply with all applicable rules and regulations in providing educational services, including those rules and regulations to be adopted following the policy directives of the Opinion. The Company is carefully considering the provisions of the Opinion and assessing their implications for the Company's business. The Company expects the Opinion, related rules and regulations, and the compliance measures to be taken by the Company *will have material adverse impact on its after-school tutoring services related to academic subjects in China's compulsory education system, which in turn may adversely affect the Company's results of operations and prospect*. The Company will proactively seek guidance from and cooperate with government authorities in connection with its efforts to comply with the Opinion and any related rules and regulations.

(Ex. H, July 24 Press Release at 4-6.)

The release of the Double Reduction Regulations caused "all Chinese education stocks on the U.S. market [to] tumble[]." (AC ¶ 72.) On July 26, 2021, the next day of trading after the official release of the Regulations, Gaotu's ADS price closed at $2.50, down from closing price of $3.52 on the last day of trading. (Ex. I, Historical Share Prices.)

Shortly thereafter, shareholders of all U.S.-listed Chinese education companies began to file putative securities class actions based on the companies' alleged failure to predict this unprecedented industry-wide ban. All such cases that have reached a decision on the pleadings have since been dismissed. *See generally Banerjee v. Zhangmen Educ. Inc*., No. 21-CV-9634 (JPO), 2023 WL 2711279, at *10 (S.D.N.Y. Mar. 30, 2023) (dismissing securities complaint as plaintiffs failed to allege Chinese education company knew the "timing and form of [Double Reduction] regulations"); *Haping v. 17 Educ. & Tech. Grp. Inc*., 1:22-CV-09843 (LAK) (SDA), 2023 WL 8716895, at *11 (S.D.N.Y. July 20, 2023) (recommending dismissal because "the relevant risk (*i.e.*, regulatory changes) had not yet occurred at the time of the IPO"), *report and recommendation adopted*, No. 22-cv-9843, slip op. at 1 (S.D.N.Y. Nov. 8, 2023); *Dagan Invs., LLC, v. First High-School Educ. Grp. Co. Ltd., et al.*, No. 22-CV-3831 (JGK), 2023 WL 8452223, at *3 (S.D.N.Y. Dec. 6, 2023) ("defendants cannot be liable for failing to predict with certitude

what changes Chinese lawmakers would make to the relevant regulations").  This Action is based on the same flawed theory that has been uniformly rejected in this Circuit.

## ARGUMENT

To state a claim under Section 10(b), Plaintiffs must allege, among other things: (1) a material misstatement or omission; (2) scienter; and (3) loss causation.  *See Singh v. Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019).  Plaintiffs' claims are subject to heightened pleading requirements under Rule 9(b) and the PSLRA, which require that the Complaint plead the circumstances constituting the fraud with particularity.  *ATSI*, 493 F.3d at 99.  "[P]articularity means the who, what, when, where, and how: the first paragraph of any newspaper story."  *In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 567 (S.D.N.Y. 2007).

## I.   PLAINTIFFS FAIL TO PLEAD A MATERIAL MISREPRESENTATION

### A.   None of the Challenged Statements Was False or Misleading

Plaintiffs allege that six statements made between March 5, 2021 and July 23, 2021, materially misrepresented the impact of the as-yet-unannounced Double Reduction Regulations. (AC ¶¶ 143-69.)  Plaintiffs fail to plead that any of these statements was false or misleading.

"It is well established that . . . '[c]ompanies subject to government regulation are not required to speculate or foresee coming regulation or its potential effect on the company.'"  *Banerjee*, 2023 WL 2711279, at *9 (quoting *Kwalbrun v. Glenayre Techs., Inc*., 201 F.3d 431, 431 (2d Cir. 1999)); *see Garnett v. RLX Tech. Inc*., 632 F. Supp. 3d 574, 604 (S.D.N.Y. 2022) (similar), *aff'd sub nom. Tseng v. De Vries*, No. 22-2787-CV, 2023 WL 8073087 (2d Cir. Nov. 21, 2023); *Dagan*, 2023 WL 8452223, at *3.

Here, four of the six challenged statements were made ***before*** the Double Reduction Regulations were ***even passed*** on May 21, 2021.  (AC ¶¶ 67, 143-48.)  Specifically, Plaintiffs challenge two statements made on March 5, 2021 (***more than two months before*** the Regulations

were passed) and two on April 26, 2021 (*one month before* they were passed).  (*Id.*)  Because the Company could not, and had no duty to, predict or disclose Regulations that had not even been passed at the time, Plaintiffs cannot state a claim on the basis of these statements.

Plaintiffs argue that the March 5, 2021 statements were nonetheless misleading because various Chinese authorities had already begun to call for "implement[ing] tighter control over the after-school tutoring industry" at the March 2021 Two Sessions meeting.  (AC ¶ 145.)  But as the Complaint itself alleges, the calls for stricter control over the after-school tutoring industry did not take place until President Xi Jinping's comments on March 6, 2021—a day *after* these challenged statements were made.  (AC ¶¶ 86-88.)  Such "fraud by hindsight" allegations are plainly insufficient to state a claim.  *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000).  In any event, the Complaint also *admits* that these comments were widely reported in the media, in both English and Chinese.  (AC ¶¶ 86-88 (referencing English news articles including Caixin Global); *see id.* ¶ 82 (alleging Caixin Global is "the English version of . . . one of China's most dogged investigative journalism outlets and best-known business publications"); Ex. E, Mar. 11, 2021 *South China Morning Post* Article.)  Indeed, several other courts have held that widespread reporting of these precise public comments forecloses a securities law claim based on the alleged omission of the as-yet-unannounced Double Reduction Regulations, because "[w]here allegedly undisclosed material information is in fact readily accessible in the public domain, the Second Circuit has found that a defendant may not be held liable for failing to disclose this information."  *Haping*, 2023 WL 8716895, at *11; *see Banerjee*, 2023 WL 2711279, at *9 ("[T]he securities laws do not require disclosure of information that is publicly known."); *Dagan*, 2023 WL 8452223, at *5 (dismissing securities claims based on omission of forthcoming Double Reduction Regulations because "the

information that the plaintiffs contend was omitted . . . was, in fact, readily accessible in the public domain," including news articles explicitly cited in the complaint from March 2021).

Plaintiffs also argue that the April 26, 2021 statements were misleading as Defendants "possessed specific nonpublic information about the forthcoming Double Reduction Regulation[s'] detrimental impact on the after-school tutoring sector" (AC ¶¶ 146-49), as evidenced by the alleged sale of Gaotu shares through Irefresh Future Limited ("Irefresh"), "a British Virgin Island shell company holding shares for Gaotu's employees upon their exercise of options granted under the Share Incentive Plan" (*id.* ¶ 107). But the Complaint itself undermines any inference that these sales—which were publicly disclosed—were based on any undisclosed knowledge of the Regulations (which were ***not even adopted until a month later*** on May 21, 2021). For starters, as explained above, the Complaint alleges that by early March 2021, the public was already aware of the possibility of an impending "regulatory storm" that "might be more severe than ever." (*Id.* ¶ 89; *see id.* ¶¶ 86-88.) Indeed, Plaintiffs ***admit*** that "three prominent investment firms" not alleged to be controlled by any Defendant similarly "sold most or all of their holdings" in Chinese after-school tutoring companies "during the first quarter of 2021." (*Id.* ¶ 97.) These undisputed facts undermine Plaintiffs' conclusory assertion that Irefresh's sales show Defendants' prior knowledge of the comprehensive ban. *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995). Because the Complaint itself makes clear that the market was aware of the possibility that stricter regulations would soon be handed down, Plaintiffs' reference to a November 6, 2021 *Financial Times* article claiming that "one person close to [Gaotu] said its leaders were aware at the time of the trade that Beijing was considering stricter regulations on the industry" adds nothing. (AC ¶ 137-138.) Moreover, the Complaint alleges nothing about the

*Financial Times*' anonymous source, let alone the requisite particularized facts showing the source was in a position to know what information Gaotu's leaders had.  *See Novak*, 216 F.3d at 314.

Plaintiffs also fail to show that the remaining two challenged statements on May 26, 2021 and July 23, 2021 were false or misleading.  At Gaotu's May 26, 2021 Q1 2021 earnings call, Defendants acknowledged the passage of the Double Reduction Regulations (which was publicly reported (AC ¶ 67)) and openly stated that although "we haven't received the specific account yet," they remained "optimistic about the future of online education" and would "immediately take measures to comply" and "proactively embrace the policy" "[o]nce the opinion is published" (*id.* ¶ 164).  The July 23, 2021 statement published after the alleged leak of the Double Reduction Regulation's contents in the Western and Chinese media, merely stated that "[t]he regulations have not been published, and the Company has not received official notification of the regulations." (AC ¶ 168.)  Plaintiffs fail to plead that either statement was inaccurate.

Similarly, the Complaint itself undermines Plaintiffs' conclusory assertions that Defendants "possessed knowledge of the 'specific contents'" of the Double Reduction Regulations prior to their official release on July 24, 2021.  (AC ¶ 165; *see id.* ¶¶ 164-69.)  Plaintiffs argue that this claim is supported by "numerous and compelling indicia" (*id.* ¶ 165), including allegations of layoffs and the cessation of "all its information flow and live streaming business operations" in May 2021, as reported in a Chinese online source called "36Kr" (*id.* ¶ 114).  But once again, Plaintiffs fail to plead any requisite particulars "to support the probability" that this obscure online publication or its unidentified sources "would possess the information alleged."  *Novak*, 216 F.3d at 314.  Moreover, these conclusory claims are directly contradicted by "more specific allegations of the complaint."  *Hirsch*, 72 F.3d at 1092.  Plaintiffs cite a former employee 1 ("FE1"), who allegedly was a "city manager" at a local Gaotu subsidiary "from May 2021 to July 2021," where

he "was responsible for sales [], ***building up marketing team personnel*** . . . ***creating a new-media matrix, and attracting traffic*** through Gaotu's official" social media accounts, including "***live streaming***." (AC ¶ 119.) Not only do these allegations contradict Plaintiffs' claim that Gaotu ceased live streaming operations and implemented widespread layoffs in May 2021, but the fact that FE1 was hired to carry out these precise activities ***beginning*** in May 2021 undermines any inference that Gaotu knew these activities would soon be banned under the as-yet-unpublished Double Reduction Regulations.[4]

Plaintiffs also point to other alleged business changes, including "[d]iscontinuing the acquisition of traffic from online social platforms" after Q2 2021, "[s]hifting focus toward non-after-school tutoring business through Gaotu Online and a revised Gaotu app" in late May 2021, and "[e]xpanding the registered business scope beyond after-school tutoring" on July 16, 2021. (AC ¶¶ 115-17, 166, 169.) But again, these alleged business changes occurred long after the market generally had become aware of the risk of an impending "regulatory storm" and are consistent with actions taken by numerous other industry actors not affiliated with Gaotu to hedge against that risk. Indeed, Plaintiffs themselves allege that as early as March 31, 2021, lobbying groups began to publicly advise online after-school tutoring companies "to proactively transform their business models and extend services to other segments."[5] (AC ¶ 89.) Plaintiffs also ***admit*** that "other major after-school tutoring institutions . . . ***all*** either la[id] off employees or engag[ed]

---

[4]    Nor are FE1's allegations inconsistent with Defendant Shen's later statement that Gaotu "stopped acquiring traffic from online social platforms ***since*** the second quarter." (Ex. J, Q2 2021 Earnings Tr. at 6.) Q2 2021 ended on June 30, 2021—***two months after*** FE1 started in this position. Plaintiffs' vague allegation that "FE 2 states that the massive layoff in May 2021 'was in response to the national Double Reduction policy'" (AC ¶ 121) is unsupported by particularized facts "to support the probability" that FE2 "would possess the information alleged." *Novak*, 216 F.3d at 314.

[5]    Indeed, the alleged changes to the Gaotu app to cover "professional education services, including language training, college entrance exams, finance, public service exams, teacher certification, study abroad, management, healthcare, and more" (AC ¶ 117) were completely in line with Gaotu's pre-existing business as of December 2020, ***several months before*** the possibility of stricter regulations were even announced (*see* Ex. B at 38, 41).

in frequent high-level meetings to undertake substantial organizational restructuring," and "broadened their scope of registered business to include services unrelated to K-12 academic subject tutoring." (AC ¶¶ 114, 118.) Because the Complaint itself shows that the market generally was encouraging companies to re-assess their business model in the face of widely reported *speculation* over stricter regulations, their conclusory claim that Defendants *knew* of the Regulations' contents at the time of these statements fail. Nor is this claim supported by Gaotu's closure of "67% of operating centers" and layoffs "of over 10,000 employees" *after* the release of the Regulations. (AC ¶¶ 166, 169.) Plaintiffs' claim that implementing these decisions quickly would have been "administratively and logistically implausible" is wholly conclusory. (AC ¶ 135.) Because Plaintiffs fail to plead particularized facts demonstrating that Defendants had prior knowledge of the Regulations, they fail to show that any challenged statement was misleading.

Even if Plaintiffs had sufficiently pled Defendants' prior knowledge of the Regulations or their contents (they did not), they would still fail to plead a material misstatement or omission because all of the challenged statements are (i) forward-looking statements (*see* AC ¶¶ 143-44, 146-48, 164) protected by the PSLRA's safe harbor provision, 15 U.S.C. § 78u-5(c)(1)(A)(i); (ii) inactionable puffery (AC ¶ 143 ("We are confident that we will continue to excel")), *see In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 757 (S.D.N.Y. 2018) (statement that company is "confident about and prepared for what lays ahead" is puffery); or (iii) opinions on what Gaotu "believe[s]," (AC ¶¶ 144, 164), which Plaintiffs fail to show were both false and not honestly held when made, *see Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189 (2015).

### B.      The Company Fully and Accurately Disclosed the Relevant Risks

"Even at the pleading stage, dismissal is appropriate where the complaint is premised on the nondisclosure of information that was actually disclosed."  *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003).  Thus, to the extent Plaintiffs claim Gaotu omitted a material risk, dismissal is warranted because the Complaint *admits* Gaotu disclosed the risk of regulatory uncertainty.  Specifically, in addition to disclosing the existing regulations applicable to its business (Ex. C at 115-134; Ex. B at 8-9), it warned that:

> ***Uncertainties exist in relation to new legislation or proposed changes in the PRC regulatory requirements regarding online private education, which may materially and adversely affect our business, financial condition and results of operations.*** The private education industry in the PRC is subject to regulations in various aspects. Relevant rules and regulations are relatively new and evolving and could be changed to accommodate the development of the education, in particular, the online private education, markets from time to time.  (Ex. B at 8; *see* AC ¶ 146.)

In fact, although Gaotu could not have predicted the effective ban on private K-9 after-school tutoring, Gaotu repeatedly warned that such regulatory uncertainties could have not only a significant, but "potentially fatal, impact on its business."  (AC ¶ 3.)  The Company also warned that "the interpretation and application of the existing laws and regulations and the newly promulgated implementation rules and interpretations, if any, that govern[] the online private education industry *would create substantial uncertainties regarding the legality of our business operation*."  (Ex. B at 9; Ex. D at 9.)  Therefore, "*[t]here is no assurance that we can comply with any promulgated laws and regulations in a timely manner or at all*, and any failure to comply may subject us to fines, penalties, rectifications and other regulatory measures, and may in turn materially and adversely affect our business, financial condition and results of operations."  (Ex. B at 9; *see also* Ex. D at 8.)

This case is thus on all fours with other putative securities class actions brought against similarly situated Chinese private after-school tutoring companies.  Of the cases that have reached a decision on the pleadings, every one of them has been dismissed.  For example, in *Haping*, the court held that nearly identical disclosures—that "[t]here is no assurance that we can comply with any newly promulgated laws and regulations in a timely manner or at all"—supported dismissal, as "[t]hese statements fairly alerted investors to the prospect that heightened regulation could be undertaken and the attendant risks."  2023 WL 8716895, at *10; *see Banerjee*, 2023 WL 2711279, at *8 ("Precautionary statements render any allegedly misleading omission immaterial as a matter of law, and so are appropriate as reasons for dismissal at the motion to dismiss stage, when, considered in the context of the materials as a whole, the precautionary statements were sufficient such that it could not be supposed by a reasonable investor that the future is settled, or unattended by contingency.")  Indeed, the case for dismissal is even stronger where, as here, the Company went so far as to warn that the highly uncertain regulatory risks could call into question "***the legality of [its] business operation***."  (Ex. B at 9.)  *See Garnett*, 632 F. Supp. 3d at 602 ("These warnings, which went so far as to warn of the possible future prohibition upon e-cigarette sales, were sufficient to pick up the regulatory risk that later materialized: that China would decide to calibrate regulation of e-cigarettes to track its regulation of tobacco products.").

Because Defendants disclosed the relevant risks, including the potentially existential and "fatal" (AC ¶ 3) risk that uncertain regulatory changes posed to its business, Plaintiffs fail to plead that the Company had a duty to disclose anything further under Item 105 of Regulation S-K or Item 5(D) of Form 20-F (*id.* ¶¶ 151-63).  Plaintiffs' assertion that the risk disclosures failed to "apprise the investing public of the specific known risk resulting from the forthcoming Double

Reduction Regulations" fails, as it is undisputed that the Regulations had not even **passed** at the time these risk disclosures were made in the April 26, 2021 Annual Report.  (AC ¶ 147, 149.)

## II.    PLAINTIFFS FAIL TO ALLEGE A STRONG INFERENCE OF SCIENTER

The Complaint should be dismissed for the separate and independent reason that Plaintiffs fail to adequately plead "with particularity facts giving rise to a strong inference" that Defendants acted with scienter, *i.e.*, "an intent 'to deceive, manipulate, or defraud.'"  *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JPMorgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)).  The inference "must be 'more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'"  *Id.*  Scienter can be pled either by showing "(1) that the defendants had both motive and opportunity to commit the fraud" or "(2) strong circumstantial evidence of conscious misbehavior or recklessness."  *Golla v. Neovasc, Inc.*, No. 22-361-CV, 2023 WL 2469770, at *2 (2d Cir. Mar. 13, 2023).  Plaintiffs fail to allege either.

### A.    Plaintiffs Fail To Plead Motive and Opportunity To Commit Fraud

To plead "motive and opportunity," Plaintiff must allege that Defendants "benefitted in some concrete and personal way from the purported fraud."  *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 586 (S.D.N.Y. 2011).  Plaintiffs argue that "by denying knowledge of the Double Reduction Regulations[] and asserting that any forthcoming regulation would benefit Gaotu, Gaotu and its executive[s] bought time to: (1) implement measures at the Company to mitigate the impact of the Double Reduction Regulation[s], and (2) dispose of their holdings of Gaotu stock."  (AC ¶ 81.)

Plaintiffs' allegations regarding the sale of Gaotu shares by Irefresh as disclosed on March 9, 2021 are insufficient to show motive.  (*Id.* ¶¶ 107-08)  "For insider sales to raise an inference of improper motive, they must be 'suspicious' or 'unusual.'"  *Keyspan*, 383 F. Supp. 2d at 381. Plaintiffs allege that the disclosure of these proposed sales was made on "the same day" that a

Gaotu spokesperson said that the Company "was expecting sales and marketing spending to decrease in response to increased 'government . . . concerns on unhealthy marketing campaigns,'" resulting in a **decline** in Gaotu's share price.  (AC ¶ 108.)  They further allege that "[t]his trade occurred at a time when national delegates were expressing their strongest concerns about the after-school tutoring industry during the annual Two Sessions meetings." (*Id.* ¶ 109.)  Plaintiffs' own allegations undermine an inference of scienter, as they demonstrate that the sales were made "well after numerous public disclosures concerning the" potential for adverse regulatory action, and thus "cannot logically be attributed to defendants' desire to take advantage of any market deception about these issues." *Keyspan*, 383 F. Supp. 2d at 384.  Indeed, the trades simply could not have been made on the basis of insider knowledge of the contents of the Double Reduction Regulations as Plaintiffs claim, because the Regulations themselves were not even approved until **two months later**. *See Woolgar v. Kingstone Cos.*, 477 F. Supp. 3d 193, 235 (S.D.N.Y. 2020) ("[S]tock sales are not indicative of scienter when they are 'more than two months before the announcement' in question.").

Moreover, Plaintiffs do not even allege that any Individual Defendant's shares were sold by Irefresh.  They allege only that Irefresh "h[eld] shares for Gaotu's *employees* upon their exercise of options granted under the Share Incentive Plan."  (AC ¶ 107.)  Although Plaintiffs allege that Defendant Shen was one of the members of the executive advisory committee that "controlled" Irefresh as of February 2021, the Complaint does not allege that Defendant Shen or any other Individual Defendant traded any of their own shares or benefited from Irefresh's trading decision. (*Id.*)  In fact, Plaintiffs **admit** there are no records demonstrating that Individual Defendants sold any shares at all during the Class Period.  (*Id.* ¶ 109.)  Their vague assertions that "[i]t is highly likely that Gaotu executives also sold significant amounts of shares that were not publicly reported"

and that other non-parties must have sold their shares at unknown times between 2020 and 2021 are wholly conclusory, and serve only to highlight their inability to plead motive on the basis of particularized allegations regarding insider trades.  (*Id.* ¶¶ 110-11.)  *See Town of Davie Police Officers Ret. Sys. v. City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan,* No. 21-909-cv, 2021 WL 5142702, at *2 (2d Cir. Nov. 5, 2021) (no motive where plaintiff-appellants did not allege that any individual defendant sold shares).  And again, Plaintiffs' assertion that Irefresh trades support fraud is further undermined by their allegation that other "prominent investment firms" not alleged to be controlled by any Defendant also "sold most or all of their holdings" in Chinese after-school tutoring companies "during the first quarter of 2021."  (AC ¶ 97.)

Similarly, Plaintiffs' allegations of changes to Gaotu's business—many of which, as shown above, *supra* Section I.A, are not sufficiently particularized to support their claim of securities fraud—also do not support an inference that the Company was acting on nonpublic information.  (AC ¶¶ 113-17.)  Rather, the Complaint **admits** that "[n]ot coincidentally . . . many other leading after-school tutoring institutions . . . similarly broadened their scope of registered business" (*id.* ¶ 118) and "all either la[id] off employees or engag[ed] in frequent high-level meetings to undertake substantial organizational restructuring" (*id.* ¶ 114).  These facts, alleged in the Complaint itself, clearly support the more cogent and compelling inference that the trades and business changes were made to hedge risks, in reaction to general speculation over the potential impact of the Double Reduction Regulations, as opposed to nonpublic information concealed by Gaotu.

**B.      Plaintiffs Fail To Plead Conscious Misbehavior or Recklessness**

Because Plaintiffs fail to establish motive, "the strength of the circumstantial allegations must be correspondingly greater."  *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001).  Plaintiffs must plead conduct that "at the least . . . is highly unreasonable and which represents an extreme

departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Bd. of Trs. of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 869 (S.D.N.Y. 2011) (alteration in original), *aff'd sub nom. Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012). This requires allegations that Defendants had "knowledge of facts or access to information contradicting their public statements." *Kalnit,* 264 F.3d at 142. "[W]here plaintiffs contend defendants had access to contrary facts, they must *specifically identify* the reports or statements containing this information." *Mechel OAO,* 811 F. Supp. 2d at 869. Plaintiffs' vague allegations fall far short of this standard.

Plaintiffs do not allege any specific meeting, report, or even a particular moment in time when Defendants learned of the Double Reduction Regulations and their comprehensive ban on private K-9 after-school tutoring. Instead, Plaintiffs allege various unparticularized "indicia" of knowledge (AC ¶ 165), which is plainly insufficient to plead scienter. Plaintiffs allege that Chinese officials had "widespread discussions in various levels of Chinese society" at unknown times with "principals, teachers, parents, experts, and representatives from tutoring institutions," and that Gaotu therefore "was aware" of the ban by virtue of being "one of the most prominent and profitable companies in the industry." (*Id.* ¶ 82.) This conclusory assertion plainly lacks the requisite particularized facts necessary to support their Section 10(b) claim. So, too, does Plaintiffs' vague reference to an "anonymous consultation channel" with Beijing educational authorities, which they do not even allege Gaotu used during the Class Period. (*Id.* ¶ 105.)

Plaintiffs also point to a May 7, 2021 meeting between several after-school tutoring companies, including Gaotu, and Beijing's Party Secretary, where he allegedly "issued directives regarding the Double Reduction initiative." (AC ¶ 90.) But Plaintiffs do not allege what these

alleged "directives" were.  Nor do they allege that the contents of the eventual Double Reduction Regulations—which had not even been adopted yet—were discussed.  (*Id.*)  To the contrary, the official reports of this meeting (which Plaintiffs cite) show that the Party Secretary acknowledged the industry's critical "role in meeting diverse educational needs" and emphasized the need to strengthen existing restrictions, such as those controlling teacher qualifications and curriculum. (Ex. F, May 7, 2021 Meeting Article at 1.)  Such comments would make no sense if everyone at the meeting knew the government was going to ban the industry entirely.

Plaintiffs' other vague allegations about alleged transmittals of the "spirit" or "minutes" of the Regulations to unspecified "after-school tutoring companies" likewise fail, as they do not even mention the comprehensive ban or specify whether Gaotu received these alleged communications. (*See* AC ¶¶ 92, 94-95.)  Similarly, apart from conclusory assertions regarding the profitability of Gaotu (*see id.* ¶ 103), Plaintiffs allege no facts showing Gaotu saw (or should have seen) unverified leaks, including the alleged webpage containing the "exact title of the article that the Chinese government media officially publicized on July 24, 2021"—which, in any event, Plaintiffs do not allege disclosed the comprehensive ban or the contents of the Regulations (*id.* ¶¶ 98-101).

Moreover, none of Plaintiffs' FEs alleges that ***any*** Individual Defendant specifically knew of the comprehensive ban or saw the Double Reduction Regulations prior to July 24, 2021.  (AC ¶¶ 119-22.)  *See Glaser*, 772 F. Supp. 2d at 589-90.  FE2's speculative claim that he "suppose[s] most [] employee[s] including senior management were aware of the general situation of this policy" (AC ¶ 98) is so speculative and "so vague as to be meaningless," as it does not even specify who possessed such knowledge, how they knew of it, or even what specifically was known.  *Glaser*, 772 F. Supp. 2d at 590.  The more cogent and compelling inference is that, although rumors circulated regarding the contents of the Double Reduction Regulations in the preceding months,

24

weeks, and days, Defendants did not learn of the official contents, let alone their impact, until the Regulations' official release on July 24, 2021.

## III.    PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION

Finally, Plaintiffs' claims also fail because there is no causal link between any of the alleged misstatements and any purported loss.  The securities laws protect investors only "against those economic losses that misrepresentations actually cause." *Dura Pharms.*, *Inc. v. Broudo,* 544 U.S. 336, 345 (2005).  In other words, the misstatement or omission must have "concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).  Moreover, "when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, . . . a plaintiff's claim fails when it has not adequately ple[]d facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events." *Id.* at 174.

Here, Plaintiffs admit their losses were not caused by the revelation of any fact or risk concealed by Gaotu, but instead by "widespread reporting about the highly restrictive 'Double Reduction Regulation[s]' after the Chinese government officially published it on July 24, 2021" (AC ¶ 174)—*i.e.*, a market-wide development that "immediately decimated the operations of every academic tutoring business" (Pls. Pre-Mot. Letter, ECF No. 33 at 1) and caused "all Chinese tutoring companies' shares [to] tank[]" (AC ¶ 126, *see also id.* ¶ 72).  Such new and industry-wide events cannot be used to allege loss causation.[6]  *See Lentell*, 396 F.3d at 174.

## CONCLUSION

For the foregoing separate and independent reasons, the Amended Complaint should be dismissed in its entirety with prejudice.

---

[6]    Because Plaintiffs fail to state a claim under Section 10(b), their control person claim under Section 20(a) necessarily fails.  *ATSI*, 493 F.3d at 108.

Dated: New York, New York
　　　　March 22, 2024

Respectfully submitted,

/s/ Robert A. Fumerton
SKADDEN, ARPS, SLATE,
　MEAGHER & FLOM LLP
Scott D. Musoff
Robert A. Fumerton
Michael C. Griffin
Judith A. Flumenbaum
One Manhattan West
New York, New York 10001
Phone: (212) 735-3000
Fax:　 (212) 735-2000
scott.musoff@skadden.com
robert.fumerton@skadden.com
michael.griffin@skadden.com
judy.flumenbaum@skadden.com

*Counsel for Defendant Gaotu Techedu Inc.*