# Exhibit A

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSHUA ZHANG, Individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>GAOTU TECHEDU INC. F/K/A GSX TECHEDU INC., XIANGDONG CHEN and NAN SHEN,<br><br>        Defendants. | Case No: 1:22-cv-07966-PKC-CLP<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiff TCP Diversified Technology Fund and additional named plaintiff Jun Ye ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their amended complaint against Defendants Gaotu Techedu Inc. f/k/a GSX Techedu Inc. ("Gaotu" or the "Company"), [1] Xiangdong Chen, and Nan Shen ("Defendants"), allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on the investigation they conducted by and through their attorneys, which included, among other things, a review and analysis of: (i) Gaotu's public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) Gaotu's public filings with Chinese regulatory agencies and their local provincial offices; (iii) public reports and news articles; (iv) transcripts of Gaotu's conference calls; (v) interviews with former Gaotu employees and third-party witnesses; and (vi) other publicly-available material and data identified herein. Plaintiffs' investigation is continuing, and many of the facts supporting the allegations contained herein are known only to Defendants or are

---

[1] Gaotu was known as GSX Techedu Inc. prior to June 4, 2021.

exclusively within their control or custody. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly-traded Gaotu American Depository Shares ("ADSs") between March 5, 2021 and July 23, 2021, inclusive (the "Class Period"). Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      On July 24, 2021, the Chinese government officially published the highly restrictive "Double Reduction Regulation," which essentially shuttered the for-profit after-school academic subject tutoring industry for K-9 Education. Months prior to the publication, Gaotu, one of China's leading for-profit after-school tutoring companies, had acquired nonpublic information about the impending Double Reduction Regulation and knew the devastating impact it would have on the Company.  Nevertheless, during the Class Period Gaotu and its executives repeatedly denied any such knowledge and instead falsely assuaged investors that forthcoming regulations would *benefit* Gaotu.

3.      While Gaotu was presenting a deceptively optimistic view of the forthcoming regulation to the public despite knowing that the regulation would have a significant, potentially fatal, impact on its business, Gaotu secretly initiated measures to mitigate these expected devastating consequences before the regulation's official release to the general public. The actions that Gaotu took included, among other things, a workforce reduction of 30%, the closure of 67% of its operating centers, and a shift in business strategy away from academic subject tutoring to non-academic subjects that fall outside of the scope of the Double Reduction Regulation.

4.      Additionally, unbeknownst to the investing public, Gaotu's executives, including Defendant Shen, exploited an SEC rule governing insider trades and secretly sold a substantial number of Gaotu shares they held through a shell company before the market became aware of the specific contents of the Double Reduction Regulation.

5.      On July 23, 2021, when the market first learned about the specific prohibitions imposed by the Double Reduction Regulation, the price of Gaotu's ADSs experienced a sharp decline of 63%. Following the official publication of the Double Reduction Regulation on July 24, 2021, Gaotu's ADSs further plummeted by an additional 29% on the subsequent trading day. As a consequence of the Defendants' failure to disclose material information pertaining to the Double Reduction and its associated impact on Gaotu's operations, Class Period investors incurred significant losses.

## JURISDICTION AND VENUE

6.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

8.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

9.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of

interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

10.     Plaintiff TCP Diversified Technology Fund purchased Gaotu ADS during the Class Period at artificially inflated prices and suffered damages. Its PSLRA certification has been previously filed with the Court and is incorporated by reference herein. (Dkt. No. 7-1.)

11.     Named plaintiff Jun Ye purchased Gaotu ADS during the Class Period at artificially inflated prices and suffered damages. His PSLRA certification has been previously filed with the Court and is incorporated by reference herein. (Dkt. No. 12-2.)

12.     Defendant Gaotu is an education company that provides online after-school tutoring services in the People's Republic of China. Gaotu is incorporated in the Cayman Islands and maintains its headquarters in Beijing. Gaotu ADSs were listed on the New York Stock Exchange ("NYSE") under ticker symbol GSX before June 4, 2021 and GOTU thereafter.

13.     Defendant Xiangdong Chen ("Chen") is and was at all pertinent times Chairman of Gaotu's Board of Directors and the Company's Chief Executive Officer.

14.     Defendant Nan Shen ("Shen") is and was at all pertinent times the Chief Financial Officer of Gaotu.

15.     Defendants Chen and Shen are sometimes referred to herein as the "Individual Defendants."

16.     The Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

4

      (c)      was privy to confidential proprietary information concerning the Company

            and its business and operations;

      (d)      was directly or indirectly involved in drafting, producing, reviewing and/or

            disseminating the false and misleading statements and information alleged

            herein;

      (f)      was aware of or recklessly disregarded the fact that the false and misleading

            statements were being issued concerning the Company; and/or

      (g)      approved or ratified these statements in violation of the federal securities

            laws.

17. The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

18. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

19. The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

**SUBSTANTIVE ALLEGATIONS**

**I.**    **The Intensely Competitive Chinese Education System Led to the Rapid Growth of the After-School Tutoring Industry.**

20. In the People's Republic of China ("China"), the Ministry of Education oversees the public education system and plays a central role in managing education throughout the country. Under Chinese law, all Chinese citizens are required to attend school for a minimum of nine years, which is commonly referred to as the nine-year compulsory education ("K-9 Education"), funded

by the Chinese government and provided free of charge. Compulsory education in China encompasses six years of elementary school, typically commencing at the age of six and concluding at the age of twelve. Following elementary school, students progress to three years of middle school, typically beginning at the age of twelve and concluding at the age of fifteen.

21.     Upon graduating from middle school, students who wish to pursue further education are required to undergo a demanding high school admission examination known as the "Zhongkao." Depending on their performance in the Zhongkao, middle school graduates have several options:

>   (a)     Continue their education at an academic high school for up to three years ("Grades 10-12 Education", and together with K-9 Education as "K-12 Education").
>
>   (b)     Enroll in a vocational high school to receive vocational training, which can vary in length from two to four years.
>
>   (c)     Conclude their formal schooling at this stage.

22.     Between 2015 and 2019, approximately 56% to 58% of middle school graduates in China secured placements in academic high schools following the Zhongkao examination.

23.     The higher the score a middle school graduate achieves in the Zhongkao examination, the greater their likelihood of gaining admission to a more prestigious local high school with better quality education. Superior academic performance at the high school level, in turn, increases a student's chance of success in the Nationwide Unified Examination for Admissions to General Universities and Colleges, commonly known as the "Gaokao."[2]

---

[2] Chen Zhiwen, *5:5 split? Anxious debate on diversion from general employment based on erroneous facts and perceptions* (Mar. 9, 2023) (available at: https://news.eol.cn/zbzl/202303/t20230309_2318925.shtml)

24.     Gaokao, held annually in June and administered by the Ministry of Education, serves as China's national college admission test. Considered the ultimate equalizer for individuals seeking to advance in society, the Gaokao holds special significance in China. This standardized examination offers young people, regardless of their socio-economic backgrounds, a chance to gain admission to prestigious colleges based solely on their personal abilities and achievements, rather than their family connections or social status.

25.     A student's performance in the Gaokao can have profound and transformative effects on their personal and familial circumstances. For a Chinese student from an average or below-average socio-economic background, an exceptional Gaokao score can open the door to the most prestigious universities and coveted career prospects, offering them the chance to fundamentally alter the trajectory of their lives and those of their families.

26.     In 2022, the average monthly income of a recent college graduate from a non-prestigious university, generally referring to universities not included in China's Project 985 and Project 211 initiatives, amounted to RMB 5,724. In contrast, a college graduate from one of China's top 39 universities, known as Project 985 universities, earned RMB 9,088 on average, or nearly 60% higher than the income of non-prestigious college graduates. [3] For example, at BYD, a prominent clean energy automobile manufacturer in China with backing from Warren Buffett's Berkshire Hathaway[4], the sole determinant of a new hire's salary was the university from which the new hire graduated. Graduates with bachelor's or master's degrees in automobile-related

---

[3] https://theinterview.asia/hot-topics/110745/
[4] https://www.forbes.com/sites/russellflannery/2023/07/15/warren-buffett-backed-ev-maker-byd-says-first-half-profit-may-have-more-than-tripled/?sh=7d6427b2430b

majors from Project 985 universities received salaries that were 50-62% higher than those of graduates with the same degrees from non-Project 985/Project 211 universities. [5]

27.    Prior to the Ministry of Education's directive that prohibited job postings from requiring degrees from top universities[6], many employers, especially those known for offering attractive salaries and benefits such as blue-chip companies, government agencies, and state-owned institutions, predominantly recruited graduates exclusively from Project 985 and Project 211 universities. [7]

28.    Gaokao holds such paramount importance in shaping the futures of Chinese students and their families that it is widely perceived as a watershed event in one's life and an obstacle that must be conquered at all costs. Due to the immense number of young individuals taking the Gaokao each year compared to the limited available spots at prestigious colleges, however, the competition has consistently been fierce, often described by Chinese people as akin to "thousands of troops and horses fighting to cross a single-log bridge simultaneously."

29.    In 2019, 10.31 million individuals participated in the Gaokao. [8] Despite 43.9% gaining admission to regular four-year colleges, [9] however, only 5%[10] of test takers secured spots

---

[5] https://new.qq.com/rain/a/20221213A06Z7600
[6] https://www.gov.cn/gzdt/2013-04/17/content_2380233.htm
[7] https://www.sohu.com/a/293894007_176210; https://www.gov.cn/govweb/jrzg/2013-05/04/content_2395667.htm
[8] https://m.thepaper.cn/newsDetail_forward_18483303
[9] https://m.thepaper.cn/rss_newsDetail_8777457?from=
[10]https://weibo.com/1439660697/4522610110672812; https://zhuanlan.zhihu.com/p/166485560

in Project 211 colleges, comprising the top 122 colleges in China. [11], [12], [13] Furthermore, a mere 1.62% of Gaokao examinees managed to gain entry into Project 985 colleges.[14]

30.    In 2020, a total of 10.71 million individuals took the Gaokao examination. [15] Among them, 41.37% gained admission to regular four-year colleges, [16] while 5.2% secured places in Project 211 colleges, [17] and a mere 1.9% were accepted by the prestigious Project 985 colleges. [18]

31.    In 2021, a total of 10.78 million individuals participated in the Gaokao examination.[19] Among these candidates, 41.6% were admitted to regular four-year colleges, 4.75% secured spots in Project 211 colleges[20], and a mere 1.67% were accepted by Project 985 colleges. [21] [22]

32.    Confronted with significant academic and societal pressure, Chinese parents often start their children's preparations for Zhongkao and Gaokao several years in advance. In many instances, this preparation begins as early as preschool, as parents strive to provide their children with every available advantage.

---

[11] http://app.pennonedu.com/index.php?m=content&c=index&a=show&catid=32&id=2282
[12] Both Project 985 and Project 211 have been discontinued following China's 2015 initiative known as the "Double First-Class University Plan." However, Chinese students and parents continue to use the terms Project 985 and Project 211 to refer to the most prestigious universities.
[13]
http://www.moe.gov.cn/jyb_hygq/hygq_zczx/moe_1346/moe_1366/201911/t20191128_409940.html
[14] https://weibo.com/1439660697/4522610110672812; https://zhuanlan.zhihu.com/p/166485560
[15] https://m.thepaper.cn/newsDetail_forward_18483303
[16] https://www.jiemodui.com/N/132320.html
[17] https://www.sohu.com/a/434758401_120387155
[18] https://www.sohu.com/a/434758401_120387155
[19] https://m.thepaper.cn/newsDetail_forward_18483303
[20] https://new.qq.com/rain/a/20211112A0EFJ700
[21] https://new.qq.com/rain/a/20211112A0EFJ700
[22] https://www.toutiao.com/article/7114900103290241574/

33. In response to this demand, after-school tutoring institutions, colloquially known as "cram schools," experienced remarkable growth. In 2011, around 8,700 after-school tutoring institutions were established. [23] In 2020, approximately 84,000 such institutions emerged. [24] The Covid-19 pandemic, which led to the closure of public schools, accelerated the expansion of online education in China. [25] By May 2021, there were a staggering 490,000 after-school tutoring institutions across the country. [26] By comparison, in 2021, China only had approximately 278,000 public schools, encompassing all levels from elementary schools to colleges and universities. [27]

34. According to research conducted by China Merchants Bank in 2018, the market value of China's after-school tutoring sector for primary and secondary education had reached RMB 520.5 billion (US $74.3 billion). It was projected that by 2022, the market value of this sector would grow to RMB 768.9 billion (US $109.8 billion). [28] The online tutoring business model was anticipated to be a significant beneficiary of the burgeoning after-school tutoring industry. In a January 15, 2020 research report titled "*A Cinderella Story*" covering Gaotu, UBS estimated that the online after-school tutoring market in China could reach RMB 684 billion (US $100 billion) by 2025, up from RMB 46 billion in 2018.

## II. Gaotu Thrived Amidst The Robust Demand For After-School Tutoring.

35. Capitalizing on the fervor of Chinese parents to secure a brighter future for their children, Gaotu quickly thrived following its founding in 2014. Its Chinese name, which translates

---

[23] https://m.sohu.com/a/472552159_422199/?pvid=000115_3w_a
[24] https://m.sohu.com/a/472552159_422199/?pvid=000115_3w_a
[25] http://english.www.gov.cn/archive/statistics/202102/14/content_WS6028ba06c6d0719374af8d9d.html
[26] https://m.sohu.com/a/472552159_422199/?pvid=000115_3w_a
[27] http://www.moe.gov.cn/jyb_sjzl/sjzl_fztjgb/202209/t20220914_660850.html
[28] https://xueqiu.com/9508834377/131697786

to "high road" or "promising future," encapsulates Gaotu's purported mission. Within just four years, Gaotu evolved into the third-largest online K-12 large-class after-school tutoring service provider in China, as measured by gross billings.

36.     On June 6, 2019, Gaotu achieved a significant milestone by completing its initial public offering on the New York Stock Exchange, offering its ADSs at $10.50 per ADS and raising nearly $208 million from the U.S. capital market.

37.     According to its IPO registration statement, Gaotu used a "large-class dual-teacher system" for its K-12 Education courses. According to Gaotu, in this system, large-class courses accommodated more than 100 students per class, leveraging the advantages of top-tier teaching resources and curriculum design, while delivering standardized education to a broad student base.

38.     Under this dual-teacher system, Gaotu had instructors responsible for each course, conducting live online lectures. These instructors (leading teachers) collaborated with tutors (assistant teachers) based in Gaotu's operational centers throughout China. The tutors, trained in specific subjects and curriculum, focused on enhancing student engagement and improving learning effectiveness. For K-12 courses, Gaotu designated one instructor responsible for delivering lectures to each course, with each course consisting of multiple smaller student groups. Within each group, there was an assigned tutor who provided monitoring, assistance, and closer interactions with students both before, during, and after each lesson.

39.     According to Gaotu's 2020 annual report filed on the Form 20-F ("2020 Form 20-F"), Gaotu's workforce consisted of 1,315 employees in 2018, rising to 6,435 in 2019, and ballooning to 22,570 in 2020, all of whom were located in China. In particular, as of December 31, 2020, Gaotu employed 319 full-time instructors, 73 full-time online exclusively contracted instructors, and 15,291 tutors. Gaotu's full-time employed instructors conducted online courses

11

from the company's Beijing headquarters, while contracted instructors were not required to be present at Gaotu's offices to deliver their lessons.

40.     According to Gaotu's 2020 Form 20-F, the Company offered a range of online after-school tutoring courses covering core academic subjects for all grade levels, from elementary school to high school. These subjects encompassed mathematics, English, Chinese, physics, chemistry, biology, history, geography, and political science. Below is a table listing the after-school tutoring courses Gaotu provided for primary and secondary education as of the time of the company's 2020 Annual Report:

|  | Elementary School | | | | | | Middle School | | | High School | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| Mathematics | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| English | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| Chinese | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| Physics |  |  |  |  |  |  |  | ● | ● | ● | ● | ● |
| Chemistry |  |  |  |  |  |  |  |  |  | ● | ● | ● |
| Biology |  |  |  |  |  |  |  |  |  | ● | ● | ● |
| History |  |  |  |  |  |  |  |  | ● | ● | ● | ● |
| Geography |  |  |  |  |  |  |  |  |  |  | ● | ● |
| Political Science |  |  |  |  |  |  |  |  |  |  |  | ● |

• Refers to courses offered at Gaotu.

41.     Furthermore, Gaotu offered mathematics, Chinese, and English courses tailored for children aged 3 to 8 years old, aiming to facilitate a smoother transition into elementary school education.

42.     In its SEC filings, Gaotu labeled its tutoring services covering children from preschool to high school as "K-12 courses," a terminology chosen to assist U.S. investors in understanding the company's business scope, because K-12 Education in the U.S. broadly corresponds to a combination of preschool education along with primary and secondary education in China.

43.     According to Gaotu's IPO prospectus, the Company provided year-round K-12 after-school tutoring courses organized into four semesters: two school semesters in spring (March

to June) and fall (September to December), and two holiday semesters in the summer school break (July to August) and the winter school break (January to February). During the spring and fall school semesters, Gaotu typically conducted K-12 Education classes on weekends. During the summer and winter semesters, K-12 Education classes were held daily for a continuous period of approximately eight to ten days.

44.     Gaotu's online K-12 academic subject tutoring services brought in the majority of its revenue, accounting for 80.7%, 87.5%, and 91.4% of total revenue in 2019, 2020, and 2021, respectively. [29] In 2020, 92.5% of Gaotu's paid course enrollments were attributed to K-12 Education courses, compared to 89.5% in 2019 and 74.8% in 2018. Specifically, in 2021, K-9 Education academic subject tutoring services constituted approximately half of Gaotu's revenue. [30],[31]

45.     Marketing expenses consistently constituted the most substantial component of Gaotu's total operating expenses, underscoring the pivotal role that marketing played in attracting new customers for Gaotu. Gaotu marketed its courses and its brands across various online and mobile platforms in China. According to UBS's January 15, 2020 research report "*A Cinderella Story*," Gaotu management stated that Gaotu's major customer acquisition channels were social media such as its "WeChat official accounts and feed ads on WeChat moment, TikTok, etc.,"

---

[29] https://www.sec.gov/ix?doc=/Archives/edgar/data/1768259/000095017022006141/gotu-20211231.htm
[30] https://cn.investing.com/analysis/article-200477137
[31] According to the Ministry of Education, academic subjects typically include ethics and rule of law, Chinese language and literature, history, geography, mathematics, foreign languages (including English, Japanese and Russian), physics, chemistry and biology; non-academic subjects include physical education (or sports and health), arts (or music, fine arts), integrated practical activities (including information technology education, labor and technology education).
 http://www.moe.gov.cn/srcsite/A29/202107/t20210730_547807.html

which were the most common media platforms used by Chinese parents to obtain information about after-school tutoring.

46.     In 2019, Gaotu allocated US$195 million, or 53% of its operating expenses, toward marketing on a wide array of channels including online and mobile platforms, offline channels, short reviews, and live streaming. In 2020 amidst intensifying competition among after-school tutoring companies, Gaotu spent an astounding US$688 million on marketing, representing 63% of its operational expenses. Throughout most of the latter half of 2020, Gaotu consistently spent more on advertising than any other China-based education company.[32] According to its 2020 Form 20-F, Gaotu planned to further increase its marketing expenditure "in the foreseeable future" in order to expand its paid course enrollments.

## III.   Widespread Fraud and Onerous Burdens on Chinese Families Compelled the Chinese Government to Ramp Up Regulation on the After-School Tutoring in 2018 and 2019.

### A.   Burdens On Chinese Families Were Becoming Unbearable.

47.     As the number of after-school tutoring companies grew exponentially, Chinese students increasingly devoted more and more hours each week on after-school tutoring classes.

48.     According to Reuters, in 2016, over 75% of Chinese students aged approximately 6 to 18 attended after-school tutoring classes, and there is anecdotal evidence suggesting that this percentage has continued to rise.[33] According to a 2019 study by iMedia Research, during the

---

[32]

https://appgrowing.cn/blog/2020/12/17/2020%E5%B9%B4q4%E6%95%99%E8%82%B2%E8
%A1%8C%E4%B8%9A%E5%B9%BF%E5%91%8A%E6%8A%95%E6%94%BE%E5%88%
86%E6%9E%90%EF%BC%8C%E3%80%8A%E9%A2%98%E6%8B%8D%E6%8B%8D%E3
%80%8B%E4%BD%8D%E5%B1%85%E6%8E%A8%E5%B9%BF/ ;
https://www.27sem.com/article/5498

[33] https://www.reuters.com/world/china/china-bars-for-profit-tutoring-core-school-subjects-document-2021-07-
23/#:~:text=SHANGHAI%2C%20July%2023%20(Reuters),sector%20and%20share%20prices
%20plunging.

14

school seasons, more than half of primary and secondary students dedicated 2-6 hours daily on weekends to after-school tutoring, with some students spending over 6 hours. Likewise, during winter and summer breaks, over 66% of students participated in after-school tutoring, and the majority of them spent 2 to 8 hours daily on these sessions. [34]

49.     Fueled by the proliferation of after-school tutoring, Chinese parents were investing hundreds of billions of RMB annually in their children's "supplemental education." [35] For instance, in 2019, Chinese parents allocated 22% of their disposable family income to after-school activities for each elementary school child and 30% of their disposable income for each middle school child's after-school activities. [36], [37].

## B.     Fraud Proliferated Alongside the Expansion of the After-School Tutoring Industry.

50.     Not wanting to miss out on the lucrative and ever-expanding market, Chinese after-school tutoring companies raced to secure funding to expand their operations. According to the "2020 China Online Education Investment and Financing Data Report," in 2020 alone, there were 111 financing transactions within the Chinese online education sector, amassing a total amount exceeding RMB 53.93 billion (approximately US$7.8 billion). This represented a remarkable year-on-year growth of 267.37%, and surpassed the total financing of the previous four years. As

---

[34] https://www.sohu.com/a/304647570_533924
[35] http://www.xinhuanet.com/english/2018/01/15/c_136897295.htm
[36]
http://ciefr.pku.edu.cn/images/cbw/kyjb/2021/06/22/16D99F9D00F7BAFDC70CB3EE08ED6301.pdf
[37]
http://www.stats.gov.cn/sj/zxfb/202302/t20230203_1900600.html#:~:text=%E5%AD%97%E4%BD%93%EF%BC%9A%20%E5%B0%8F%F2%0%E4%B8%AD%20%E5%A4%A7&text=2019%E5%B9%B4%EF%BC%8C%E5%85%A8%E5%9B%BD%E5%B1%85%E6%B0%91%E4%BA%BA%E5%9D%87,%E5%9B%A0%E7%B4%A0%EF%BC%8C%E5%AE%9E%E9%99%99%85%E5%A2%9E%E9%95%BF5.8%25%E3%80%82

Defendant Chen conveyed to the media, "approximately 80% of the world's investment in the education sector in 2020 flowed into China." [38]

51.    The massive injection of capital, however, led to a detrimental transformation of the Chinese after-school tutoring industry, from one that prioritized service quality to an industry focused on profit.

52.    To promote their courses in an increasingly cutthroat industry, after school tutoring companies flooded various media outlets with advertisements.

53.    Popular TV shows, galas, office and residential buildings, and social media were inundated with advertisements from after-school tutoring companies.[39] People complained that at every bus station, "three out of the four advertising boards would be about online education, and the buses passing by displayed yet more online education advertisements."[40] According to App Growing, a global mobile advertising strategy analytics platform, during the fourth quarter of 2020, the combined advertising expenditures of educational training institutions in China ranked fifth among advertising spending across all industries.

54.    Advertisements by after-school tutoring institutions often conveyed misleading information to Chinese parents and students, creating a false impression that after-school tutoring was essential for keeping up academically with their peers. The pervasive advertising campaigns were designed to instill a sense of unease among Chinese parents, implying that without purchasing courses from these after-school tutoring companies, their children would be severely disadvantaged. To entice parents to purchase their courses, after-school tutoring companies commonly boasted in their ads that their teachers graduated from top universities or teacher-

---

[38] https://www.163.com/dy/article/FV1PNMBR0531M1VX.html
[39] http://www.xinhuanet.com/politics/2021-01/18/c_1126992636.htm
[40] http://www.xinhuanet.com/politics/2021-01/18/c_1126992636.htm

training colleges, and were well-versed in the question patterns of exams like Zhongkao and Gaokao.[41]

55.     Once parents purchased courses from these after-school tutoring companies, however, they often discovered that the quality and credentials of teaching staff were questionable. Teachers who were advertised as "renowned" often lacked proper teaching licenses or teaching experience.[42], [43] A survey conducted among 24,000 parents revealed that half of them were dissatisfied with the teaching quality provided by after-school tutoring companies. [44] For instance, in May 2021, the State Administration for Market Regulation (SAMR)[45] released a compilation of "typical" false and illegal advertising cases involving after-school tutoring institutions, with Gaotu being one of the companies implicated. In this specific case, SAMR found that Gaotu had employed an actor to falsely portray a "teacher with 40 years of English teaching experience" in their video advertisement promoting the "Gold Medal Teacher Rocket Special Offer Course." This deceptive use of a "renowned teacher" in the advertisement violated Chinese law, resulting in an administrative penalty of RMB 262,100 yuan imposed on Gaotu in April 2021.[46]

---

[41]

http://www.moe.gov.cn/jyb_xwfb/moe_2082/2021/2021_zl23/202103/t20210324_522288.html
[42]

http://www.moe.gov.cn/jyb_xwfb/moe_2082/2021/2021_zl23/202103/t20210324_522288.html
[43] https://new.qq.com/rain/a/20210807A0306U00
[44] https://new.qq.com/rain/a/20210807A0306U00
[45] The State Administration for Market Regulation (SAMR) is the ministerial-level agency directly under the Chinese central government in charge of regulating areas such as market competition, monopolies, intellectual property, and drug safety. It is mainly responsible for the comprehensive market supervision and management, including unifying the registration of market entities.
[46]

https://www.samr.gov.cn/ggjgs/sjdt/gzdt/art/2023/art_f7a6c684ae5447a7ba413e7a0f3bbbb2.html

17

56.     To address widespread parental discontent and manage potential danger posed by the after-school tutoring sector to societal stability, the Chinese government intervened and escalated its regulation of the industry.

57.     In February 2018, the Ministry of Education and three other Chinese central government ministries jointly released a "Circular on Alleviating After-school Burdens on Primary and Secondary School Students and Implementing Inspections on Afterschool Training Institutions." [47] This directive banned after-school tutoring institutions from conducting standardized exams and competitions for primary and secondary school students. Additionally, it prohibited activities like offering lessons that exceed the prescribed curriculum for a specific grade level in subjects such as mathematics and Chinese, and teaching specifically for exams.

58.     Later that year, in August 2018, the Chinese State Council issued the Opinion on the Regulation of the Development of Extracurricular Training Institutions, or State Council Circular 80, which imposed additional limitations on the after-school tutoring industry, such as limiting curriculum content, enforcing additional certification requirements, prohibiting homework, implementing early class ending times, and restricting tutoring companies from collecting prepaid tuition fees for more than three months. [48]

59.     On November 20, 2018, the Ministry of Education, along with another two central governmental agencies, jointly issued the "Notice on Improving the Specific Governance and Rectification Mechanisms of After-School Tutoring Institutions," or "Circular 10," requiring local governments to enforce the State Council Circular 80. [49]

---

[47] http://www.moe.gov.cn/srcsite/A06/s3321/201802/t20180226_327752.html
[48] https://www.gov.cn/zhengce/content/2018-08/22/content_5315668.htm
[49] http://www.moe.gov.cn/srcsite/A06/s3325/201811/t20181126_361476.html

60.     On July 8, 2019, the Central Committee of the Communist Party of China and the State Council issued the "Opinions on Deepening the Reform of Education and Teaching to Improve the Quality of Compulsory Education", emphasizing the importance of averting violations by after-school tutoring companies and mitigating the undue extracurricular burden on children.[50]

61.     On July 12, 2019, six central governmental agencies, including the Ministry of Education, jointly issued the Implementation Opinions on Regulating Online After-school Training ("Online After-School Training Opinions"), further regulating online academic after-school training institutions.[51]

## IV.     Prior Regulations Failed to Curb Fraud Within the After-School Tutoring Sector; in Response to Public Outcry, China Enacted Its Most Stringent Regulation on After-School Tutoring in 2021.

62.     China's regulatory actions targeting after-school tutoring institutions, which began in 2018, noticeably decreased the number of elementary and middle school students in cram schools, particularly enrollments in subject-specific tutoring. Nonetheless, these measures did not put an end to the pervasive illegal practices of profit-driven after-school tutoring companies. Instead, fraudulent activities actually increased.

63.     From 2019 to 2020, as after-school tutoring companies spent massively on marketing efforts to out-do one another, many of these companies exhausted their financial resources. With no fresh capital infusion, these firms struggled to sustain their operations and eventually succumbed to bankruptcy. Consequently, these companies were unable to, and in some cases deliberately evaded, refunding the substantial amounts of prepaid tuition fees that they

---

[50] https://www.gov.cn/zhengce/2019-07/08/content_5407361.htm
[51] http://www.moe.gov.cn/srcsite/A06/s3325/201907/t20190715_390502.html

received. For example, around the 2021 New Year, Xuebajun abruptly closed down its operations, leaving approximately 54,000 parents with outstanding prepaid tuition fees totaling RMB 540 million. [52] But just two weeks before its sudden closure, Xuebaojun was still vigorously marketing its courses. [53] Similarly, when Yousheng Education shut down over a thousand campuses and vanished overnight at the end of 2020, it was still holding onto hundreds of millions of RMB in prepaid tuition fees from parents. [54] It is estimated that in 2019 alone, nearly 12,000 tutoring companies ceased their operations. [55]In 2020, an additional over 9,600 tutoring companies shut down or disappeared. [56] The Chinese government deemed this a "financial security risk to many families." [57]

64.     Large numbers of upset parents and employees of shuttered tutoring companies gathered at the companies' premises, requesting refunds for tuition or unpaid wages.[58] These large-scale assemblies attracted the Chinse central government's attention as these escalating protests had the potential to undermine social stability, a foremost priority for the Chinese central government.

65.     On January 18, 2021, the Central Commission for Discipline Inspection of the Communist Party of China/the National Commission of Supervision of China published an article

---

[52] https://finance.sina.com.cn/chanjing/gsnews/2021-01-25/doc-ikftpnny1539847.shtml
[53] https://finance.sina.com.cn/chanjing/gsnews/2021-01-25/doc-ikftpnny1539847.shtml
[54] https://zhuanlan.zhihu.com/p/299132909
[55] http://m.ce.cn/cj/gd/202103/16/t20210316_36384458.shtml
[56] https://sdxw.iqilu.com/share/YS0yMS0xNDM1MTI1Mw==.html
[57]
http://www.moj.gov.cn/pub/sfbgw/jgsz/gjjwzsfbjjz/zyzsfbjjzyw/202102/t20210219_355139.html
[58] https://news.stcn.com/sd/202010/t20201020_2443909.html

20

titled "Online education in the whirlpool of capital".[59] The article stressed that "education is the State's priority and the [Communist] Party's priority" and highlighted the severe problems that the influx of "large-scale" profit driven capital into the after-school tutoring industry had caused, including deceptive marketing, exorbitant pricing, refund difficulties, misappropriation of prepaid tuitions, and reckless operational expansion. The article urged heightened governmental oversight across all levels of the after-school tutoring industry.

66.     During the annual Two Sessions meetings held from March 4 to 11, 2021, where thousands of delegates of the National People's Congress and the Chinese People's Political Consultative Conference gathered to communicate the most urgent concerns of people across China to the Chinese central government to formulate key policies, the central topic of discussion revolved around the regulation of the after-school tutoring industry.[60] On March 6, 2021, Chinese President Xi Jinping also expressed the same concern to the delegates at the Two Sessions, likening the disorder in the after-school tutoring sector to "a persistent and hard-to-remedy disease" and demanding that the problem be fixed.[61] President Xi said the problem "can't be solved by the education authority alone, and all social aspects and related departments should make joint efforts to study and solve it."

67.     Thus, the most stringent, and indeed, devastating set of regulations on the after-school tutoring sector came into existence. On May 21, 2021, the 19th session of the Central Comprehensive Deepening Reform Committee, presided over by Xi Jinping and attended by top

---

[59]

http://www.moj.gov.cn/pub/sfbgw/jgsz/gjjwzsfbjjz/zyzsfbjjzyw/202102/t20210219_355139.html

[60]https://m.21jingji.com/article/20210309/a4b061541f8f15d308b437ab4c9e9f31.html;
http://edu.china.com.cn/2021-03/06/content_77276548.htm ;
[61] https://news.sina.cn/gn/2021-03-18/detail-ikkntiam4487274.d.html

21

government officials in China, approved the "Opinions on Further Alleviating the Burden of Homework and After-School Tutoring for Students in Compulsory Education" ("Double Reduction Regulation"). [62] According to the government's official news reports, the session underscored the critical nature of rigorously overseeing the "disorderly" after-school tutoring institutions, stating that "institutions lacking qualifications, exhibiting disorganized management, exploiting profit opportunities, engaging in false advertising, or colluding with schools for financial gain must be rectified. A transparent framework for the fees charged by tutoring institutions must be established, accompanied by enhanced scrutiny of prepaid tuition. Unauthorized capital funding must be strictly prohibited in order to ensure that this conscientious industry will not transform into a purely profit-driven sector."[63]

68. The Double Reduction Regulation provides, in relevant part, that: (i) the existing after-school tutoring institutions providing tutoring services on academic subjects for K-9 Education shall be registered as non-profits; (ii) online academic after-school tutoring institutions that have filed with the local education administration authorities providing tutoring services on academic subjects shall be subject to review and re-approval procedures by competent government authorities, and any failure to obtain such approval will result in the cancellation of its previous filing and Internet Content Provider or ICP license; (iii) after-school tutoring institutions providing tutoring services on academic subjects for K-9 Education are prohibited from raising funds by listing on stock markets or conducting any capitalization activities, and publicly-listed companies are prohibited from investing in after-school tutoring institutions providing tutoring services on academic subjects for K-9 Education through capital markets fund

---

[62] http://www.xinhuanet.com/politics/leaders/2021-05/21/c_1127476498.htm
[63] http://www.xinhuanet.com/politics/leaders/2021-05/21/c_1127476498.htm

raising activities, or acquiring assets of after-school tutoring institutions providing tutoring services on academic subjects for K-9 Education by paying cash or issuing securities; and (iv) foreign capital is prohibited from controlling or participating in any after-school tutoring institutions providing tutoring services on academic subjects for K-9 Education through mergers and acquisitions, entrusted operation, joining franchise or variable interest entities.

69.     Moreover, the Double Reduction Regulation specifies a series of operating requirements that after-school tutoring institutions must meet, including, among other things, (i) no advertisements for after-school tutoring shall be published or broadcasted in network platforms and billboards displayed in the mainstream media, new media[64], public place and residential areas; (ii) the provision of foreign countries' education courses is strictly prohibited; (iii) fees charged for academic subjects tutoring in compulsory education shall be included into government-guided price management, and excessive high fees and excessive profit-seeking behaviors will be prohibited; (iv) government authorities will implement risk management and control of the collection of prepaid fees by after-school tutoring institutions with requirements such as setting up third-party custodians and risk reserves, and strengthen supervision over loans regarding tutoring services; (v) online tutoring for preschool-age children is prohibited, and offline

---

[64] According to the People.com.cn, "new media" refers to all new forms or methods of communication that utilize digital technology, internet technology, and mobile communication technology, which encompass various channels such as the internet, broadband LAN, wireless communication networks, and satellites. The primary output terminals include television, computers, and mobile phones. New media aims to provide users with integrated information and entertainment services, including video, audio, voice data services, online gaming, remote education, and other forms of communication and dissemination. In China, the most popular forms of new media include: online media (websites, email newspapers, electronic bulletin boards...), mobile media (mobile SMS, mobile MMS, mobile ringtones, mobile games, mobile TV, mobile radio, mobile newspapers...), digital TV, live satellite TV, mobile TV, IPTV, internet TV, digital broadcasting in buildings, outdoor large screens, online instant messaging, virtual communities, blogs, podcasts, internet search engines, and Really Simple Syndication (RSS). http://cpc.people.com.cn/n/2014/0625/c68742-25195789.html

academic subjects (including foreign language) tutoring services for preschool-age children is also strictly prohibited; (vi) no more approval of new after-school tutoring institutions providing tutoring services on academic subjects for pre-school-age children and students on grade ten to twelve will be granted; (vii) after-school tutoring institutions are not allowed to conduct academic subject tutoring during national holidays, weekends, or winter and summer school breaks; and (viii) administration and supervision over academic subjects tutoring institutions for high school students shall be implemented by reference to the relevant provisions of the Double Reduction Regulation.

70.     Although authorizing its official media outlets to release a brief news report in identical wording regarding the enactment of the Double Reduction Regulation on May 21, 2021, the Chinese central government did not immediately publish the full text of the Double Reduction Regulation. [65]Instead, on May 21, 2021, the Chinse government's official media channels only reported, on the enactment of the Double Reduction Regulation, that at the 19th session of the Central Comprehensive Deepening Reform Committee, the Chinese central government "pointed out that one of the most prominent issues in compulsory education is the unduly academic burden on primary and secondary school students…. In particular, there is disorderly development of after-school tutoring institutions" and "emphasized the imperative for comprehensive oversight and management of after-school tutoring institutions, along with a resolute commitment to rigorous governance... Arbitrary capitalization endeavors must be strictly prohibited." It wasn't until two months later, during the night of July 24, 2021, U.S. Eastern Time, that the Chinese government formally unveiled the full text of the Double Reductions Regulation.[66]

---

[65] http://politics.people.com.cn/n1/2021/0521/c1024-32110261.html
[66] http://www.xinhuanet.com/mrdx/2021-07/25/c_1310083959.htm

71.     On July 23, 2021, however, one day before the Chinese government officially released the Double Reduction Regulation, the U.S. market learned of the Double Reduction Regulation and realized that the regulation was essentially a death knell for the Chinese after-school tutoring industry. As the vast majority of, if not all, after-school tutoring institutions teaching academic subjects in China operated for profit, and the industry leaders were all publicly listed on U.S. and/or Hong Kong stock markets, the enforcement of the Double Reduction Regulation—which mandates a transition to non-profit status and strictly forbids these institutions from accessing capital markets or seeking foreign investments—would "significantly suppress, if not eliminate," tutoring for K-9 grade level students, according to DS Kim, a JP Morgan analyst, who immediately downgraded prominent U.S.-listed Chinese tutoring companies, including New Oriental, Tal Education and Gaotu, upon learning of the Double Reduction Regulation on July 23, 2021.

72.     On July 23, 2021, all Chinese education stocks on the U.S. market tumbled. In premarket trading TAL Education shares fell by 54%, New Oriental Education & Technology by 48%, Gaotu by 59% and 17 Education & Technology by 40%. By comparison, S&P 500 and Dow Jones Industrial Average futures were both up that same morning. By the end of the day on July 23, TAL Education shares plunged 71%, New Oriental Education & Technology 54%, Gaotu 63% and 17 Education & Technology 39%,

73.     On Monday, July 26, 2021, Chinese education stocks continued to plummet upon the official release of the Double Reduction Regulations. TAL Education shares fell by an additional 27%, New Oriental Education & Technology by 34%, Gaotu by 29% and 17 Education & Technology by 26%.

74.     Major financial institutions also downgraded Chinese education stocks. On July 23, 2021, JPMorgan downgraded New Oriental Education to underweight from overweight with a price target of $3.50, down from $19, lowered TAL Education to underweight from neutral with a price target of $7.60, down from $70, and downgraded Gaotu to underweight from neutral with a price target of $3.50, down from $37. Goldman Sachs downgraded Gaotu to sell from neutral with a price target of $2.60, down from $20. Goldman Sachs analyst Christine Cho predicted that the afterschool tutoring total addressable market would shrink from $100 billion in 2020 to $24 billion by 2025. Deutsche Bank downgraded New Oriental and Tal from buy to hold and slashed the firm's price targets on New Oriental and Tal Education by 88% and 90% respectively. Deutsche Bank also lowered Gaotu's price target from $97 to $3, a 97% decrease. CLSA downgraded Gaotu to sell from underperform with a price target of $2.70, down from $19.

## V.     **Double Reduction Regulation Would Materially and Adversely Impact Gaotu.**

75.     The devastating impact that the Double Reduction Regulation would have on Gaotu was obvious.

76.     First, the Double Reduction Regulation presented Gaotu with a stark dilemma: it had to decide between discontinuing its K-12 academic subject tutoring division, resulting in a loss of half its revenue, or undergoing a transformation into a non-profit organization and delisting from the NYSE. Both options posed a grave threat to Gaotu's business model.

77.     Second, even in the unlikely scenario that Gaotu, as a for-profit entity, could somehow find a way to retain its K-12 academic subject tutoring division, it would still be required to cancel its winter and summer semester courses. The forfeiture of two of Gaotu's four tutoring semesters would also severely reduce its revenue.

78. Thirdly, marketing and advertisements constituted the primary means through which Gaotu attracted customers. The Double Reduction Regulation's sweeping prohibition on advertising for after-school tutoring across traditional media, new media, public spaces, and residential areas would effectively cripple Gaotu's ability to attract new customers.

79. When the market became aware of the Double Reduction Regulation, Gaotu's stock price also suffered its largest-ever loss. On July 23, 2021, Gaotu's ADS price recorded its most significant percentage decrease since its IPO. Subsequently, on July 26, 2021, Gaotu's ADS price reached its all-time low.

## VI. Despite Its Denial, Gaotu Had Knowledge of The Unpublished Double Reduction Regulation Before July 24, 2021.

80. During the Class Period, despite Gaotu's repeated denials of any knowledge regarding the Double Reduction Regulation and its assurances to the investing public that the anticipated regulation would be *beneficial* for Gaotu, Gaotu and its executives were in actuality aware of the regulation's damaging contents several months before its official publication. During this time, they secretly carried out measures to mitigate the potential harm to both the Company and its senior employees.

81. Indeed, by denying knowledge of the Double Reduction Regulation and asserting that any forthcoming regulation would benefit Gaotu, Gaotu and its executive bought time to: (1) implement measures at the Company to mitigate the impact of the Double Reduction Regulation, and (2) dispose of their holdings of Gaotu stock.

### A. Various Local Governments and Institutions Across China Had Obtained Copies of the Double Reduction Regulation and Communicated Its Essential Contents to the After-School Tutoring Industry Before July 24, 2201.

82. During the time the Chinese government was drafting the Double Reduction Regulation, the drafting team, led by the Ministry of Education, conducted on-site research in

Beijing, Shanghai, and other places. The Chinese government later revealed that the drafting team conducted a comprehensive data analysis, "covering 10 provinces, 100 districts and counties, 18,600 tutoring institutions, 680,000 students, and 740,000 parents" relating to the issues both within and outside of schools. The team also held discussions with officials from provincial, municipal, and county-level education administrative departments, as well as meetings with school principals, teachers, parents, experts, and representatives from tutoring institutions.[67] Considering the widespread discussions in various levels of Chinese society, the after-school tutoring industry, including Gaotu – one of the most prominent and profitable companies in the industry, was aware that the Chinese government was going to pass a comprehensive ban on the for-profit after-school tutoring industry. Caixin Global, the English version of the Caixin Media outlet, known as "one of China's most dogged investigative journalism outlets" and "best-known business publications"[68], also reported that "Chinese officials held multiple rounds of talks with top private education firms to discuss the industry's future before announcing sweeping new [Double Reduction Regulation] that are set to transform the sector." [69] Representatives from Gaotu, one of the largest and most visible private education companies in China, were included in those discussions.

83.    Beginning in January 2021, the Communist Party's Central Commission for Discipline Inspection (the "CCDI") criticized the expansion of off-campus online tutoring due to misleading advertising and charges. The CCDI called for stricter supervision of the industry. The CCDI published an article blaming the online education sector for creating a "capital whirlpool"

---

[67] http://www.moe.gov.cn/jyb_xwfb/s271/202107/t20210724_546567.html
[68] https://www.reuters.com/world/china/china-updates-official-news-sources-list-tightening-information-oversight-2021-10-20/
[69] https://www.caixinglobal.com/2021-07-26/education-companies-knew-sweeping-rules-were-in-the-pipeline-101745681.html

where "the quality of courses and teaching effects to gain market choice and favor, but is gradually dominated and influenced by capital." The CCDI is the highest internal control institution from within the Chinese Community Party.

84.     On February 4, 2021, following the CCDI's comments, the Minister of Education released said in a speech that the Ministry was seeking to "reduce the burden on students and their families by having stricter supervision of the after-school tutoring market in a bid to free students from endless after-school classes and curriculums." Minister Chen Baosheng said further that there was an "urgent" need to "proactively" "rectify mercenary behaviors, subject training, wrong speeches, anomie of teachers' morality, and false advertisements."

85.     On March 9, 2021, Deutsche Bank hosted its 29th Annual Media, Internet & Telecom Conference. Gaotu attended the conference and discussed its business and operations with Deutsche Bank analysts. According to Deutsche Bank's report dated March 10, 2021, based on Deutsche Bank's discussions with Sandy Qin, Gaotu's Investor Relations Manager, Gaotu expected its "[sales and marketing spending] spree to slow down after the government raised concerns on unhealthy marketing campaigns in January and February [2021]." Ms. Qin's comments during the Deutsche Bank conference reflected the recent intensifying negative sentiment for Gaotu's business and, indeed, Gaotu's knowledge of the impending Double Reduction Regulation and the devastating impact it would have on the Company; contrary to Ms. Qin's comments during the Deutsche Bank conference, Ms. Qin spoke positively about Gaotu's long-term prospects for online after-school tutoring just several weeks earlier at according to analysts from Credit Suisse who reported on the 2021 Greater China Tech/Internet Conference on January 8, 2021 and UBS who reported on the 2021 UBS Greater China Conference on January 20, 2021.

86.     The Two Sessions parliamentary deliberations occurred on March 4-11, 2021. As described previously, President Xi's criticized the after-school tutoring industry heavily during the conference. He described the business as "chaotic," a "stubborn disease that is difficult to manage," and said the problem "can't be solved by the education authority alone, and all social aspects and related departments should make joint efforts to study and solve it."

87.     Following President Xi's comments, a CPPCC delegate and deputy director of Shanghai's municipal educational commission said in an interview with Beijing News on March 8, 2021 that proposed various regulations would be implemented in Shanghai. The following day, another CPPCC member told Tsinghua University News about a proposal for a ban on any after-school tutoring company providing courses in Chinese, Math, English, Physics, or Chemistry. Caixin Global also reported that "Multiple representatives raised concerns that seven-days-a-week extracurricular classes hurt children's physical and mental health. Some even suggested a ban on tutoring institutions."

88.     Then, on March 10, 2021, two offices within the Beijing Ministry of Education produced a document demanding that all academic-based and language after-school training be suspended. Specifically, after President Xi's comments, Beijing educational authorities ordered all in-person training classes to postpone reopening (following a closure for COVID) and conduct inspection and rectification. As Caixin Global reported:

> According to a checklist circulated online, Beijing authorities are conducting inspections of all in-person after-school education institutions, involving qualification of teachers, tuition management, advertising, forms of contracts and pandemic control measures. Any institution has to go through two rounds of inspections and meet all requirements in the checklist before they can reopen, Chu Feng, chief executive of a Beijing K-12 training company told Caixin.

> This round of inspections is particularly focusing on business licenses and qualifications, Chu said. Even if a parent company owns an education service business license, each of its branches and campuses has to pass the checklist

separately. For large companies with hundreds of sites, it could take quite some time for full compliance.

89. On March 11, 2021, as the Two Sessions closed, news outfits reported an impending "regulatory storm" focused on the after-school tutoring industry, claiming that "the recent crackdown might be more severe than ever." On March 31, 2021, the Ministry of Education announced a measure to limit the amount of online learning for primary and secondary school students, addressing another concern about children's welfare at the Two Sessions. That same day, the Chairman of China Association for Non-Government Education (a lobbying group for companies like Gaotu) also delivered a speech telling companies "to proactively transform their business models and extend services to other segments."

90. On May 7, 2021, only two weeks before President Xi Jinping's approval of the Double Reduction Regulation at the 19th session of the Central Comprehensive Deepening Reform Committee, Cai Qi, the Secretary of the Beijing Municipal Committee of the Communist Party of China and the highest-ranking official in the Beijing government, held a meeting with several public-school principals and leading after-school tutoring institutions, including Gaotu, Tal Education, New Oriental, Zuoyebang, NetEase Youdao, Yuanfudao, VIPKID, and Onion Academy.[70] During the meeting, he issued directives regarding the Double Reduction initiative. While the media briefly reported on the meeting, it did not provide the complete details of the discussions.

91. Cai Qi is widely known as *the* most loyal follower of Xi Jinping, having received four promotions within four years between 2018 and 2022, "indicating his significance to Xi

---

[70] https://www.beijing.gov.cn/gongkai/ldhd/202105/t20210508_2383569.html

Jinping," as noted by the Voice of America.[71] Katsuji Nakazawa, a Tokyo-based senior staff and editorial writer at Nikkei who spent seven years in China as a correspondent and later as the China bureau chief of Nikkei, commented on the close relationship between President Xi and Cai Qi, describing them as "very close." [72] Nakazawa also mentioned that "any order from Xi is passed down to old and trusted close aides through Cai." Considering that the proposed Double Reduction Regulation needed to be finalized well in advance of the 19th Session and presented privately to China's top political leaders for review first, with Xi formally approving it during the 19th Meeting, Xi shared the contents of the Double Reduction Regulation with Cai. In this context, Cai Qi relayed to the companies attending the meeting, including Gaotu, Xi's directive, as manifested in the Double Reduction Regulation, which mandated the transformation of after-school academic subject tutoring institutions into non-profit entities and prohibited them from being listed on any stock market or seeking capital funding.

92.    Significantly, immediately after Xi Jinping signed off on the Double Reduction Regulation, Beijing Municipal Education Commission "transmitted the spirit of" the 19th session of the Central Comprehensive Deepening Reform Committee, during which session the new regulation was officially approved, to after-school tutoring companies. This was confirmed by an employee of the Haidian Branch of Beijing Municipal Education Commission in an interview with Caixin Media, according to Caixin Media's May 25, 2021 article entitled "Rumors of "Tutoring Institutions Not Being Allowed to Go Public" Disrupt the Market, Haidian Education Commission Responds" ("May 25, 2021 Caixin Article").[73] In Chinese political discourse, the

---

[71] https://www.voachinese.com/a/beijing-party-chief-cai-xi-loyalist-vaults-to-top-rank-20221023/6801807.html
[72] https://asia.nikkei.com/Editor-s-Picks/China-up-close/Analysis-Xi-s-chief-of-staff-Cai-Qi-is-symbol-of-powerful-court
[73] https://www.caixin.com/2021-05-25/101717622.html

term "spirit" is frequently used to denote the essential core or essence of a meeting, speech, or document that both government officials and the general public should comprehend.[74] Beijing Municipal Education Commission has supervisory authority over Gaotu's principal executive office.

93.     On May 21, 2021, President Xi hosted the 19th meeting of the LGCDR—a powerful organization and the leading policymaking body responsible for education. At the meeting, President Xi "reviewed and passed" the Double Reduction Regulation (or the "Opinions on Further Reducing the Burden of Homework and Off-Campus Tutoring for Students Undergoing Compulsory Education"). According to reports, the regulation addressed the need to "comprehensively regulate the management of off-campus training institutions, adhere to strict governance, and seriously investigate and deal with institutions that have problems such as substandard qualifications, chaotic management, taking advantage of opportunities to accumulate money, false propaganda, and colluding with schools for profit." The *South China Morning Post* reported that "[a] clampdown will focus on the business qualification of after-school tutors, false advertising and overcharging for services."

94.     On May 23, 2021, in Beijing's Haidian District, the Haidian Branch of the Beijing Municipal Education Commission conducted a meeting regarding the Double Reduction Regulation. This district houses major after-school tutoring companies, including Gaotu, which fall under the jurisdiction and supervision of the Haidian Branch. A person with knowledge of the meeting, who worked in the after-school industry, later that day shared in a group chat message that the Haidian Branch of Beijing Municipal Education Commission had announced during the

---

[74] http://dangjian.people.cn.cn/n1/2021/1129/c117092-32294640.html

meeting that, in accordance with the Double Reduction Regulation and the Law on the Protection

of Minors, "by the end of July at the latest, three 'no's' will be introduced":

(a)    [After-school tutoring institutions] are not allowed to hold classes during

school breaks [*i.e.* during winter and summer vacations].

(b)    Tutoring institutions (offering academic subjects and comprehensive

education) are not allowed to go public on stock markets."

(c)    [After-school tutoring institutions] are not allowed to engage in

advertising." [75]

95.    The same individual also mentioned in the chat that they would share the "detailed

meeting minutes" in the group chat. The following day, on May 24, 2021, a social media account

named "Shoudu Shengxuetong," or "Capital City's Expert on Education Advancement," obtained

screenshots of this person's revelations in the chat group and posted the images on its account. [76]

96.    A May 25, 2021 Caixin Article reported that on May 24, "multiple tutoring

institutions' principals" independently disclosed to Caixin a "widely circulated" chat record:

According to this record, on the afternoon of the 23rd, the Haidian District
Education Committee held a meeting related to the "Double Reduction." A member
of the group stating to have attended the meeting revealed that this round of policies
will strictly enforce the "three no's": training institutions (both academic subject-
based and comprehensive) will not be allowed to go public, conduct classes during
breaks (including winter and summer breaks, holidays, and weekends), or engage
in advertising. These policies are anticipated to be officially announced before the
end of July. [77]

---

[75]

https://www.sohu.com/a/468335254_465270?scm=1004.759738464039272448.0.0.0&spm=sm
pc.home.business-news11.1.1621909618536HbWWkS6&_f=index_businessnews_0_0
[76]

https://www.sohu.com/a/468335254_465270?scm=1004.759738464039272448.0.0.0&spm=sm
pc.home.business-news11.1.1621909618536HbWWkS6&_f=index_businessnews_0_0
[77] https://www.caixin.com/2021-05-25/101717622.html

97.     The May 25, 2021 Caixin Article also revealed that three prominent investment firms, Tiger Global Management, Hillhouse Group, and Greenwoods Asset Management, who held significant stock in Chinese after-school tutoring companies, including Gaotu, sold most or all of their holdings during the first quarter of 2021. This revelation confirms that certain investment firms, which were one of the intended targets for removal from the industry by the Double Reduction Regulation, were aware of nonpublic information about the new regulation at that time and began reducing their significant exposures in the industry before losing their investments when the Double Reduction Regulation became public.[78]

98.     On May 28, 2021, Changyi City of China's Shandong Province publicized on its official website the Double Reduction Regulation but later removed the webpage at unknown time. Wayback Machine, a digital archive maintained by the Internet Archive in California which allows internet users to go "back in time" to see how websites looked in the past, captured, as shown below, the appearance of the summary publication page on Changyi's official website as of December 1, 2021. This capture showed that on May 28, 2021, Changyi had published a webpage titled "The General Office of the Central Committee of the Communist Party of China and the General Office of the State Council have Printed and Disseminated the "the Opinions on Further Alleviating the Burden of Homework and After-School Tutoring for Students in Compulsory Education," which is the exact title of the article that the Chinese government media officially publicized on July 24, 2021, releasing the full text of the Double Reduction Regulation.

---

[78] https://www.caixin.com/2021-05-25/101717622.html



99.     On July 10, 2021, the Experimental School Affiliated to Fuzhou University published the full text of the Double Reduction Regulation on its website. [79]

100.    On July 19, 2021, Huifa Net, a legal data and information service platform in China, published the full text of the Double Reduction Regulation on its official website www.lawxp.com.[80]

101.    On July 20, 2021, the official website of a village in Taihu County in Anhui Province published the full text of the Double Reduction Regulation. [81]

---

[79] https://fsxx.fzu.edu.cn/info/1027/1063.htm
[80] https://www.lawxp.com/statute/s2088761.html
[81] http://www.thxf.gov.cn/news/11372/85649.html

102.    Indeed, it is not uncommon for regulations drafted under the Ministry of Education's guidance during that same period to be leaked through unofficial channels before their official publication. For instance, in April 2021, the full text of the revised "Regulation on the Implementation of the Law on the Promotion of Private Schools," which contained a requirement similar to the Double Reduction Regulation that foreign entities should not establish or control private compulsory education schools, was leaked and made public by several reputable WeChat accounts specializing in education news before the Chinese central government officially published it in May 2021. [82] Similarly, a regulation not intended for public release, "Implementation Opinions on Regulating the Development of Private Compulsory Education," became accessible on various non-governmental commercial social media accounts after the Chinese central government distributed the document to lower government levels. This regulation, approved by Xi Jinping at the 15th meeting of the Central Committee for Comprehensive Deepening of Reform in September 2020 but officially published in May 2021, included a provision similar to the Double Reduction Regulation that private compulsory education should transition into nonprofit entities.

103.    As one of the largest, most profitable, and influential education companies in China, Gaotu was – at minimum – monitoring these various reports and leaks concerning the Double Reduction Regulation.

---

[82] http://www.tongmanresearch.com/index.php?c=show&id=75

**B.**     **Contrary to Its Representations, Gaotu Had Knowledge of the Double Reduction Regulation before July 24, 2021.**

104.    While the officially unpublished details of the Double Reduction Regulation were floating through various channels, Gaotu became aware of its adverse contents and began implementing mitigating measures while publicly denying any knowledge of the regulation.

105.    First, Gaotu maintained an "anonymous consultation" channel with the Chinese government, particularly with the Beijing Municipal Education Commission and the Haidian Branch of the Beijing Municipal Education Commission. This channel allowed Gaotu to anonymously seek information from the government regarding potential actions or upcoming rules and regulations. In its IPO registration statement, Gaotu provided an example of how it used this anonymous consultation mechanism. It revealed that, prior to the IPO, Gaotu anonymously consulted the Beijing Municipal Education Commission and its Haidian Branch regarding a series of new rules aimed at strengthening the regulation of after-school training institutions. Through this consultation, Gaotu gained insider knowledge that additional implementation rules and interpretations "may" be promulgated in the area. Therefore, Gaotu had contemporaneous knowledge of the ongoing regulatory developments related to the Double Reduction Regulation, particularly its contents, before its official publication on July 24, 2021.

106.    Furthermore, the measures that Gaotu and its employees secretly took during the Class Period also shows that Gaotu had knowledge of the contents of the Double Reduction Regulation before its official publication on July 24, 2021, and was proactively trying to mitigate the detrimental impact the regulation would soon have on the company.

107.    On March 9, 2021, Irefresh Future Limited, a British Virgin Island shell company holding shares for Gaotu's employees upon their exercise of options granted under the Share Incentive Plan, filed a Form 144 to sell 1,335,000 ADSs, which represented 890,000 Class A

ordinary shares[83] and had a market value of $137,304,750. According to Gaotu's 2021 Form 20-F, Irefresh was controlled by an advisory committee consisting of Gaotu executives, specifically Defendant Shen and Gaotu Vice Presidents Xiuping Qi and Wei Liu. As of February 28, 2021, Defendant Shen and Xiuping Qi controlled Irefresh. As Gaotu is a foreign private issuer, it is exempt from complying with Section 16 of the Exchange Act. This exemption means that Gaotu insiders are not obligated to publicly disclose their sales of Gaotu ADSs on Form 4, unlike insiders of U.S.-domiciled issuers. Consequently, prior to discovery, Plaintiffs have no practical means to identify the sales of registered Gaotu shares by Individual Defendants or other Gaotu executives during the Class Period. Instead, only Gaotu executives who planned to sell *unregistered* shares of the Company's stock have to file Form 144s with the SEC, which serves as notice of a proposed sale of securities. The sale must then be completed within three days, or else the Form 144 becomes void.

108. Irefresh's dumping of Gaotu stock was highly suspicious in both timing and amount, and is highly probative of fraudulent intent. As of February 28, 2021, Irefresh held securities that represented 2,992,120 Class A ordinary shares of Gaotu. This sale, as indicated in the March 9, 2021 Form 144, constituted 30% of Irefresh's holdings at that time. Furthermore, Irefresh filed the Form 144 on March 9, 2021, the same day as Deutsche Bank's 29th Annual Media, Internet & Telecom Conference during which Ms. Qin said that Gauto was expecting sales and marketing spending to decrease in response to increased "government . . . concerns on unhealthy marketing campaigns," according to Deutsche Bank analyst reports. Following Ms. Qin's comments and Deutsche Bank's reports, Gaotu's stock declined from $88.62 per share on

---

[83] Pursuant to Gaotu's IPO registration Statement, three Gaotu ADSs represent two Class A ordinary shares.

March 9, 2021 to $81.01 per share on March 10, 2021, a single-day decline of approximately 8.5%.

109.    Gaotu insiders only filed one Form 144 during the period from Gaotu's IPO on June 6, 2019 to June 13, 2023, which was the March 9, 2021 Form 144. This trade occurred at a time when national delegates were expressing their strongest concerns about the after-school tutoring industry during the annual Two Sessions meetings, concerns that were echoed by Xi Jinping. Given the senior-level positions of Defendant Shen, Xiuping Qi, and Wei at Gaotu, as well as their control of Irefresh, the trade made by Irefresh is highly suspicious and supports the inference that high-level Gaotu senior executives knew about the Double Reduction Regulation before it was publicly disclosed.

110.    Furthermore, the exemptions from Section 16 that enabled Gaotu's senior management to avoid publicly disclosing sales of registered shares has been described by securities law experts, including former SEC Commissioner Robert Jackson and Senators Van Hollen and John Kennedy, as highly problematic, as such rules "effectively shield the trades of foreign insiders from public scrutiny and market discipline," and are particularly concerning in the case of Chinese issuers like Gaotu. Working with academics from The Wharton School, former Commissioner Jackson used data from all available Form 144 filings over a four-and-a-half year period to analyze the trading of insiders at Chinese-domiciled issuers and found that insiders at these issuers placed trades that, on average, preceded stock price declines of 10.2%, enabling the average trade to "avoid between $3.829 and $3.950 million in losses," an outcome described as a "shocking amount of loss avoidance" suggesting a "strong possibility of rampant illicit activity." Gaotu's public filings indicate that Gaotu granted options and restricted share units, and recorded RMB60.2 million, RMB238.4 million (US$36.5 million) and RMB345.3

40

million (US$54.2 million) in 2019, 2020 and 2021, respectively, in share-based compensation, with a material portion to Gaotu executive. It is highly likely that Gaotu executives also sold significant amounts of shares that were not publicly reported given that such share awards would have expired worthless if not sold during the Class Period.

111.    Gaotu's 2020 Form 20-F disclosed that as of February 29, 2020, Xiuping Qi held 1,714,560 Class A Ordinary Shares, equivalent to 1% of Gaotu's total ordinary shares. However, the 2021 Form 20-F indicated that Xiuping Qi no longer possessed 1% of the shares. Xiuping Qi sold his holdings during the Class Period upon obtaining specific nonpublic information about the adverse impacts of the forthcoming Double Reduction Regulation.

112.    At the end of the Class Period, Gaotu's stock price declined from $9.58 per share on July 22, 2021 to $2.50 per share on July 26, 2021, a total decline of $7.08 per share. Including the decline of $7.61 per share on March 10, 2021, Irefresh and other Gaotu insiders avoided losses of approximately $14.69 per share by selling Gaotu shares while in possession of material adverse non-public information.

113.    During the Class Period, Gaotu also implemented measures to mitigate the potential adverse impact of the Double Reduction Regulation and introduced products and services that fell outside the scope of the ban, showing that Gaotu had nonpublic information regarding the Double Reduction Regulation before its official publication.

114.    On May 28, 2021, seven days after Xi Jinping approved the Double Reduction Regulation and two days after Gaotu's Q1 2021 earnings call where Defendant Shen denied that Gaotu had "received the specific contents yet" of the Double Reduction Regulation, 36Kr[84], a media company covering China's "new economy" industries, reported that "several days ago"

---

[84] https://36kr.com/p/1242832911568137

Defendant Chen held an internal meeting, which resulted in Gaotu's plan to lay off 30% of its workforce "starting from this week." Additionally, Gaotu decided to shut down all its information flow and live streaming business operations. As Defendant Chen later admitted, Gaotu had "stopped acquiring traffic from online social platforms since the second quarter." [85] These measures align precisely with the bans outlined in the Double Reduction Regulation, indicating that Gaotu had "received the specific contents" of the regulation. First, as 36Kr explained, in the after-school tutoring industry, the recruitment and training of new tutors typically took 2-3 months, leading companies to start their recruitment efforts well in advance. Campus recruitments for the peak tutoring season, which was the summer break, usually conclude by the end of May. As online after-school tutoring institutions heavily relied on advertising as their primary customer acquisition channel, a halt in advertising signified the removal of a vital avenue for attracting new students. This directly resulted in a need for a massive lay-off of teachers hired for the 2021 summer break. Gaotu's decision to downsize by 30% indicates that the company was proactively implementing countermeasures after becoming aware of the Double Reduction Regulation. The bans outlined in the Double Reduction Regulation had circulated within the after-school tutoring industry. This is evident not only from Gaotu but also from other major after-school tutoring institutions, such as TAL Education, Zuoyebang, NetEase Youdao, and ByteDance's education business, all either laying off employees or engaging in frequent high-level meetings to undertake substantial organizational restructuring, as revealed by 36Kr.

115.  Additionally, on May 27, 20221, in an effort to counteract the restrictions on for-profit K-12 education, Gaotu, which previously focused on K-12 after-school tutoring delivered

---

[85] https://seekingalpha.com/article/4456587-gaotu-techedu-inc-gotu-ceo-larry-chen-on-q2-2021-results-earnings-call-transcript

through its application "Gaotu Ketang" (or Gaotu Classroom), officially announced its adult education platform Gaotu Online[86]. The Company also launched advertising campaigns featuring social media influencers with the aim of establishing adult education as a primary focus of Gaotu's business operations. [87]

116.    The corporate registration records filed by Gaotu with China's State Administration for Market Regulation shows that on July 16, 2021, Gaotu expanded its officially registered business scope to include various services unrelated to K-9 academic subject tutoring. These services include "cultural consulting," "public relations services," "health management," "health consulting," "self-funded overseas study intermediary services," and "human resources services." This expansion was part of Gaotu's strategic efforts to position itself to operate in different fields and survive the challenges posed by the Double Reduction Regulation.

117.    On July 19, 2021, Gaotu launched a new version of the Gaotu mobile app. Unlike the main Gaotu Classroom app, which primarily focuses on K-12 education, the Gaotu app primarily covers various professional education services, including language training, college entrance exams, finance, public service exams, teacher certification, study abroad, management, healthcare, and more.[88]

118.    Not coincidentally, in June and early July 2021, before the official publication of the Double Reduction Regulation, many other leading after-school tutoring institutions, such as New Oriental, Tal Education, Jingrui Education, Libu, Tencent Education, similarly broadened their scope of registered business to include services unrelated to K-12 academic subject tutoring

---

[86] https://www.sohu.com/a/468846293_250147
[87] https://www.sohu.com/a/478366633_112831
[88] https://www.163.com/tech/article/GG09IQ2100097U7R.html ;
https://www.sohu.com/a/478366633_112831

and launched services unrelated to K-12 academic subject tutoring. [89][90] In mid-July, some New Oriental outlets sent questionnaires to parents asking for feedback on proposed changes to after-school services for kindergarteners and primary school students. In June and early July, TAL, with unusual alacrity, introduced several initiatives unrelated to K-12 academic subject tutoring. These initiatives included a separate science program, a modified flagship English learning service, and a new adult education brand focusing on postgraduate entrance exams, language training, and overseas study.[91]

119.     Former employee 1 ("FE 1") worked as a senior high school class leader from November 2020 to May 2021 and subsequently a city manager at Changsha Gaotuyunji Education Technology Co. Ltd., a subsidiary of Gaotu, from May 2021 to July 2021. As a senior high school class leader, FE 1 was in charge of operation of the senior class section teachers and other staffs' trainings; FE 1 also led the recruitment of personnel such as supervisors, group leaders and teachers, operation, data, administrative personnel; FE 1's responsibilities also included setting up SOP (Standard Operating Procedure) of operation and management, such as : standardizing product communication and consulting service communication, and formulating sales strategy and system. As a city manager, FE 1 was responsible for sales at the Changsha center, building up marketing team personnel and customer referral system from scratch and creating a new-media matrix, and attracting traffic through Gaotu's official account such as WeChat, WeChat group, Short video, live streaming.

---

[89] https://finance.sina.cn/2021-07-26/detail-ikqciyzk7710734.d.html
[90] https://www.163.com/tech/article/GG09IQ2100097U7R.html
[91] https://www.caixinglobal.com/2021-07-26/education-companies-knew-sweeping-rules-were-in-the-pipeline-101745681.html

120.    FE 1 states that Gaotu had 14 operating centers nationwide which ran online live classes via "Gaotu Classroom" during his tenure. FE 1 states that on July 25, 2021, Defendant Chen "summoned" the heads of all these operating centers to Beijing "for a daylong meeting." During the meeting, according to FE1, they made the decision to immediately dissolve 11 centers on July 31, 2021, while retaining the remaining three centers in Zhengzhou, Wuhan, and Chengdu (excluding the Beijing headquarters) to continue their operations. FE1 adds he received his termination form on July 31, 2021, just like all the other employees who were laid off from the 11 centers on the same day. FE 1 states that all departments and teams from 11 centers were dissolved including tutors, functional departments, HR teams, human resources business partners, and administrative departments. According to FE 1, the only exception was instructors and course developers, who were not laid off and were based in the Beijing headquarters.

121.    Former Employee 2 ("FE 2) worked as a financial manager at Zhengzhou Gaotu Yunji Education Technology Co. Ltd., a subsidiary of Gaotu, from January 2020 to April 2022. FE 2 was responsible for reviewing financial statements, verifying related transactions, conducting financial analysis, and providing various financial reports to headquarters. FE 2 reported directly to the financial director at Gaotu's Beijing headquarters who reported to the CFO, Defendant Shen. FE 2 and other financial managers regularly held online meetings with officers at Gaotu's Beijing headquarters. FE 2 also communicated with the Beijing headquarters through e-mail. FE 2 states that the Double Reduction Regulation was "widely known" before July 24, 2021 and hence he "suppose most of employee including senior management were aware of the general situation of this policy." FE 2 states that the massive layoff in May 2021 "was in response to the national Double Reduction policy," so that "Gaotu's business adjustment was in compliance with market policy."

122.     Former Employee 3 ("FE 3") worked as a product operator at Gaotu's Beijing headquarters from September 2020 to January 2022. FE 3 states that the "official document" of the Double Reduction Regulation "had been spread out on the Maimai" since mid-July, 2021 and he and his colleagues saw it on Maimai before its official release. Maimai is a professional social networking platform with recruitment features in China. FE 3 states that he read the "stamped" version of the Double Reduction Regulation on Maimai before July 24, 2021. In China's regulatory context, a stamp on a document means that the document has been finalized and is considered official.

123.     Gaotu would not have undertaken the drastic downsizing measures that it did, or shift its focus from the lucrative K-12 tutoring market to other less lucrative products, if Defendants were not certain that the Double Reduction Regulation would be passed, or if they believed that there was a possibility that Xi Jinping and the Chinese government might have a last-minute change of heart.

## VII.    **The Truth Emerged.**

124.     On July 23, 2021, various news media outlets released reports on the Double Reduction Regulation. For example, at 5:10 am Eastern time, Bloomberg reported that "China is said to consider turning tutoring firms into non-profits" and "edtech firms are to be banned from going public or raising capital, while vacation and weekend tutoring on school subjects will also be banned."

125.    On July 23, 2021, at approximately 9:00 am Eastern time, *The Wall Street Journal* reported that it saw "an unverified document, circulating among investors," which "appeared to be an official communication detailing new, tougher guidelines for the sector."[92]

126.    In premarket trading, all Chinese tutoring companies' shares tanked. Gaotu ADSs fell by 59%, TAL Education by 54%, New Oriental by 48%, and 17 Education & Technology 40%, while S&P 500 and Dow Jones Industrial Average futures, in comparison, were both trading higher that morning.

127.    At 2:39 pm Eastern time, *Reuters* published an article titled "China bars for-profit tutoring in core school subjects -document", reporting that "China is barring tutoring for profit in core school subjects to ease financial pressures on families that have contributed to low birth rates, news that sent shockwaves through its vast private education sector and share prices plunging."

128.    At 5:15 pm Eastern time, Caixin Global[93] published an article titled "Chinese Education Stocks on NYSE Collapse Amid New Crackdown." This article delved into the specifics of the Double Reduction Regulation and cited confirmations from education "department staff in Beijing and several other cities" who acknowledged "receiv[ing] the document and are conducting regulatory actions in accordance with it." Furthermore, the article noted that the Double Reduction Regulation, "including implementation measures and trial programs, was distributed nationwide to local authorities July 20." Bloomberg later republished the Caixin article on the same day.

---

[92] https://www.wsj.com/articles/snap-twitter-facebook-intel-what-to-watch-when-the-stock-market-opens-today-11627037194

[93] https://www.caixinglobal.com/2021-07-24/chinese-education-stocks-on-nyse-collapse-amid-new-crackdown-101744729.html#:~:text=Shares%20of%20Chinese%20education%20companies,public%20off erings%20and%20-Foreign%20investments.

129.    These news reports, along with numerous others on July 23, 2021, caused the price of Gaotu's ADSs to plummet by 63.3%, closing at $3.52 per ADS, down from $9.58 per ADS on July 22, 2021, resulting in significant losses for investors.

130.    On Saturday, July 24, 2021, the Chinese government officially released the Double Reduction Regulation to the general public via China's official state media.

131.    On Sunday, July 25, 2021, Gaotu announced that the Chinese government had officially published the Double Reduction Regulation on July 24, 2021. In its announcement, Gaotu provided a summary of the key directives within the Double Reduction Regulation and stated that "[t]he Company expects the [Double Reduction Regulation], related rules and regulations, and the compliance measures to be taken by the Company will have a material adverse impact on its results of operations and prospect."

132.    On Monday, July 26, 2021, Gaotu's ADS dropped an additional 29% to close at $2.50 per ADS after the official release of the Double Reduction Regulation and Gaotu's weekend announcement, further damaging investors.

VIII.    **Events after the Class Period Further Substantiate Plaintiffs' Allegations.**

133.    As Gaotu fully anticipated, the Double Reduction Regulation did indeed impose severe restrictions  on the Company's operations and forced it to continue overhauling and downsizing its business, which Gaotu had been quietly undertaking during the Class Period. The ultimate aim behind these actions, as described by Defendant Chen, was to "survive." [94]

134.    In an August 4, 2021 interview with The 21st Century Economic Report, Defendant Chen disclosed the closures of 10 of Gaotu's 15 operations centers, retaining only the Beijing headquarters and the 5 operating centers in Shanghai, Zhengzhou, Wuhan, Chengdu, and

---

[94] https://news.stcn.com/sd/202108/t20210801_3497371.html

Taiyuan. [95] Defendant Chen further revealed that due to the prohibition of classes on weekends and during winter and summer school breaks, Gaotu anticipated a reduction of approximately 70% in class time, resulting in a corresponding decline in revenue. Defendant Chen, however, declined to disclose the exact number of terminated employees. Chinese news media reported that the layoffs before August 1, 2021, were expected to be over 10,000 employees, accounting for approximately one-third of Gaotu's entire workforce. [96]

135.    Defendant Chen's interview with The 21st Century Economic Report corroborates FE 1's statements that Gaotu had been planning a substantial downsizing of its operations during the Class Period. Otherwise, it would have been administratively and logistically implausible for the Company to swiftly close down 67% of its operations, involving over 10,000 employees, within a mere 7 days following the official publication of the new regulation.

136.    On September 22, 2021, Gaotu held an earnings call to discuss its Q2 2021 financial results. On the call, Defendant Chen disclosed that "[r]egarding advertising, we stopped acquiring traffic from online social platforms since the second quarter."[97] Notably, this form of advertising would be explicitly prohibited by the Double Reduction Regulation. That Gaotu suddenly stopped this form of marketing in the *second quarter* of 2021 – before the official release of the Double Reduction Regulation - further supports the inference that the Defendants possessed prior knowledge of the restrictions outlined in the Double Reduction Regulation and had been proactively taking measures during the Class Period to prepare for compliance with the forthcoming regulation.

---

[95] https://m.21jingji.com/article/20210805/herald/42b3bba7e99442853f0a0d777a9a7147.html
[96] https://news.stcn.com/sd/202108/t20210801_3497371.html
[97] https://seekingalpha.com/article/4456587-gaotu-techedu-inc-gotu-ceo-larry-chen-on-q2-2021-results-earnings-call-transcript

137.    On November 6, 2021, the Financial Times published an article titled "*How China's Tech Bosses Cashed Out At The Right Time-Sales Of US-Listed Shares Came Ahead Of Significant Moves In Price.*" This article exposed how Chinese companies listed on U.S. stock markets leveraged Rule 144 under the Securities Act of 1933 to conduct insider trades discreetly, escaping public scrutiny "ahead of regulatory action or the release of disappointing earnings reports." The article highlighted that nearly all trades filed under Rule 144's Form 144 have traditionally been submitted by mail, with the SEC granting access to these documents in its Washington, D.C. reading room but not uploading them publicly to EDGAR.[98] While the SEC has started accepting email notifications since April 2022, those are also not uploaded to EDGAR. A private company digitized these filings for sale to institutional investors and banks, effectively keeping this information on Form 144 insider trades out of reach for the average investing public.

138.    The Financial Times article specifically pointed to Gaotu and 51 Talk, two Chinese online education companies whose insiders executed trades of their U.S. listed shares before the market became aware of the Double Reduction Regulation. The article delved into the Irefresh trade discussed above, and noted that the block of Gaotu shares traded as indicated in the March 9, 2021 Form 144 would only be worth $4 million after the market reacted to the official publication of the Double Reduction Regulation. The Financial Times revealed that "one person close to [Gaotu] said its leaders were aware at the time of the trade that Beijing was considering stricter regulations on the industry," suggesting that Gaotu insiders, including Defendant Shen,

---

[98] According to the SEC, EDGAR "is the primary system for companies and others submitting documents under the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, and the Investment Company Act of 1940. Containing millions of company and individual filings, EDGAR benefits investors, corporations, and the U.S. economy overall by increasing the efficiency, transparency, and fairness of the securities markets." Access to EDGAR's public database is free. https://www.sec.gov/edgar/about.

traded based on nonpublic information. Furthermore, the article highlighted that in March 2021, when rumors circulated about the Chinese government's intentions to tighten control over the after-school tutoring industry, Defendant Chen attempted to stabilize Gaotu's share price by "express[ing] confidence in his business, promising at the end of March to buy $50m of shares with his own money" — a promise he ultimately did not fulfill. As of February 28, 2021, Defendant Chen held a significant ownership stake in Gaotu, possessing 43.5% of the total ordinary shares. This high level of ownership vested him with a strong personal incentive to prevent any decline in Gaotu's share price.

139.    The ongoing adverse impact of the Double Reduction Regulation on Gaotu's operations became increasingly apparent in the subsequent months.

140.    On November 15, 2021, Gaotu announced that "[i]n compliance with the [Double Reduction Regulation], the Company will cease offering tutoring services related to academic subjects to students from kindergarten through grade nine (the "K-9 Academic AST Services") by the end of 2021 (the "Cessation"). The Company expects that the Cessation will have a substantial adverse impact on the Company's revenues for the fiscal year ending December 31, 2021 and the subsequent periods." [99]

141.    On February 16, 2022, Gaotu announced that in order to comply with Beijing local government's updated regulatory requirements following the Double Reduction Regulation, "the Company will cease offering tutoring services related to academic subjects to students in senior high schools [i.e. Grades 10-12 Education] before the end of February 2022 (the "Cessation").

---

[99]

https://www.sec.gov/Archives/edgar/data/1768259/000119312521328796/d259413dex991.htm

The Company expects that the Cessation will have a substantial adverse impact on the Company's revenues for 2022 and subsequent periods."[100]

142.    On April 26, 2022, Gaotu filed its 2021 annual report on Form 20-F, showing a significant decline in Gaotu's new revenue and gross billings, and an increase in net loss for 2021 due to the impact of the Double Reduction Regulation. The 2021 Form 20-F recognized that Gaotu's "compliance with" the Double Reduction Regulation and the following implementation measures "has materially and adversely affected and will materially and adversely affect our business, financial condition, results of operations and prospect." The 2021 Form 20-F confirmed that Gaotu terminated "10 operation centers, personnel reduction, etc. As a result, we suffered large summer tuition refunds in the third quarter of 2021." The 2021 Form 20-F showed that "[Gaotu] generated a net loss of RMB3,103.5 million (US$487.0 million) in 2021, compared to a net loss of RMB1,392.9 million in 2020, and a net income of RMB226.6 million in 2019, primarily due to the decrease in revenue as a result of the cessation of the K-9 Academic AST Services and the severance costs for the personnel reduction." The 2021 Form 20-F highlighted that the termination of the K-9 related courses by the end of 2021 "will have a material adverse impact on the Company's revenues in 2022 and subsequent periods."

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING OMISSIONS DURING THE CLASS PERIOD

143.    On March 5, 2021, Gaotu held a conference call with securities analysts to discuss its Q4 2020 earnings ("Q4 2020 Earnings Call"). Asked about revenue growth targets, Defendant Chen stated:

> In 2021, we will continue to expand our recruiting and training of the star instructors, expand our efforts on content, product and the technology developments, maintain effective growth strategy on lifetime value basis, optimize

---

[100] https://www.sec.gov/Archives/edgar/data/1768259/000095017022001380/gotu-ex99_1.htm

our regional efficiency and effectiveness, and further improve our organizational capabilities and efficiency.

We are confident that we will continue to excel in terms of operating efficiency in 2021.And certainly, we are pretty confident about our growth rate of full-year 2021. So we hope for 2021, the full-year growth rate is going to be in the range of 70% to 80%.

In 2020, in terms of balancing between the ROI and the scale, we are doing a really great job. And in 2021, we are confident we do also a good job.

144.    During the call, Christine Cho, a Goldman Sachs analyst, asked Defendants about

an "update on the regulatory landscape" on after-school tutoring. Defendant Shen responded to

the analyst's question:

And as you mentioned, since January, the government has taken a closer look at the marketing campaign of the online education industry, and ***actually we highly welcome and proactively embrace the change and we probably support the government's current and the following regulator measures. We believe the policy will benefit the whole industry in a long run.*** For instance, firstly, the potential customer acquisition cost is likely to decline, and this is consistent with our observation in January and February. So in the past two months, the unit sales leads price we acquired from social media platforms were much lower compared to November and December in 2020. And that's basically we are the last the company to join the campaign to sponsor TV programs or like other shows or do like best station advertisement. From the bottom of our heart, we really wanted to have effective growth other than that burning money. ***So if something just came out, we will be delightful and I think it's good to our company because we are a operations-orientated company and we are not a traffic-oriented company.***

And the second is like the management will increase the trust of the students and the parents towards online education campaign. We really wanted the engagement between the parents and us and students and us as peaceful without creating an anxiety. And talking about that in itself, education also should not only help students to improve their academic performance, but more importantly, should foster their academic capability, develop good learning habits, and if we really have the capital, we really want to invest in upgrading our products, other than spend them in sales and the marketing.

145.    The statements referenced above were materially false and misleading because at

the time of the Q4 2020 earnings call, the annual Two Sessions for 2021 had already commenced.

During these sessions, delegates from across China urged the Chinese central government to

implement tighter control over the after-school tutoring industry. In contrast to the Defendants' public representations that they believed the forthcoming regulations would be "good" for the Company and would "benefit the whole industry in the long run," the actual belief among Gaotu's employees, including Defendant Shen, was that regulatory action severely detrimental to Gaotu was imminent as reported in the November 6, 2021 Financial Times article. As a result, Gaotu's employees, including Defendant Shen, were in the process of selling 1,335,000 ADSs with a market value of $119 million through their shell company, Irefresh. Just four days later, on March 9, 2021, Irefresh, acting on behalf of Gaotu's employees, including Defendant Shen, officially filed the proposed sale on Form 144, which sale had to be executed within three days according to Rule 144.

146.   In its 2020 Form 20-F filed on April 26, 2021, Defendants disclosed two risk disclosures relating to China's regulatory uncertainty. Specifically, the 2020 Form 20-F stated that,

> ***Uncertainties exist in relation to new legislation or proposed changes in the PRC regulatory requirements regarding online private education, which may materially and adversely affect our business, financial condition and results of operations.***
> The private education industry in the PRC is subject to regulations in various aspects. Relevant rules and regulations are relatively new and evolving and could be changed to accommodate the development of the education, in particular, the online private education, markets from time to time.
>
> \* \* \*
>
> Given the foregoing, the interpretation and application of the existing laws and regulations and the newly promulgated implementation rules and interpretations, if any, that governs the online private education industry would create substantial uncertainties regarding the legality of our business operation, which create risks that we may be found to violate the existing laws and regulations and any newly promulgated implementation rules and interpretations.

147.    The risk disclosure mentioned above was materially false and misleading because it failed to disclose that when Gaotu filed its 2020 Form 20-F on April 26, 2021, Gaotu's employees, including Defendant Shen, possessed specific nonpublic information about the forthcoming Double Reduction Regulation's detrimental impact on the after-school tutoring sector; they had consequently sold a significant quantity of Gaotu shares through Irefresh, as evidenced in Section VI and corroborated by the November 6, 2021 Financial Times article. The general risk disclosure about future risks resulting from unknown future regulatory uncertainty was not substantive or specifically tailored to apprise the investing public of the *specific known* risk resulting from the forthcoming Double Reduction Regulation.

148.    The 2020 Form 20-F also stated that,

*We face uncertainties with respect to the development of regulatory requirements on operating licenses and permits for our online education services in China. Failure to renew requested licenses or permits in a timely manner or obtain newly required ones due to adverse changes in regulations or policies could have a material adverse impact on our business, financial condition and results of operations.*

The internet industry and education industry in China are highly regulated by the PRC government. As an internet-based education service provider, we are required to obtain and maintain all necessary approvals, licenses or permits applicable to our business operations and make all necessary registration and filings for our education services in China, and we may be required to apply for and obtain additional licenses or permits for our operations as the interpretation and implementation of current PRC laws and regulations are still evolving, and new laws and regulations may also be promulgated.

There can be no assurance that once required, we will be able to obtain all the required approvals, licenses, permits and complete all necessary filings, record renewals and registrations on a timely basis for our online education services, given the significant amount of discretion the PRC authorities may have in interpreting, implementing and enforcing relevant rules and regulations, as well as other factors beyond our control and anticipation. If we fail to obtain required permits in a timely manner or obtain or renew any permits and certificates, or fail to complete the necessary filings, record renewals or registrations on a timely basis, we may be subject to fines, confiscation of the gains derived from our non-compliant

operations, suspension of our non-compliant operations or claims for compensation of any economic loss suffered by our students or other relevant parties.

149.    The risk disclosure mentioned above was materially false and misleading because it failed to disclose that when Gaotu filed its 2020 Form 20-F on April 26, 2021, Gaotu's employees, including Defendant Shen, possessed specific nonpublic information about the forthcoming Double Reduction Regulation's detrimental impact on the after-school tutoring sector; they had consequently sold a significant quantity of Gaotu shares through Irefresh, as evidenced in Section VI and corroborated by the November 6, 2021 Financial Times article. The general risk disclosure about future risks resulting from unknown future regulatory uncertainty was not substantive or specifically tailored to apprise the investing public of the ***specific known*** risk resulting from the forthcoming Double Reduction Regulation.

150.    Defendant Chen signed the 2020 Form 20-F.

151.    Furthermore, Defendants had an affirmative duty to disclose material risks and uncertainties in Gaotu's 2020 Form 20-F under SEC regulations.

152.    In accordance with 17 C.F.R. §229.105 – Item 105 (Risk Factors), [101]issuers, such as Gaotu, are obligated to "provide, under the caption 'Risk Factors,' a discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. §229.105.[102] The presentation of risks that could apply generically to any registrant or any offering is discouraged. *Id*. Where a summary of risk factors is required, the issuer should provide

---

[101] Item 105's requirements were previously set forth in 17 CFR §229.503 ("Item 503"). On April 2, 2019, the SEC relocated Item 503(c) to Item 105 of Regulation S-K.

[102] Item 105 was amended in October 2020, to expand the scope of required disclosure from "the most significant factors" to "material factors." The purpose of the revision was to "focus registrants on disclosing the risks to which reasonable investors would attach importance in making investment or voting decisions." *See* 85 F.R. 63761, 63744-45 (Oct. 8, 2020).

"a series of concise, bulleted or numbered statements that is no more than two pages summarizing the principal factors that make an investment in the registrant or offering speculative or risky." *Id*.

153. When Gaotu filed its 2020 Form 20-F on April 26, 2021, there were numerous compelling indicia, as detailed in Section VI above and corroborated by the Financial Times article dated November 6, 2021, that Gaotu's employees, including Defendant Shen, were in possession of specific nonpublic information regarding the impending Double Reduction Regulation's prohibitions on the after-school tutoring sector and had discreetly divested themselves of a significant quantity of Gaotu shares through Irefresh. The forthcoming Double Reduction Regulation substantially increased the risky nature of investing in Gaotu's ADSs. Consequently, Defendants had an affirmative duty, but failed, to disclose their awareness of the Double Reduction Regulation and its associated material risks on Gaotu's operations, as required by Item 105.

154. Additionally, Part I, Item 5(D) Form 20-F, requires registrants to:

> [D]iscuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition.

155. Even a one-time regulatory event, if "reasonably expect[ed]" to have a material impact on the company must be disclosed.

156. Item 5(D) of Form 20-F "call[s] for the same disclosure as Item 303 of Regulation S-K".[103] And pursuant to Item 303, issuers must disclose actual and contemplated regulatory

---

[103] *See also* SEC Division of Corporation Finance's *Financial Reporting Manual* ("FRM") which provides: "The requirements for MD&A [Management's Discussion & Analysis] are set forth in Item 5 of Form 20-F, under Operating and Financial Review and Prospects (sometimes referred to as the OFR). This Item calls for the same disclosure as S-K 303 …" FRM §9410.1.

action or "changes in" the "regulatory environment[.]" *In Re Comm'n Guidance Regarding MD&A of Fin. Condition & Results of Operation*, Release No. 8350 (Dec. 19, 2003) (the "2003 Guidance") available at 2003 WL 22996757, *1 nn.1, 27.

157.     Regulation S-K provides that the discussion of known trends, uncertainties, and events should appear in the section of an issuer's registration statement reporting "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"). In a 1989 Interpretive Release, the SEC described the purposes of MD&A:

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future.

*Management's Discussion & Analysis of Fin. Condition & Results of Operations; Certain Inv. Co. Disclosures*, Release No. 6835 (May 18, 1989) (the "1989 Interpretive Release") available at 1989 WL 1092885.[104]

158.     Item 5(D) requires disclosure based on "currently known trends, events, and uncertainties that are reasonably expected to have material effects." *Id.* at *4.

159.     Item 303 demands disclosure of known trends unless management determines that a material effect on financial condition or results of operations is not likely to appear. The 1989

---

FRM §9410.2 further provides: "The requirements of Item 5 of Form 20-F are as follows: … d. Trend information – Item 5.D."

[104] The 1989 Interpretive Guidance applies to Item 5(d) of Form 20-F. Form 20-F, Instruction 5 (stating that issuers should refer to the 1989 Interpretive Guidance); 2003 Guidance, at 2003 WL 22996757, *1 n.1 (same).

Interpretive Release provides the following test to determine if disclosure under Item 303(a) or

Part I, Item 5 of Form 20-F is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required. (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results is not reasonably likely to occur.

1989 Interpretive Release, 1989 WL 1092885, at *6

160.    Issuers must disclose regulatory actual or contemplated regulatory action, as

shown by an example provided by the 1989 Interpretive Release:

> Facts: A registrant has been correctly designated a PRP by the EPA with respect to cleanup of hazardous waste at three sites. No statutory defenses are available. The registrant is in the process of preliminary investigations of the sites to determine the nature of its potential liability and the amount of remedial costs necessary to clean up the sites. Other PRPs also have been designated, but the ability to obtain contribution is unclear, as is the extent of insurance coverage, if any. Management is unable to determine that a material effect on future financial condition or results of operations is not reasonably likely to occur.
>
> Based upon the facts of this hypothetical case, MD&A disclosure of the effects of the PRP status, quantified to the extent reasonably practicable, would be required. [Footnote omitted]. For MD&A purposes, aggregate potential cleanup costs must be considered in light of the joint and several liability to which a PRP is subject. Facts regarding whether insurance coverage may be contested, and whether and to what extent potential sources of contribution or indemnification constitute reliable sources of recovery may be factored into the determination of whether a material future effect is not reasonably likely to occur.

*Id.* at *6.

161.    Issuers must disclose both (a) known trends and uncertainties and (b) any potential

material impact of known trends and uncertainties on their own operations even if the trends are

a matter of public knowledge. 1989 Interpretive Release, 1989 WL 1092885 at *6. *See also Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 721 (2d Cir. 2011).

162.    Indeed, as a foreign issuer, Gaotu faces heightened obligations to disclose government action. Item 303 specifically instructs foreign private registrants like Gaotu to "discuss briefly any pertinent governmental economic, fiscal, monetary, or political policies or factors that have materially affected or could materially affect, directly or indirectly, their operations or investments by United States nationals." 17 C.F.R. § 229.303, ¶12. There is no corresponding specific requirement for domestic companies.

163.    When Gaotu filed its 2020 20-F Form 20-F on April 26, 2021, there were numerous indications, as outlined in Section VI above and corroborated by the Financial Times article dated November 6, 2021, strongly suggesting that Gaotu's employees, including Defendant Shen, were in possession of specific nonpublic information regarding the impending Double Reduction Regulation's prohibitions on the after-school tutoring sector and had discreetly divested themselves of a significant quantity of Gaotu shares through Irefresh. Thus, pursuant to Item 5(D), Gaotu had an affirmative duty, but failed, to disclose their awareness of the Double Reduction Regulation and its associated material uncertainties on Gaotu's operations, as required by Item 303.

164.    On May 26, 2021, five days after President Xi officially approved the Double Reduction Regulation, the Company held a conference call with securities analyst to discuss its Q1 2021 earnings. On the call, Defendants once again denied that regulations would have any material adverse impact on Gaotu's operations:

Q: Hi, Larry. Hi, management. Thanks for the presentation. This is Mark Li from Citi. *May I ask given the recent update in our regulation from the government, what do we see is the potential impact on our operations for the rest of the quarters or for the next year?* Could you share a bit more color? And also my

60

second question is for our advertising ROI, could you share a little bit more color on the ROIs in '21? And what do we think going forward? Thank you.

A <Defendant Shen>: Thanks, Mark. First question about the regulation impact. So we have been following the opinions on regulating after-school tutoring institutions in 2018 and further opinions on regulating after-school -- online after-school institutions issued in 2019 in the past years. And recently, the government has issued regulatory guidance on several aspects of online education, including, first, prepaid tuition fee management. On May 21, four departments in Beijing jointly released a guideline, listing out specific requirement on the tuition fee collected in advance, including tuition fee coverage period, advance tuition fee collection timing and tuition fee monitoring. They provided very detailed guidelines.

And second, about advertisement, our companies should follow the law of advertising and the law of -- against and fire compensation. The department also provided a list about what the company should now do in commercial. It's a very detailed list.

Also, regulators provided guidelines on our teaching content, course format, course scheduling, teacher qualifications, homework and student rest time, et cetera. So to better implement these regulations, we have proactively activated a cross-department compliance team within the company. This team consists of all senior management teams, and we have organized several rounds of meetings, initiate rounds of study on the new regulations. We've taken down a non-compliant advertisement and adjusted our homework procedures and adjusted the class schedule to meet the requirement from all of those regulators. And with regard to instructor qualifications, except for check the paper, the certificate of the teachers' qualifications, we also cross check the teacher qualifications online and from other channels.

***So on May 21, the same day was the prepaid tuition fee management rule, the Central Commission for Comprehensively Deepening Reform launched its 19th meeting, inversely also approved the opinion on reducing burden from homework and apps for tutoring for compulsory education students, that is called (Foreign Language). So we haven't received the specific account yet. Once the opinion is published, we will immediately take measures to comply in all levels.***

So after school tutoring is part of the education industry and education, especially for K-12 education should focus on the social impact and core values. The regulation provided timely and clearly directions for the industry. ***We will proactively embrace the policy and take solid actions and closely monitor the following execution. We believe only when other companies comply with the government policy at the highest level, the whole industry can achieve a lasting healthy and sustainable development.***

A <Defendant Chen>: (Foreign Language) I want to add several more points. The first one is (inaudible) for premium education for customized education from students and parents is eternal, always exist. Secondly, the benefits brought by online education at very affordable price will provide a secure for equal access to the education. Thirdly, the online education is able to collect data with all assets from the students. So it's easier for online education to provide more customized solutions for each student. So insured, me personally, ***I am very optimistic about the future of online education and I believe that as long as we give education with our true heart, with our consciousness, I believe this sector will have a very long term and sustainable development.***

165.    The statements above were materially false and misleading because contrary to Defendant Shen's public representation that Defendants "haven't received the specific contents yet" of the Double Reduction Regulation, numerous and compelling indicia, as detailed in Section VI above, show that at the time of the May 26, 2021 earnings call, Defendants possessed knowledge of the "specific contents" of the new regulation relating to the restrictions on the after-school tutoring industry.

166.    Additionally, the statements above were materially false and misleading because contrary to Defendant Chen's public representation that they were "very optimistic about the future of online education," compelling evidence, as stated above in Section VI, shows that Defendants had grown pessimistic about the future of Gaotu and the after-school tutoring industry as a whole. The above statements omitted the material information that at the time of the May 26, 2021 earnings call, Defendants had initiated or were contemplating a series of mitigating measures to counteract the adverse impacts anticipated from the Double Reduction Regulation. These measures included:

> (a)    Implementing significant layoffs, with a 30% reduction in the workforce, commencing from the week of the May 26, 2021 earnings call;
>
> (b)    Ceasing all information flow and live streaming business operations;

62

    (c)    Discontinuing the acquisition of traffic from online social platforms starting in the second quarter of 2021;

    (d)    Shifting focus toward non-after-school tutoring business through Gaotu Online and a revised Gaotu app;

    (e)    Expanding the registered business scope beyond after-school tutoring; and

    (f)    Shutting down 67% of operating centers and letting go of over 10,000 employees.

167.    These actions taken by the Defendants contradicted their public statements and demonstrated their awareness of the impending challenges posed by the Double Reduction Regulation.

168.    On July 23, 2021, amid reports from both Chinese and English news outlets detailing the specific bans imposed by the Double Reduction Regulation, which subsequently led to a 63% decline in Gaotu's ADS price, the company issued a carefully worded press release. In this press release, Gaotu denied having received the official copy of the Double Reduction Regulation. This same press release was also submitted to the SEC on Form 6-K, with Defendant Shen's signature. The press release stated, in pertinent part, as follows:

### Gaotu Techedu Inc. Responds to Media Reports

BEIJING, July 23, 2021 Gaotu Techedu Inc. (Gaotu or the Company) (NYSE: GOTU), a leading online large-class after-school tutoring service provider in China, today noted that certain English and Chinese language media outlets reported that the PRC regulators are considering a new set of regulations concerning after-school tutoring service related to school subjects taught in China's compulsory education system. The regulations have not been published, and the Company has not received official notification of the regulations. It is the Company's policy not to comment on market speculations.

169.    The statements above were materially false and misleading because Gaotu intended to create a false impression in the investing public's mind that Gaotu had no knowledge

of the contents of the Double Reduction Regulation yet in order to stabilize its sharply declining ADS price. Contrary to the public impression that Defendants intended to create, the above statements omitted the material information that at the time of the July 23, 2021 press release, Defendants had taken a series of mitigating measures to counteract the adverse impacts anticipated from the Double Reduction Regulation. These measures included:

(a) Implementing significant layoffs, with a 30% reduction in the workforce, commencing from the week of the May 26, 2021 earnings call;

(b) Ceasing all information flow and live streaming business operations;

(c) Discontinuing the acquisition of traffic from online social platforms starting in the second quarter of 2021;

(d) Shifting focus toward non-after-school tutoring business through Gaotu Online and a revised Gaotu app;

(e) Expanding the registered business scope beyond after-school tutoring; and

(f) Shutting down 67% of operating centers and letting go of over 10,000 employees.

## **LOSS CAUSATION AND ECONOMIC LOSS**

170. The market for Gaotu ADSs was open, well-developed, and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Gaotu ADSs traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired Gaotu ADSs relying upon the integrity of the market of Gaotu, and market information related to the Company and have been damaged thereby.

171.    During the Class Period, Defendants named in this Action materially misled the investing public, thereby inflating the price of Gaotu ADSs, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make their own statements, as set forth herein, not false and/or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Gaotu's business, operations, and regulatory risk as alleged herein.

172.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Gaotu's regulatory risk and exposure. These material misstatements and/or omissions had the cause and effect of creating and/or maintaining in the market an unrealistically positive assessment of the Company and its operations, thus causing the Company's stock to be overvalued and artificially inflated at all relevant times. The materially false and/or misleading statements made by Defendants named in this Action during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's ADSs at artificially inflated prices, thus causing the damages complained of herein.

173.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that caused the price of Gaotu ADSs to be artificially inflated by failing to disclose and/or misrepresenting the adverse facts detailed herein. As Defendants' misrepresentations and fraudulent conduct were gradually disclosed and became

apparent to the market, the artificial inflation in the price of Gaotu ADSs was removed, and the price of Gaotu ADSs fell.

174. As a result of their purchases of Gaotu ADSs during the Class Period at artificially inflated prices, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Indeed, on March 5, 2021, at the start of the Class Period, Gaotu ADSs price traded at $91.39 per share and, at the end of the Class Period, traded for only $2.50 per share on July 26, 2021. This decline includes the sharp decreases in value caused by Gaotu's commentary about the prospects for additional government regulation during Deutsche Bank's 29th Annual Media, Internet & Telecom Conference on March 9, 2021, and widespread reporting about the highly restrictive "Double Reduction Regulation" after the Chinese government officially published it on July 24, 2021.

175. The timing and magnitude of the price decline in Gaotu's stock negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

## **PLAINTIFFS' CLASS ACTION ALLEGATIONS**

176. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities who purchased or otherwise acquired Gaotu ADSs publicly traded on the NYSE during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Gaotu, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

177.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Gaotu ADSs were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are at least hundreds, if not thousands of members in the proposed Class.

178.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

179.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiff have no interests antagonistic to or in conflict with those of the Class.

180.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the Exchange Act was violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of Gaotu;

(c)     whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether the Defendants caused Gaotu to issue false and misleading filings during the Class Period;

(e)    whether Defendants acted knowingly or recklessly in issuing false filings;

(f)    whether the prices of Gaotu ADSs during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

181.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)    Gaotu ADSs met the requirements for listing, and were listed and actively traded on the NYSE, an efficient market;

(b)    As a public issuer, Gaotu filed periodic public reports;

(c)    Gaotu regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d)    Gaotu securities were liquid and traded with moderate to heavy volume during the Class Period; and

(e)    Gaotu was followed by securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

182.    Based on the foregoing, the market for Gaotu securities promptly digested current information regarding Gaotu from all publicly available sources and reflected such information in the prices of the ADSs, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

183.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

184.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE

185.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

186.    To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

187.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Gaotu who knew that the "forward-looking statement" was false. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

188.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Gaotu who knew that the statement was false when made.

## COUNT I

### Violations of Section 10(b) and Rule 10b-5
### Against All Defendants

189.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

70

190.   This Count asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

191.   During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

192.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)   employed devices, schemes and artifices to defraud;

(b)   made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)   engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Gaotu ADSs during the Class Period.

193.   Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Gaotu were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of Gaotu, their control over, and/or receipt and/or modification of Gaotu's allegedly materially misleading statements, and/or their

associations with the Company which made them privy to confidential proprietary information concerning Gaotu, participated in the fraudulent scheme alleged herein.

194.     Individual Defendants, who are or were the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Gaotu personnel to members of the investing public, including Plaintiffs and the Class.

195.     As a result of the foregoing, the market price of Gaotu ADSs was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Gaotu securities during the Class Period in purchasing Gaotu ADSs at prices that were artificially inflated as a result of Defendants' false and misleading statements.

196.     Had Plaintiffs and the other members of the Class been aware that the market price of Goatu ADSs had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Gaotu ADSs at the artificially inflated prices that they did, or at all.

197.     As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

198.     By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of Gaotu securities during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

199.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

200.    During the Class Period, the Individual Defendants participated in the operation and management of Gaotu, and conducted and participated, directly and indirectly, in the conduct of Gaotu's business affairs. Because of their senior positions, they knew the adverse non-public information about Gaotu's false financial statements.

201.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Gaotu's financial condition and results of operations, and to correct promptly any public statements issued by Gaotu which had become materially false or misleading.

202.    Because of their positions of control and authority as senior officers or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Gaotu disseminated in the marketplace during the Class Period concerning Gaotu's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Gaotu to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Gaotu within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Gaotu securities.

203.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Gaotu.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of the Class, pray for judgment and relief as follows:

(a)     declaring this action to be a proper class action, certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiffs' counsel as Class Counsel;

(b)     awarding damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)     awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: October 16, 2023       **LEVI & KORSINSKY, LLP**

             s/ Adam M. Apton
            Adam M. Apton
            33 Whitehall Street, 17th Floor
            New York, NY 10004
            Tel: (212) 363-7500
            Fax: (212) 363-7171
            aapton@zlk.com

            *Counsel for Lead Plaintiff*
            *and Lead Counsel for the Class*

             -and-
            **THE ROSEN LAW FIRM, P.A.**
            Phillip Kim
            Yu Shi
            Jing Chen

275 Madison Avenue, 40th Floor
New York, NY 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
pkim@rosenlegal.com
yshi@rosenlegal.com
jchen@rosenlegal.com

*Additional Counsel for Plaintiffs
and the Class*