# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

JOSHUA ZHANG, Individually and on behalf of all other similarly situated,

                 Plaintiff,

    v.

GAOTU TECHEDU INC. F/K/A GSX TECHEDU INC., XIANGDONG CHEN, and NAN SHEN,

                 Defendants.

Case No. 22-cv-7966-PKC-CLP

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

Adam M. Apton
LEVI & KORSINSKY, LLP
33 Whitehall Street, 17th Floor
New York, N.Y. 10004
(212) 363-7500
(212) 363-7171 (fax)

*Attorneys for Lead Plaintiff*
*and Lead Counsel for the Class*

## **TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................................................. 1

II.    BACKGROUND FACTS ...................................................................................... 2

    A.    China Greenlights the Double Reduction Regulation.............................. 2

    B.    Defendants Lie about the Impending Legislation and Falsely Tell Investors to Ignore the Storm Warnings. ................................................. 4

    C.    Investors Lose Nearly Everything from the Extreme Fallout while Defendants Avoid Millions in Losses with Insider Trades.................................... 6

III.    LEGAL STANDARD ........................................................................................... 8

IV.    ARGUMENT ......................................................................................................... 8

    A.    Defendants Made False and Materially Misleading Statements about the "Double Reduction Regulation" and Its Impact on the Company. ......................... 8

        1.    March 5, 2021: Gaotu's 4Q20 Earnings Call.............................. 8

        2.    April 26, 2021: Gaotu's 2020 Form 20-F Annual Report ....................... 12

        3.    May 26, 2021: Gaotu's 1Q21 Earnings Call.............................. 15

        4.    July 23, 2021: Gaotu's Response to Media Reports ................................. 16

    B.    Plaintiffs Adequately Plead a Strong Inference of Scienter.................................. 18

    C.    Plaintiffs Adequately Plead Loss Causation. ....................................................... 23

    D.    Defendants Are Liable as "Control Persons" under Section 20(a) of the Exchange Act. ..................................................................................... 25

V.    CONCLUSION................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*,
  615 F. App'x 44 (2d Cir. 2015) ............................................................................. 23

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*,
  19 F.4th 145 (2d Cir. 2021) .............................................................. 1, 20, 23, 25

*ATSI Communs., Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ..................................................................................... 8

*In re Avon Sec. Litig.*,
  2019 U.S. Dist. LEXIS 200816 (S.D.N.Y. Nov. 18, 2019) ................................... 21

*Banerjee v. Zhangmen Educ. Inc.*,
  2023 WL 2711279 (S.D.N.Y. Mar. 30, 2023) ...................................................... 11

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ............................................................................................... 12

*Bell Atl. Corp. v. Twombly*,
  127 S. Ct. 1955 (2007) ............................................................................................. 8

*In re Cabletron Sys.*,
  311 F.3d 11 (1st Cir. 2002) ................................................................................... 20

*Caiola v. Citibank, N.A.*,
  295 F.3d 312 (2d Cir. 2002) ........................................................................... 12, 16

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
  750 F.3d 227 (2d Cir. 2014) ................................................................................. 25

*Christine Asia Co. v. Ma*,
  718 F. App'x 20 (2d Cir. 2017) ......................................................................... 9, 19

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017) ................................................................................ 20

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
  875 F. Supp. 2d 359, (S.D.N.Y. 2012) ................................................................. 21

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*,
  70 F.4th 668 (3d Cir. 2023) .................................................................................. 10

*Dagan Invs., LLC v. First High-Sch. Educ. Grp. Co. Ltd*..,
    2023 WL 8452223 (S.D.N.Y. Dec. 6, 2023) ............................................................ 11

*In re Didi Global Inc. Securities Litigation*,
    2024 WL 1119483 (S.D.N.Y. Mar. 14, 2024) ........................................................ 13

*Dodona I, LLC v. Goldman, Sachs & Co.*,
    847 F. Supp. 2d 624 (S.D.N.Y. 2012) ............................................................. 13, 15

*Employees' Ret. Sys. v. Blanford*,
    794 F.3d 297 (2d Cir. 2015) ...................................................................... 2, 8, 18

*In re: EZCorp, Inc. Sec. Litig.*,
    181 F. Supp. 3d 197 (S.D.N.Y. 2016) .................................................................. 24

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
    986 F. Supp. 2d 487 (S.D.N.Y. 2013) .................................................................. 11

*In re Fairway Grp. Holding Corp. Sec. Litig.*,
    2015 U.S. Dist. LEXIS 5999 (S.D.N.Y. Jan. 20, 2015) ........................................ 23

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
    783 F.3d 395 (2d Cir. 2015) ............................................................................ 25

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d. 171 (S.D.N.Y. 2010) .............................................................. 9, 12

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000) ................................................................. 8, 10, 12, 25

*Goldman v. Belden*,
    754 F.2d 1059, 1063 (2d Cir. 1985) .................................................................... 9

*Gormley v. Magicjack Vocaltec Ltd.*,
    220 F. Supp. 3d 510 (S.D.N.Y. 2016) ................................................................. 24

*Haping v. 17 Educ.*,
    No. 1:22-cv-09843-LAK-SDA (S.D.N.Y. Nov. 8, 2023) (Dkt. No. 73) ................... 11

*Heller v. Goldin Restructuring Fund, L.P.*,
    590 F. Supp. 2d 603 (S.D.N.Y. 2008) ................................................................. 18

*In re Initial Pub. Offering Sec. Litig.*,
    241 F. Supp. 2d 281 (S.D.N.Y. 2003) ................................................................. 21

*In re JPMorgan Chase & Co. Sec. Litig.*,
    2007 U.S. Dist. LEXIS 93877 (N.D. Ill. Dec. 18, 2007) ........................................................ 22

*Kanefsky v. Honeywell Int'l, Inc.*,
    2020 U.S. Dist. LEXIS 87108 (D.N.J. May 18, 2020) ............................................................ 23

*Karimi v. Deutsche Bank Aktiengesellschaft*,
    2022 U.S. Dist. LEXIS 105369 (S.D.N.Y. June 13, 2022) ..................................................... 10

*Karimi v. Deutsche Bank Aktiengesellschaft*,
    607 F. Supp. 3d 381 (S.D.N.Y. 2022) .................................................................................... 19

*Lewis v. Curtis*,
    671 F.2d 779 (3d Cir. 1982) ................................................................................................... 22

*Lewy v. SkyPeople Fruit Juice, Inc.*,
    2012 U.S. Dist. LEXIS 128416 (S.D.N.Y. Sept. 10, 2012) .................................................... 17

*Litwin v. Blackstone Grp.*,
    634 F.3d 706 (2d Cir. 2011) ................................................................................................... 14

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015) ............................................................................................ 24, 25

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
    144 S. Ct. 885, 218 L. Ed. 214 (2024) ................................................................................... 14

*In re MBIA, Inc., Sec. Litig.*,
    700 F. Supp. 2d 566 (S.D.N.Y. 2010) .................................................................................... 20

*Meyer v. JinkoSolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014) .......................................................................................... 12, 14, 16

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
    455 F. App'x 10 (2d Cir. 2011) .............................................................................................. 20

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ............................................................................................. 16, 18

*In re QuantumScape Sec. Class Action Litig.*,
    580 F. Supp. 3d 714 (N.D. Cal. 2022) ................................................................................... 17

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014) ................................................................................................. 20

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001) ................................................................. 10, 19, 21

*SEC v. Bank of Am. Corp.*,
    677 F. Supp. 2d 717 (S.D.N.Y. 2010) ................................................................. 11

*Setzer v. Omega Healthcare Inv'rs, Inc.*,
    968 F.3d 204 (2d Cir. 2020) ................................................................. 16, 18

*Sharette v. Credit Suisse Int'l*,
    127 F. Supp. 3d 60 (S.D.N.Y. 2015) ................................................................. 8

*Skiadas v. Acer Therapeutics Inc.*,
    2020 U.S. Dist. LEXIS 105814 (S.D.N.Y. June 16, 2020) ............................... 20, 23

*Strougo v. Barclays PLC*,
    105 F. Supp. 3d 330 (S.D.N.Y. 2015) ................................................................. 20

*In re Synchrony Fin. Sec. Litig.*,
    988 F.3d 157 (2d Cir. 2021) ................................................................. 16

*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
    531 F.3d 190 (2d Cir. 2008) ................................................................. 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ................................................................. 18, 21

*Va. Bankshares v. Sandberg*,
    501 U.S. 1083, (1991) ................................................................. 11, 15

*In re Van der Moolen Holding N.V. Sec. Litig.*,
    405 F. Supp. 2d 388 (S.D.N.Y. 2005) ................................................................. 12, 14

*In re Vivendi Universal, S.A. Sec. Litig.*,
    381 F. Supp. 2d 158 (S.D.N.Y. 2003) ................................................................. 8

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016) ................................................................. 12, 24

*In re Wells Fargo & Co. Sec. Litig.*,
    2021 U.S. Dist. LEXIS 188666 (S.D.N.Y. Sept. 30, 2021) ................................ 9

*Youngers v. Virtus Inv. Partners Inc.*,
    228 F. Supp. 3d 295 (S.D.N.Y. 2017) ................................................................. 24

**Statutes**

15 U.S.C. §78u-4 ................................................................................................ 1

**Other Authorities**

36Kr Holdings Inc. Form 20-F
    www.sec.gov/Archives/edgar/data/1779476/000110465921056812/a21-3508_120f.htm) ..... 17

**Regulations**

17 CFR §229.105 ............................................................................................ 14

17 CFR §229.303 ............................................................................................ 14

I.    **INTRODUCTION**

Plaintiffs allege violations under the Securities Exchange Act of 1934 as modified by the Private Securities Litigation Reform Act of 1995. 15 U.S.C. §78u-4 ("PSLRA"). While the PSLRA carries special pleading standards for fraud claims, these standards are not meant to create a near-impossible hurdle for plaintiffs to overcome, as Gaotu would lead this Court to believe. The PSLRA does not turn the motion to dismiss into a trial by papers. All factual allegations in the complaint are still required to be accepted as true and common-sense inferences should not be disregarded. *See Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*, 19 F.4th 145, 150 (2d Cir. 2021) (emphasizing that courts "must be careful not to mistake heightened pleading standards for impossible ones"). With that, it takes little to see that Plaintiffs have adequately stated a claim for relief under Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5(b).

The People's Republic of China ("PRC") officially published the "Double Reduction Regulation" or "DRR" on July 24, 2021, which decimated the operations of every academic tutoring business in the industry due to its prohibitions against for-profit online after-school tutoring. At issue in this case is whether and when Gaotu first knew about the DRR and the severe impact it would have on Gaotu's business. Plaintiffs' allegations show that Defendants possessed this knowledge as early as March 5, 2021, while publicly misleading investors that the DRR would "benefit" the Company's business. Gaotu makes much of the fact that the DRR was not finalized until July 24, 2021 and therefore Defendants could not have possibly received the "specific contents" of the regulation beforehand or know how it would impact the Company. This argument is strikingly weak. Plaintiffs' allegations give rise to a compelling inference that Defendants knew the DRR's contents (even if they did not have a formal, stamped version of the regulation) and knew that it would be extremely detrimental to the Company's operations, growth, and revenue. Beginning in May 2021, Gaotu began overhauling its business with mass layoffs, the closing of

multiple operation centers, and the cessation of online advertising for the Company's after-school tutoring business. Thus, while Gaotu presently pleads ignorance, its actions confirm it knew full-well exactly what the DRR required and what the Company had to do to comply with it.

Gaotu also relies heavily on other securities fraud cases against after-school tutoring companies holding that the claims are inactionable. But these cases are distinguishable either because they did not decide the claims on the merits or because the facts at bar were not present. Indeed, none of the other cases involved an insider stock sale on par with the one committed by Defendants here. In March 2021, contemporaneously with commentary about Gaotu's increasing regulatory risk, an off-shore company holding Gaotu stock belonging to Defendant Chen and other Gaotu insiders sold 30% of holdings worth nearly $140 million. This was the only sale of Gaotu stock during the relevant period and, given its timing relative to when Defendants obtained knowledge of the DRR, is highly suggestive of scienter. *See Employees' Ret. Sys. v. Blanford*, 794 F.3d 297, 308-09 (2d Cir. 2015). In addition, while Gaotu's other cases admittedly relate to the DRR and its impact on the after-school tutoring business, none of the defendants in those cases publicly told their shareholders that the new regulation would be a "benefit" to their company.

In sum, Gaotu concealed and materially downplayed the risks it faced from the DRR. Those risks materialized when, eventually, the DRR was disseminated to the public and then, for the first time, the market could see directly just how devastating it was for Gaotu. Plaintiffs and other similarly situated investors lost hundreds of millions of dollars. Gaotu should be held accountable.

## II.  BACKGROUND FACTS

### A.  China Greenlights the Double Reduction Regulation.

Gaotu sat at the top of China's $100 billion after-school tutoring industry. ¶34. Between 2014 and 2021, the Company grew exponentially as Chinese students struggled to outrank each other on competitive high school and graduate admission examinations. ¶¶20-23. Successful

2

scores on these tests—referred to as "Zhongkao" for high school admissions and "Gaokao" for university admissions—could fundamentally alter the financial trajectory for an entire family. ¶¶24-31. Given the importance of these tests, families paid after-school tutoring companies like Gauto exorbitant amounts of money in hopes of gaining an edge against other students. ¶¶32-33; *see also* ¶49 (approximately 22% to 30% of disposable income went to after-school tutoring).

On June 6, 2019, Gaotu capitalized on the fervor around its after-school tutoring business by taking the Company public on the New York Stock Exchange. ¶36. Its public filings with the SEC boasted Grade K-12 courses that could accommodate upwards of more than 100 students per class and a burgeoning workforce consisting of more than 22,500 instructors and tutors. ¶¶37-43. Gaotu's online tutoring services accounted for the vast majority (over 80%) of the Company's revenue. ¶44. In total, the Company raised nearly $208 million by selling its ADSs at $10.50 per share to public investors. ¶36.

Gaotu's success depended heavily on its after-school tutoring business. Consequently, investors grew nervous as the Chinese government began imposing various regulations on the industry. It started with complaints over false advertising; after-school tutoring companies were using false claims to promote their services (for example, when Gaotu falsely portrayed a teacher with 40 years of English teaching experience as one of the Company's instructors). ¶¶54-55. China's Central Committee of the Communist Party, State Council, Ministry of Education, and other government agencies soon began to enact regulations that *inter alia* forbid companies from engaging in false advertising, limited curriculum content, and restricted companies from collecting prepaid tuition fees. ¶¶56-61.

Things took a grave turn in March 2021 during China's annual Two Sessions meeting (where top-ranking government officials meet to discuss the country's must urgent concerns). ¶66. On March 6, 2021, during the Two Sessions meeting, President Xi Jinping issued an edict, stating

that the after-school tutoring industry was akin to "a persistent and hard-to-remedy disease" and called upon "all social aspects and related departments" to "solve it." ¶66. Thereafter, on May 21, 2021, President Xi Jinping quickly approved the "Double Reduction Regulation," which required in pertinent part that after-school tutoring for Grades K-9 become non-profit, online after-school tutoring companies will require certification or lose their Internet Content Provider licenses, and after-school tutoring companies for Grades K-9 will be prohibited from raising funds on public equity markets. ¶¶67-68. The "Double Reduction Regulation" also prohibited advertising and set strict pricing for the tutoring services. ¶69.

**B.     Defendants Lie about the Impending Legislation and Falsely Tell Investors to Ignore the Storm Warnings.**

Public investors, analysts, and the market in general did not know the text of the "Double Reduction Regulation" when it was approved formally on May 21, 2021; specifically, while the Chinese government allowed media outlets to report that the "Double Reduction Regulation" had been enacted, the contents of the regulation remained secret. ¶70. Plaintiffs and other similarly situated investors did not know that "Double Reduction Regulation" was effectively a death knell for the after-school tutoring industry until reports finally surfaced on July 23, 2021. ¶¶71, 124-28. Once public, the market finally understood just how damning it was for the industry and, consequently, the share price of all Chinese education companies on the U.S. markets dropped precipitously. ¶¶72-74. For Gaotu, the "Double Reduction Regulation" meant transitioning into a non-profit company, cancelling its winter and summer semester courses, and effectively eliminating its entire advertising strategy. ¶¶75-78. The fallout from the "Double Reduction Regulation" was severe. ¶79. Gaotu's investors, in particular, saw their shares plummet by nearly 75% dropping from $9.58 per ADS to $2.50. ¶¶129-132; *see also* ¶¶72-74 (multiple analyst downgrades in response to reports describing the contents of the "Double Reduction Regulation").

Unlike Gaotu's public investors, Defendants were not caught off guard. They knew about the DRR and what it meant for the Company long before the public reports and downgrades emerged. China's Ministry of Education had communicated its stance against after-school tutoring to the industry, which included both small firms and large companies like Gaotu. This took place through various communications, requests for information, and data analyses, as evidenced by statements from various regulatory agencies, such as the Central Commission for Discipline Inspection and Ministry of Education, in January and February 2021. ¶¶82-84; *see also* ¶105 (Gaotu maintained direct lines of communication with the Beijing Municipal Education Commission prior to and after the Company's June 6, 2019 initial public offering). On March 9, 2021, Gaotu's Investor Relations Manager, Sandy Qin, acknowledged the mounting regulatory risk during Deutsche Bank's 29th Annual Media, Internet & Telecom Conference, stating that the Company expected to decrease sales and marketing spending "after the government raised concerns on unhealthy marketing campaigns in January and February [2021]." ¶85.

Red flags only continued to intensify within the Company following Ms. Qin's statements to Deutsche Bank. On March 10, 2021, Beijing's Ministry of Education suspended certain after-school tutoring and postponed the reopening of in-person tutoring (following a closure for Covid-19). ¶88. On March 31, 2021, the Ministry of Education released a measure to limit online tutoring services, and lobbying outfits (including the China Association for Non-Government Education) began telling after-school tutoring companies to "proactively transform their business models and extend services to other segments." ¶89.

On May 7, 2021, the Secretary of the Beijing Municipal Committee, Cai Qi, who is reportedly President Xi Jinping's most trusted follower and spokesman, met with Gaotu and several other of the country's largest after-school tutoring companies to discuss the DRR. ¶¶90-

91. Cai Qi possessed the DRR at this meeting and shared it with Gaotu and the other meeting attendees at this time. ¶91.

On May 21, 2021, immediately after President Xi Jinping approved the DRR, the Beijing Municipal Committee transmitted the "spirit" of the new regulation to Gaotu and other after-school tutoring companies. ¶¶92-93. Two days later, on May 23, 2021, the Beijing Municipal Committee held a meeting with after-school tutoring companies (including Gaotu) and told them that "by the end of July [2021] at the latest," companies will no longer be able to offer winter and summer semester courses, companies will not be allowed to trade on public equity markets, and there will be no advertising. ¶¶94-96. Shortly after this meeting with the Beijing Municipal Committee (*i.e.*, late-May 2021), various municipalities and schools started receiving copies of the DRR, including Changyi City of China's Shandong Province, Fuzhou University, and Taihu County in Anhui Province. ¶¶98-101. Without question, Gaotu knew about the DRR and what it meant for the Company long before investors. ¶102-03.

### C. Investors Lose Nearly Everything from the Extreme Fallout while Defendants Avoid Millions in Losses with Insider Trades.

Investors did not discover the truth about the DRR until news reports emerged after trading hours on July 23, 2021. ¶¶124-28. By then it was too late; investors holding shares suffered massive declines as Gaotu's ADSs plummeted in value. ¶¶129-32. Defendants, on the other hand, had taken measures to protect against these losses. On March 9, 2021, the same day as Deutsche Bank's 29th Annual Media, Internet & Telecom Conference (where Gaotu's Investor Relations Manager Sandy Qin acknowledged the Company's mounting regulatory risk), Gaotu's senior executives (including Defendant Shen) sold over 1.3 million ADSs worth nearly $140 million. ¶¶107-08. The sale represented approximately 30% of their holdings and, by selling when they did, managed to avoid an 8.5% decline in the ADS price that ensued in response to Ms. Qin's

comments as well as the subsequent 75% decline that ultimately occurred at the end of the Class Period. *See* ¶¶108, 112. In total, Defendants Shen and other high-level executives (including Gaotu's Vice Presidents Xiuping Qi and Wei Liu) avoided losses of approximately $14.69 per ADS by selling their Gaotu shares while in possession of material adverse non-public information. ¶112; *see also* ¶110-11 (describing academic research concluding insiders at Chinese-domiciled issuers, such as Defendants, use Form 144 to avoid losses). Subsequent articles in the press highlighted Defendants' March 2021 insider sales, noting that the shares at issue would have been worth only $4 million had Defendants not sold them. ¶¶137-38.

Meanwhile, Gaotu simultaneously undertook actions coinciding with the elimination of its after-school tutoring. On May 28, 2021, a media company named "36Kr" reported that Defendant Chen disclosed during an internal meeting at Gaotu plans to lay off 30% of the Company's work force and shut down its live streaming business operations while, at the same time, initiating new adult education services. ¶¶114, 115; *see also* ¶¶116-17 (Gaotu's corporate filings with China's state Administration for Market Regulation reflected expansion to services unrelated to Grade K-9 education). Confidential witnesses confirm that Gaotu in fact undertook these actions internally in response to the DRR, which was widely known throughout the Company. ¶¶121-22. Layoffs occurred from May 2021 through July 2021 at 11 of Gaotu's 14 operating centers and the Company's Beijing headquarters. ¶¶120-22; *see also* ¶134 (Defendant Shen confirmed layoffs in interview on August 4, 2021). Furthermore, during the second quarter of 2021 (*i.e.*, between March and June 2021), Gaotu stopped its "online social platforms" marketing, thereby confirming that Gaotu knew about the DRR and its impact on the Company. ¶136.

Gaotu no longer offers after-school tutoring services. In November 2021, the Company ceased Grade K-9 services and, in February 2022, ended Grade 10-12 services. ¶¶140-41. The

DRR massively affected Gaotu's operations. In its annual report for fiscal 2021, the Company's

reported a net loss of $487 million compared to a $218 million gain in fiscal 2020. ¶142.

## III.   LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face." *Employees' Ret. Sys. v.*

*Blanford*, 794 F.3d 297, 304 (2d Cir. 2015) (internal quotations omitted). When evaluating the

complaint, the court must "draw[] all reasonable inferences in the plaintiff's favor." *Ganino v.*

*Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000). The allegations in the complaint, along with

the inferences drawn therefrom, need only "'raise a right to relief above the speculative level.'"

*ATSI Communs., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp.*

*v. Twombly*, 127 S. Ct. 1955, 1965 (2007)). Once a claim has been adequately stated, it may be

supported by showing any set of facts consistent with the allegations in the complaint." *Id.*

## IV.   ARGUMENT

### A.   Defendants Made False and Materially Misleading Statements about the "Double Reduction Regulation" and Its Impact on the Company.

Under Rule 9(b) and the PSLRA, a plaintiff must specify the alleged statements, "identify

the speaker, state where and when the statements were made, and explain why the statements were

fraudulent." *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 184 (S.D.N.Y. 2003).

To do this, a plaintiff need only plead facts "sufficient to support a reasonable belief as to the

misleading nature of the statement or omission." *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d

60, 89 (S.D.N.Y. 2015). As explained below, the Complaint readily satisfies this standard.

#### 1.   March 5, 2021: Gaotu's 4Q20 Earnings Call

On March 5, 2021, Gaotu hosted a conference call to discuss its fourth quarter and year-

end earnings. In pertinent part, Defendant Chen affirmed Gaotu's "growth strategy" for fiscal

2021, saying that the Company would "continue to expand [its] recruiting" of teachers and that its "full-year growth rate [was] going to be in the range of 70% to 80%." ¶143. At the same time, in response to analyst questioning about the "regulatory landscape," Defendant Shen said that Gaotu "highly welcome[d] and proactively embrace[d] the change," was "support[ing] the government's current and the following [sic] regulator measures," told investors that "the policy will benefit the whole industry in a long run [sic]," and that the policy would be "good to [Gaotu] because we are a operations-oriented company" and not a "traffic-oriented company." ¶144.

None of the above statements made by Defendants Shen or Chen were true; to the contrary, they were materially misleading because they obscured the devastating effects that the looming DRR would have on the Company. ¶145. These statements are false statements of verifiable fact that Courts in this circuit have routinely held to be actionable. *See*, *e.g.*, *Christine Asia Co. v. Ma*, 718 F. App'x 20, 22-23 (2d Cir. 2017) (failure to disclose threat of government action actionable); *In re Wells Fargo & Co. Sec. Litig.*, 2021 U.S. Dist. LEXIS 188666, at *53-54 (S.D.N.Y. Sept. 30, 2021) (false denial that there was "really nothing new to report" about compliance efforts actionable). Defendants' statements about the purported "benefit[s]" of increased regulation (*i.e.*, the DRR) concerned Gaotu's most important business (*i.e.*, after-school tutoring) and are belied by the severe restrictions eventually imposed. Courts frequently find such statements actionable. *E.g.*, *Goldman v. Belden*, 754 F.2d 1059, 1063, 1067-68 (2d Cir. 1985) (statements describing regulatory development as providing "increasing opportunities" actionable where "at best the future [] was unclear"); *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d. 171, 185-86 (S.D.N.Y. 2010) (statements about "strict discipline" actionable where they concern key features of business).

Gaotu attempts to skirt liability by arguing that those statements preceded President Xi Jinping's official statements at the March 2021 Two Sessions meeting by one day (*i.e.*, March 5

vs. March 6) and, therefore, Defendants cannot be accused of knowing about the government's stance on after-school tutoring or the impending regulations. Def. Br. at 13. The <24-hour period between Defendants' statements and President Xi's statements does not support a "fraud by hindsight" argument, especially in light of the fact that the Two Sessions meeting had already begun (on March 4, ¶66), and that a mere four days later (on March 9, 2021), Gaotu insiders – including Defendant Shen – secretly dumped more than 1.3 million shares of Gaotu ADSs. ¶145. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 73 (2d Cir. 2001) ("post-class period data may be relevant to determining what a defendant knew or should have known during the class period."); *see also City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 693 (3d Cir. 2023) ("an inference of falsity is easier to justify for statements that are followed shortly by corrective disclosures of significant dimension"). Moreover, Gaotu cannot credibly make this argument when in the very next sentence it argues that the media had been widely reporting the Chinese government's negative position on the after-school tutoring business. Def. Br. at 13. Whatever reports may have been circulating at that time, they did not outweigh Defendants' statements enthusiastically supporting the DRR or their claims that the DRR would actually benefit the Company. *See Ganino*, 228 F.3d at 167 ("The truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality."); *Karimi v. Deutsche Bank Aktiengesellschaft*, 2022 U.S. Dist. LEXIS 105369, at *25-26 (S.D.N.Y. June 13, 2022) (rejecting "truth-on-the-market" defense at pleading stage).

Gaotu also misplaces reliance on past cases involving other Chinese after-school tutoring companies. Def. Br. at 13-14. These cases are non-binding and were driven by different facts and arguments. Gaotu cites to a Report & Recommendation from *Haping v. 17 Education & Technology Group Inc.*, only part of which was ultimately accepted by the District Court (and did not include the legal analysis Gaotu relies upon). *See Haping v. 17 Educ.*, No. 1:22-cv-09843-

LAK-SDA (S.D.N.Y. Nov. 8, 2023) (Dkt. No. 73) (dismissing plaintiffs' case because it was "time-barred"). Gaotu also cites to *Banerjee v. Zhangmen Educ. Inc*., 2023 WL 2711279 (S.D.N.Y. Mar. 30, 2023), and *Dagan Invs., LLC v. First High-Sch. Educ. Grp. Co. Ltd*.., 2023 WL 8452223 (S.D.N.Y. Dec. 6, 2023), but neither of these cases involved statements made by the defendants giving ***support*** for the impending regulations, *i.e.*, the DRR. *Compare* ¶144 (Gaotu "highly welcome[d] and proactively embrace[d] the change," "support[ed] the government's current and the following [sic] regulator measures," "the policy will benefit the whole industry in a long run [sic]," and "good to [Gaotu] because we are a operations-oriented company") *with Banerjee*, 2023 WL 2711279, at \*7 (boldfaced "WARNING" on first page of defendants' registration statement that company could "go out of business").

Tellingly, Gaotu acknowledges in its motion that the lag between the media reports (March 2021) and the formal publication of the DRR (July 2021) "caus[ed] further uncertainty and panic in the market" (Def. Br. at 1-2); had these media reports truly corrected the misinformation in the market, there would have been no space for "uncertainty and panic" among investors. *See Va. Bankshares v. Sandberg*, 501 U.S. 1083, 1097 (1991) (dismissal not appropriate unless "true statements may discredit the other one so obviously that the risk of real deception drops to nil"); *see also In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487 (S.D.N.Y. 2013) (rejecting argument where defendants argued true information had been reported by media); *SEC v. Bank of Am. Corp.*, 677 F. Supp. 2d 717 (S.D.N.Y. 2010) (same).[1]

---

[1] Defendants also argue in passing that certain (unidentified) statements are inactionable "opinions," "puffery," or "forward-looking statements." Defs. Br. at 17. To the extent any of the above statements are "opinions," "a reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion— or, otherwise put, about the speaker's basis for holding that view. And if the real facts are otherwise, but not provided, the opinion statement will mislead its audience." *Id*. at 188. Thus, even if the statements were considered "opinion statements" (which they are not), they still misled

### 2.     April 26, 2021: Gaotu's 2020 Form 20-F Annual Report

On April 26, 2021, Gaotu filed its 2020 annual report on Form 20-F with the SEC; Defendant Chen signed the report on behalf of the Company. ¶¶146-50. While the annual report referenced "uncertainties . . . in relation to new legislation" and "proposed changes in the PRC [People's Republic of China] regulatory requirements," Gaotu made no mention of and did not disclose the DRR and associated material risk that it would reasonably likely (and ultimately did) eviscerate Gaotu's after-school tutoring business. *See* ¶¶147, 149.

"Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) (citing *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002)). A misstatement or omission is material if "a reasonable investor would have considered [it] significant in making investment decisions." *Ganino*, 228 F.3d at 161-62 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988)). Unquestionably, the DRR posed a critical threat to Gaotu's after-school tutoring, such that the above statements made by the Company in its annual report were materially misleading. "[T]o caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005); *Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp.

---

investors because they did not accurately describe the risks Defendants faced from the DRR or how the DRR was likely to impact the Company's operations. Likewise, the statements identified above are not "forward-looking," and therefore remain actionable. *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 246 (2d Cir. 2016) ("at least some of the statements that Vivendi identifies as forward-looking contain present representations"). Even if they are forward-looking statements, these statements are still actionable because Defendants knew that the Chinese government was poised to promulgate the DRR and that the DRR was going to be disastrous for Gaotu's business. *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 193 (S.D.N.Y. 2010) (forward looking statements actionable if they "were made with actual knowledge of falsity").

2d 624, 647 (S.D.N.Y. 2012) (rejecting "boilerplate disclosures" because "generic risk disclosures are inadequate to shield defendants from liability for failing to disclose known specific risks").

The recent decision in *In re Didi Global Inc. Securities Litigation*, 2024 WL 1119483 (S.D.N.Y. Mar. 14, 2024), is instructive. Didi Global Inc. is a Chinese company that offers internet-enabled services, most notably a ride-hailing service similar to Uber or Lyft, that listed its shares on the NYSE on June 30, 2021. *Id*. at *1. In *Didi*, the plaintiffs alleged that, unknown to investors, government regulators directed Didi to postpone the IPO until it had completed a thorough self-inspection to regulators' satisfaction. *Id*. at *2. Didi did not disclose this directive and instead, offered false assurances of compliance. *Id*. at *13. Following the IPO, regulators penalized Didi, triggering declines in the company's share price. The court's decision, which sustained claims based on the defendants' failure to disclose the regulators' directive to postpone the IPO and the specific material risk of defying such directive, despite Didi's extensive but generic risk warnings, underscores why Gaotu's motion to dismiss should be denied here.

The court in *Didi* credited allegations concerning Chinese regulators' functioning and policy-making (*id*. at *2, 6) and post-hoc news reports concerning regulator meetings with Didi executives warning Didi not to proceed with the IPO. *Id*. at *7, 16-18. Similarly, in this case, Plaintiffs amply allege Defendants' knowledge of the "Double Reduction Regulation"—and the falsity of Defendants' statements portraying the increased regulation as a benefit to the Company—by pleading Defendants' early access to near-final drafts of the measures (¶¶82-89, 92-93, 98-101, 105), meetings Defendants had with regulators (¶¶90-91, 94-96), insider sales aimed at avoiding losses that would necessarily come from the decline in Gaotu's ADSs upon publication of the DRR (¶¶107-08, 112), and the business transformation Gaotu undertook before the ban was publicly disclosed (¶¶114-17, 120-22, 134, 136).

13

Relatedly, by discussing Gaotu's "regulatory" exposure, Defendants triggered additional disclosure duties under Regulation S-K. *See Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 144 S. Ct. 885, 218 L. Ed. 214, 223 (2024) ("private parties remain free to bring claims based on Item 303 violations that create misleading half-truths"). Item 303 requires companies to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 CFR §229.303(b)(2)(ii). In addition, Item 105 requires companies to identify "the material factors that make an investment in the registrant or offering speculative or risky" and "[c]oncisely explain how each risk affects the registrant or the securities being offered." 17 CFR §229.105. Despite knowing about the DRR and how it would eliminate the Company's after-school tutoring business, Defendants said nothing of it, rendering Gaotu's statements about its regulatory exposure "half truths" actionable under *Macquarie* . *See* ¶¶151-63. Regulation S-K required Defendants to disclose the expected impact of the DRR and the risks it posed to the Company. *Litwin v. Blackstone Grp.*, 634 F.3d 706, 718-19 (2d Cir. 2011) ("[T]he key information that . . . should have been disclosed is . . . to what extent the . . . trend . . . or uncertainty might have been . . . expected to materially affect Blackstone[] . . . .").

Gaotu's response boils down to an issue of materiality. It argues that its risk disclosures alerted investors to the alleged concealed information. This is incorrect. Gaotu's disclosures were generic, boilerplate statements using hypothetical language, including that regulation "may subject us to fines, penalties, rectifications and other regulatory measures, and may in turn materially and adversely affect our business, financial condition and results of operations." Def. Br. at 18. These generic disclosures did not warn about the specific conduct at issue, including the severity of the DRR and the existential threat it posed to Gaotu's after-school tutoring business. *See*, *e.g.*, *Meyer*, 761 F.3d at 251; *Van der Moolen Holding N.V.*, 405 F. Supp. 2d at 400 ("to caution that it is only

possible for the unfavorable events to happen when they have already occurred is deceit"); *Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 647 (S.D.N.Y. 2012) (rejecting "boilerplate disclosures" because "generic risk disclosures are inadequate to shield defendants from liability for failing to disclose known specific risks"). Against these risk disclosures (which were buried in Gaotu's annual report), investors were told in no uncertain terms that Defendants supported increased regulation because it would "benefit" the Company. *See*, *e.g.*, ¶144. Consequently, Defendants can hardly argue that their cautionary language effectively reduced "the risk of real deception" to "nil." *Va. Bankshares*, 501 U.S. at 1097.

### 3.    May 26, 2021: Gaotu's 1Q21 Earnings Call

On May 26, 2021, Gaotu held a conference call to discuss its first quarter earnings for fiscal 2021. Analysts from Citibank asked Defendants Shen and Chen point-blank to describe the "potential impact on [Gaotu's] operations for the rest of the quarters or for the next year" in light of the "recent update in our regulation from the government." ¶164. Shen evaded the question, claiming that they knew the DRR "had been passed but "haven't received the specific account yet." ¶164. Simultaneously, Defendants Shen and Chen confirmed support for the regulation (*e.g.*, "very optimistic about the future of online education") and said that Gaotu was "proactively embrac[ing] the policy." ¶164. Thus, even though Defendants knew the contents of the DRR and the materially adverse effect it would have on Gaotu's after-school tutoring operations, they withheld that information from investors and instead provided the public with spuriously "rosy" statements that effectively concealed the acute regulatory risk they faced. *See* ¶¶165-67.

Defendants' statements during the conference call materially downplayed (if not outright concealed) an acute regulatory risk that was likely to (and did) severely harm Gaotu's after-school tutoring business. Even if Defendants had not seen the official (stamped) version of the "Double Reduction Regulation" by May 26, 2021, they knew in sum and substance what it contained and

how it would impact the Company. Their statements "did more than just offer rosy predictions" and instead provided investors with a false sense of security regarding the "Double Reduction Regulation." *See In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 169 (2d Cir. 2021) (internal quotations omitted); *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (holding that defendants offered more than just rosy predictions when they "stated that the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true"). Defendants failed to comply with black-letter law requiring them to "speak truthfully and accurately" once they "choos[e] to speak" on a particular topic. *See Caiola*, 295 F.3d at 331; *see also Setzer v. Omega Healthcare Inv'rs, Inc.*, 968 F.3d 204, 214 n.15 (2d Cir. 2020) ("by putting Orianna's rental payments 'in play,' Defendants were required to speak accurately and completely"); *Meyer*, 761 F.3d at 250 ("[e]ven when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth.").

### 4.     July 23, 2021: Gaotu's Response to Media Reports

On July 23, 2021, Gaotu responded to news reports concerning the "Double Reduction Regulation," claiming that the "regulations have not been published," "the Company has not received official notification of the regulations," and that the Company does not "comment on market speculations." ¶168. Similar to Defendant Shen's statements on the May 26, 2021 conference call (discussed above), even if Defendants had not seen the official (stamped) version of the "Double Reduction Regulation" by this point in time, they knew full-well what it contained and how it would impact the Company. Thus, to deny knowing what the "Double Reduction Regulation" meant for Gaotu was unquestionably a lie. *See* ¶169.

Defendants' actions by this point in time also contradict the notion that they did not know about the DRR or its implications for the Company. Gaotu had commenced widespread layoffs starting in May 2021 (¶¶114-15, 120-22), updated its corporate filings to include services unrelated

16

to Grade K-9 education (¶¶116-17), and stopped its "online social platforms" marketing during the second quarter of 2021 (*i.e.*, between March and June 2021) (¶136). Gaotu responds to these allegations by attacking the credibility of Plaintiffs' sources (a Chinese media outlet named "36Kr"[2]). Def. Br. at 15. However, Plaintiffs rely on more than just "36Kr"; they rely on allegations from Gaotu's former employees as well as post-Class Period statements from Defendants corroborating the other allegations. *See* ¶134 (Defendant Chen's August 4, 2021 interview with *The 21st Century Economic Report* confirming closure of operation centers, weekend classes, winter and summer semesters, and estimated 70% decline in revenue), ¶136 (September 22, 2021 earnings call where Defendant Chen confirmed cessation of online advertising), ¶140 (November 15, 2021 announcement that Gaotu stopped offering tutoring services for Grade K-9), ¶141 (February 16, 2022 announcement that Gaotu stopped offering tutoring services for Grades 10-12). Thus, Defendants' corroboration of Plaintiffs' allegations undermines the argument they presently raise on the motion. *See In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 732 (N.D. Cal. 2022) (crediting anonymous sources in short report where allegations were corroborated by other facts alleged); *Lewy v. SkyPeople Fruit Juice, Inc.,* 2012 U.S. Dist. LEXIS 128416, at *42 (S.D.N.Y. Sept. 10, 2012) ("[T]o the degree that the . . . report[] constitute[s] or contain[s] anonymous sources, they are also described with adequate particularity, and their statements are corroborated by other facts.").

---

[2] 36Kr.com, owned by 36Kr Holdings Inc., a publicly traded company listed on NASDAQ (symbol: KRKR), is a prominent online news content provider in the PRC, with widespread distribution of its news within the country. According to its annual report for 2020 filed with the SEC, 36Kr had an average monthly page view of 630.2 million during the twelve-month period ending on December 31, 2020. *See* 36Kr Holdings Inc. Form 20-F for the period ended Dec. 31, 2020 (available at: www.sec.gov/Archives/edgar/data/1779476/000110465921056812/a21-3508_120f.htm).

**B.**     <u>Plaintiffs Adequately Plead a Strong Inference of Scienter.</u>

To plead scienter, Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Novak*, 216 F.3d at 315. Courts must conduct the scienter analysis "holistically" to determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter[.]" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). "In this Circuit, plaintiffs can satisfy this requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Setzer*, 968 F.3d 204 at 212. Scienter is alleged if a "reasonable person would deem the inference of scienter…at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs,* 551 U.S. at 324-26. The inference "need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences;" rather, the inference of scienter need only be ***equally plausible*** as any non-culpable inference. *Id*. at 324. If the inferences for and against scienter are in "equipoise," the complaint survives. *Id.* at 331.

Plaintiffs sufficiently allege both motive and opportunity as well as strong circumstantial evidence of conscious misbehavior or recklessness by showing that "[D]efendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Blanford*, 794 F.3d at 306. Where a plaintiff alleges defendants "had knowledge of facts … that explicitly contradicted their public statements…[t]hese allegations alone are enough to satisfy the pleading requirement for scienter." *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 622 (S.D.N.Y. 2008). Indeed, Defendants had advanced knowledge of the "Double Reduction Regulation" through meetings, documents, and other interactions with government officials. ¶¶82-101, 105.

*See Scholastic Corp.*, 252 F.3d at 76 ("access to non-public information contradicting" statements supports scienter). Communications between Gaotu and regulators began as early as January and February 2021 (¶¶82-84) followed by meetings (at least two) in May 2021 (¶¶90-91, 94-96). Gaotu also received near-final drafts (even if they did not contain a final and official stamp) as early as May 2021 (¶¶92-93). This is powerful evidence of scienter that courts routinely credit in sustaining scienter allegations. *E.g.*, *Ma*, 718 F. App'x at 22-23 (scienter where executives met with government officials and discussed relevant information); *Karimi v. Deutsche Bank Aktiengesellschaft*, 607 F. Supp. 3d 381, 397-98 (S.D.N.Y. 2022) ("[W]arnings from" regulators are "widely recognized to be evidence of scienter.").

Gaotu does not dispute any of Plaintiffs' factual allegations but instead argues they do not contain enough detail to support an inference of scienter. Def. Br. at 23-24. For example, Gaotu takes the position that Plaintiffs cannot meet their pleading burden unless they can allege in chapter and verse precisely what "directives" Gaotu received from Cai Qi (the Secretary of the Beijing Municipal Committee) during the May 7, 2021 meeting. *Id.* (citing ¶90). But, as the official minutes for the meeting show, Cai Qi told Gaotu and the other meeting attendees that DRR "needs to be promoted by both the government and society," thereby confirming to Gaotu that the risks it faced from DRR had indeed materialized. Def. Br. at Ex. F, 1.[3] In any event, Gaotu's argument

---

[3] The meeting minutes also confirm *inter alia* that Cai Qi told Gaotu that (i) "[t]eachers should resolutely prevent advanced training, so as to avoid causing excessive pressure on students and harming physical and mental health"; (ii) "[s]trengthen supervision of online education, and implement the same standards as offline in terms of teacher qualifications, fund supervision, use of contracts, and course content, and resolutely prevent barbaric growth"; (iii) "it is necessary to strictly control the qualifications of teachers, strengthen the construction of teachers' ethics, optimize the training and assessment standards, and guide teachers to focus on the long-term growth of students, rather than the short-term grade improvement effect"; and (iv) "[i]t is necessary to standardize marketing behaviors such as educational advertising, and strengthen the management of fees and prepayments." *Id.* Consequently, the minutes show that Qi communicated to Gaotu and the other attendees at the meeting the main dictates of the DRR. *See* ¶90.

misconstrues Plaintiffs' burden at the pleading stage; Plaintiffs are entitled to all favorable inferences as the non-moving party and are not required to plead evidence. *See Altimeo Asset Mgmt.*, 19 F.4th at 150 (directing courts against imposing "impossible" pleading standards); *In re Cabletron Sys.*, 311 F.3d 11, 33 (1st Cir. 2002) (". . . the rigorous standards for pleading securities fraud do not require a plaintiff to plead evidence. Defendants' argument that even more detail be required, before there is any discovery, here amounts to requiring plaintiffs to plead evidence.").

Defendants' efforts at concealing the DRR from analysts (and the impact it would have on the Company) bolster Plaintiffs' inference of scienter. Defendants repeatedly held themselves out as knowledgeable about Chinese regulations—often in response to direct questions from analysts. *E.g.*, ¶164. Investors are entitled to assume that executives are informed about the topics on which they publicly speak. *See In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 591 (S.D.N.Y. 2010); *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 351 (S.D.N.Y. 2015) (scienter where defendant "held himself out to the public as intimately knowledgeable"). Further, the inference of scienter is especially compelling here because regulatory changes and Gaotu's regulatory compliance were the subject of intense scrutiny. *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 & n.3 (2d Cir. 2011) (summary order) (scienter where issue was one "about which investors and analysts often inquired"); *Reese v. Malone*, 747 F.3d 557, 571 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017) (issue was "the focus of both public and government inquiries").

Given the importance of Gaotu's after-school tutoring business to the Company overall (it accounted for upwards of 80% of revenue, ¶44), Defendants were aware of or, at minimum, recklessly disregarded the DRR and the massive negative impact it would have on the Company. *See Skiadas v. Acer Therapeutics Inc.*, 2020 U.S. Dist. LEXIS 105814, at *32 (S.D.N.Y. June 16, 2020) (statements concerned "the sin[e] qua non" of company's success); *In re Avon Sec. Litig.*,

2019 U.S. Dist. LEXIS 200816, at *62 (S.D.N.Y. Nov. 18, 2019)  (scienter adequately pleaded where "it would be absurd to suggest that Avon's senior management was unaware of a widespread delinquency problem in the company's single largest market"); *In re GE Sec. Litig.*, 857 F. Supp. 2d 367, 395 (S.D.N.Y. 2012) (applying core operations where "GE Capital provided 50% of GE's revenues"); *see also Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*, 22 F.4th 1, 9 (1st Cir. 2021) ("defendants 'must have known that [product] was not functional,' because the product's professed importance to the company strongly implied that senior officers at the company were following it closely and thus were aware of its failings").

Plaintiffs' allegations of scienter are certainly "cogent and at least as compelling as any opposing inference," which is all that is required at the pleading stage. *Tellabs, Inc.*, 551 U.S. at 322-23. This is especially true when considering that Defendants also gained financially from the alleged fraud. While not required to allege motive to plead scienter, *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 371 (S.D.N.Y. 2012), Plaintiffs allege specific and concrete motives in the form of insider sales. Through a privately held company, Defendants Shen and other high-level executives (including Gaotu's Vice Presidents Xiuping Qi and Wei Liu) sold over 1.3 million ADSs worth nearly $140 million. ¶¶107-08. By selling when they did (contemporaneously with Gaotu's comments about increasing regulation during the Deutsche Bank's 29th Annual Media, Internet & Telecom Conference, ¶85), Defendants Shen and others avoided losses of approximately $14.69 per ADS. ¶112. These insider sales establish motive, which helps demonstrate scienter. *See Scholastic Corp.*, 252 F.3d at 74-75. Courts have found much smaller sales sufficient. *See In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 365- 66 (S.D.N.Y. 2003) (sales for hundreds of thousands of dollars "plainly satisfied" motive).

Gaotu attempts to undermine the significance of the insider sale by pointing to similar sales made by a small number of unrelated investment firms holding stock in after-school tutoring companies. Def. Br. at 14. Similar to Defendants, these investment firms also reportedly traded on nonpublic information. ¶97. The fact that other market participants were also trading on inside information does nothing to insulate Defendants from liability. Indeed, Plaintiffs' allegations from the *Financial Times* support the conclusion that Defendants' trade was, in fact, motivated by inside information (*i.e.*, the likelihood of "stricter regulations on the industry"). ¶¶137-38. The use of an "anonymous source" (Def. Br. at 14-15) in the *Financial Times* article does not allow Defendants to completely disregard it or negate the inferences that it supports. *Cf. Lewis v. Curtis*, 671 F.2d 779, 788 (3d Cir. 1982) ("Reliance on an article in *The Wall Street Journal* is not reliance on an insubstantial or meaningless investigation."); *see also In re JPMorgan Chase & Co. Sec. Litig.*, 2007 U.S. Dist. LEXIS 93877, at *16 (N.D. Ill. Dec. 18, 2007) (crediting anonymous source in *New York Times* because "A reputable newspaper, where an independent investigation was conducted, provides an additional layer of reliability in reporting. Further, the confidential nature of a journalist's source is used to encourage reporting and accuracy.").

Gaotu also argues that the insider sale was not suspiciously timed, primarily because it occurred after public disclosures about the possibility of adverse regulation but before the official publication of the DRR. Def. Br. at 21. That's exactly Plaintiffs' point: that Defendants dumped Gaotu ADSs and raked in $140 million while Defendants – but not the public – knew about the impending doom the DRR would inflict. ¶¶107-12. At the time Defendants consummated their massive insider sale, media reports about the *potential* for tighter regulations had entered the market, "causing further uncertainty and panic" among investors (as Gaotu admits). Def. Br. at 1-2. But Defendants knew more about the contents of the DRR and its impact on the Company than any ordinary investors, and by selling more than 1.3 million shares (or 30% of their entire holding)

before the DRR was publicly released, Defendants were able to avoid losses that would ultimately occur once the DRR was released to the public. ¶112. Given that Defendants Shen and several other high-level Gaotu executives controlled the entity used to hold their shares, it logically follows that they were the ones that profited from the insider sale. *See Altimeo Asset Mgmt.*, 19 F.4th at 150 (warning courts not to "mistake heightened pleading standards for impossible ones").

Plaintiffs' inference of scienter easily outweighs Gaotu's proposed nonculpable explanation for their conduct, *i.e.*, Gaotu was unaware of the DRR's implications and any actions it took (including the insider sale) was simply a hedge against adverse business conditions. Def. Br. at 22. But at the pleading stage, Gaotu's supposed "good faith" does not stop Plaintiffs' inference from being "at least as strong." *See Kanefsky v. Honeywell Int'l, Inc.*, 2020 U.S. Dist. LEXIS 87108, at *15-16 (D.N.J. May 18, 2020). Dumping 30% of their stock in the Company, followed by mass layoffs and extensive internal reorganizations, is indicative of action much more serious than a "hedge" against adverse business conditions; it demonstrates, as alleged, that Defendants saw the writing on the wall. *See Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 615 F. App'x 44, 45 (2d Cir. 2015) (personal gain establish motive); *Skiadas*, 2020 U.S. Dist. LEXIS 105814, at *35 ("executive has a stronger incentive to bet the farm in a reckless gamble because the alternative is certain failure").[4]

C.     <u>Plaintiffs Adequately Plead Loss Causation.</u>

"Allegations of loss causation, are evaluated under the notice pleading standard in Federal Rule of Civil Procedure Rule 8." *See In re Fairway Grp. Holding Corp. Sec. Litig.*, 2015 U.S. Dist. LEXIS 5999, at *43 (S.D.N.Y. Jan. 20, 2015); *see also Gormley v. Magicjack Vocaltec Ltd*., 220

---

[4] Corporate scienter for Gaotu is alleged through the scienter of the Individual Defendants (*i.e.* Defendants Chen and Shen) whose scienter could be imputed to Gaotu. *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190 (2d Cir. 2008).

F. Supp. 3d 510, 517 (S.D.N.Y. 2016) ("Pleading loss causation with particularity is not required…"). Thus, Plaintiffs' burden of pleading loss causation is "not a heavy one," and the complaint "must simply give Defendants 'some indication' of the actual loss suffered and of a plausible causal link between the loss and the alleged misrepresentations." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015). At the pleading stage, Plaintiffs need only allege "that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Youngers v. Virtus Inv. Partners Inc.*, 228 F. Supp. 3d 295, 299 (S.D.N.Y. 2017) (citation omitted).

Gaotu concealed facts concerning the "Double Reduction Regulation" and the material regulatory risk it presented, the revelation of which harmed investors. ¶¶171-74. "[T]o show loss causation, it is enough that the loss caused by the alleged fraud results . . . through events constructively disclosing the fraud." *Vivendi, S.A.*, 838 F.3d at 261-62. The "fraud" in this case relates to Gaotu's regulatory risk and the impact the "Double Reduction Regulation" would have on the Company's after-school tutoring business. *E.g.*, ¶2. Thus, when Gaotu's ADS price plummeted in response to reports about the regulation and how it would affect the Company (¶174), the losses investors sustained were unquestionably causally related to the alleged fraud. *See*, *e.g.*, *In re: EZCorp, Inc. Sec. Litig.*, 181 F. Supp. 3d 197, 212 (S.D.N.Y. 2016) (investor losses based on regulatory non-compliance). These allegations suffice for pleading purposes because, as the Second Circuit made clear in *Vivendi*, "to show loss causation, it is enough that the loss caused by the alleged fraud results from the relevant truth . . . leak[ing] out." *See Vivendi S.A.*, 838 F.3d at 261 (constructive disclosures revealed defendants' liquidity risk) (internal quotations omitted).

Gaotu's claim that "industry-wide events" (Def. Br. at 25) caused Plaintiffs' losses obfuscates the point and ignores the allegations. This was not an instance where the share price of

Chinese education companies fell in unison because of some market phenomenon or news unrelated to the fraud alleged here; it fell because the market became aware that the contents of the DRR and the ruinous impact that the DRR would have on Gaotu (and indeed, on every Chinese private tutoring company). A decline in stock price in response to news constitutes *prima facie* evidence that the news was previously unknown to the market. *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233-34 (2d Cir. 2014) (where plaintiffs alleged that settlement agreements revealed misrepresentations about the company's financial condition, and that "the market reacted negatively to the . . . corrective disclosure by a significant (12%) decline in [defendant's] stock"); *Ganino*, 228 F.3d at 167-68 (movement of stock in response to corrective disclosure demonstrates materiality of new information). Gaotu did not identify any other news unrelated to the alleged fraud here that caused the stock drop, and in any event, such an inquiry into possible confounding factors is "not to be decided on a Rule 12(b)(6) motion to dismiss." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 404-05 (2d Cir. 2015).

**D.      Defendants Are Liable as "Control Persons" under Section 20(a) of the Exchange Act.**

Plaintiffs have adequately pleaded underlying primary violations, as discussed above. Thus, Gaotu's motion to dismiss Plaintiffs' "control person" claims should be denied. *See Altimeo Asset Mgmt.*, 19 F.4th at 152. Any other argument that could have been raised has been waived. *See Sullivan v. Aircraft Servs. Grp.*, 2021 U.S. Dist. LEXIS 3547, at *5 (E.D.N.Y. Jan. 7, 2021).

**V.      CONCLUSION**

Plaintiffs respectfully request that the Court deny Gaotu's motion in its entirety.[5]

---

[5] In the event that the Court is inclined to grant any aspect of Gaotu's motion, Plaintiffs respectfully request leave to file an amended complaint to address any deficiencies in the current allegations. *See Loreley*, 797 F.3d at 191.

Dated: May 21, 2024                    **LEVI & KORSINSKY, LLP**

                                       */s/ Adam M. Apton*
                                       Adam M. Apton
                                       33 Whitehall Street, 17th Floor
                                       New York, New York 10004
                                       Tel.: (212) 363-7500
                                       Fax: (212) 363-7171
                                       Email: aapton@zlk.com

                                       *Counsel for Lead Plaintiff*
                                       *and Lead Counsel for the Class*


                                       **THE ROSEN LAW FIRM, P.A.**
                                       Phillip Kim
                                       Yu Shi
                                       Jing Chen
                                       275 Madison Avenue, 40th Floor
                                       New York, New York 10016
                                       Tel.: (212) 686-1060
                                       Fax: (212) 202-3827
                                       Email: pkim@rosenlegal.com
                                       Email: yshi@rosenlegal.com
                                       Email: jchen@rosenlegal.com

                                       *Additional Counsel for Plaintiffs and the Class*