UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
TCP DIVERSIFIED TECHNOLOGY FUND,
Individually and On Behalf of All Others
Similarly Situated,

                          Plaintiffs,

          - against -

GAOTU TECHEDU INC. F/K/A GSX
TECHEDU INC., XIANGDONG CHEN, and
NAN SHEN,

                      Defendants.
--------------------------------------------------------x

**MEMORANDUM & ORDER**
22-CV-7966 (PKC) (CLP)

PAMELA K. CHEN, United States District Judge:

        Lead Plaintiff TCP Diversified Technology Fund and Named Plaintiff Jun Ye (collectively, "Plaintiffs") have brought this putative class action lawsuit against Defendants Gaotu Techedu Inc. ("Gaotu" or "the Company"),[1] as well as Xiangdong Chen, and Nan Shen (together, the "Individual Defendants") (altogether, "Defendants"). Plaintiffs, individual stockholders who purchased securities of Gaotu between March 5, 2021, and July 23, 2021 (the "Class Period"), have filed suit under Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78j(b) and 78t(a); and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

        Plaintiffs seek damages for what they allege were misrepresentations and omissions made by Defendants during the Class Period regarding the impact of the People's Republic of China's ("PRC") Double Reduction Regulations ("DRR") on Gaotu's business. These regulations, *inter*

---

[1] Defendant Gaotu was formerly known as GSX Techedu Inc. (Am. Compl., Dkt. 31, at 1 n.1.)

*alia*, prohibited after-school tutoring companies that provided tutoring for kindergarten through the ninth grade from raising capital or going public. Defendants now move to dismiss Plaintiffs' suit, arguing that Plaintiffs have failed to sufficiently allege (1) a material misstatement or omission with particularity, (2) Defendants' scienter, and (3) loss causation. For the reasons stated below, Defendants' motion to dismiss is denied.

## BACKGROUND[2]

I.    **Factual Background**

A.    **The Parties**

Defendant Gaotu is an "education company that provides online after-school tutoring services in the People's Republic of China." (Am. Compl., Dkt. 31 ("Am. Compl."), ¶ 12.) It is incorporated in the Cayman Islands and headquartered in Beijing. (*Id.*) Gaotu had American Depository Shares ("ADSs")[3] that were "publicly traded on the [New York Stock Exchange] during the Class Period." (*Id.* ¶ 176.) Defendant Xiangdong Chen ("Chen") is Gaotu's Chief Executive Officer and Defendant Nan Shen ("Shen") is Gaotu's Chief Financial Officer; both individuals served in those positions throughout the Class Period. (*Id.* ¶¶ 13–14.) The Individual Defendants were "directly involved in the day-to-day operations of [Gaotu] at the highest levels" and "directly participated in the management of [Gaotu]." (*Id.* ¶ 16.)

---

[2] For purposes of this Memorandum & Order, the Court assumes the truth of Plaintiffs' non-conclusory, factual allegations in the Complaint. *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

[3] "An American Depository Share is a security that represents an ownership interest in a specified number of a company's ordinary shares." *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 521 n.2 (S.D.N.Y. 2011), *aff'd*, 838 F.3d 223 (2d Cir. 2016) (citation omitted); *see also* "American Depository Shares," 2 *Litigation of International Disputes in U.S. Courts* § 8:38 ("American Depository Shares (ADSs) are U.S. securities that correspond to a foreign security.").

Lead Plaintiff TCP Diversified Technology Fund and Named Plaintiff Jun Ye are individual investors who purchased Gaotu ADSs during the Class Period.  (*Id.* ¶¶ 10–11.)

### B.    Gaotu's Business Prior to the Class Period

Prior to the Class Period, Gaotu's core services included online after-school kindergarten through twelve grade ("K-12") academic subject tutoring, which accounted for 91.4% of its total revenue in 2021.  (*Id.* ¶ 44.)  Since its founding in 2014, Gaotu quickly "evolved into the third-largest online K-12 large-class after-school tutoring service provider in China, as measured by gross billings."  (*Id.* ¶ 35.)  On June 6, 2019, the Company "achieved a significant milestone by completing its initial public offering on the New York Stock Exchange."  (*Id.* ¶ 36.)  As of December 31, 2020, Gaotu "employed 319 full-time instructors, 73 full-time online exclusively contracted instructors, and 15,291 tutors."  (*Id.* ¶ 39.)  Between 2019 and 2020, Gaotu's net revenue increased from RMB[4] 2,114,855,000 to RMB 7,124,744,000, an increase of 236.9%. (Gaotu 2020 Form 20-F, Dkt. 41-2, at ECF[5] 82.)[6]

---

[4] The value of the RMB, or "Renminbi," the official PRC currency, compared to the U.S. Dollar, varied during this period of time from a low of about 1 U.S. Dollar = 7.16 RMB (in August 2019) to a high of about 1 U.S. Dollar = 6.50 RMB (in December 2020).  *See* Macrotrends, https://www.macrotrends.net/2575/us-dollar-yuan-exchange-rate-historical-chart  (last  visited Feb. 3, 2025).

[5] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

[6] Gaotu's 2020 Form 20-F, which is an annual or registration statement that publicly traded foreign private issuers must file each year, *see* 17 C.F.R. § 249.220f, was attached to Defendants' memorandum of law in support of their motion to dismiss.  (Dkt. 41-2.)  In determining whether dismissal is warranted pursuant to Federal Rule of Civil Procedure 12(b)(6), a court may "consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the [Securities Exchange Commission ('SEC')], and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152 (2d Cir. 2013) (internal quotation and citation omitted).  Therefore, the Court treats Gaotu's 2020 Form 20-F as incorporated into the Amended Complaint.

Gaotu's rise took place against the backdrop of "remarkable growth" within the private tutoring industry in the PRC between 2011–2021, growing from "around 8,700 after-school tutoring institutions" in 2011 to "490,000 after-school tutoring institutions across the country" by May 2021.  (Am. Compl. ¶ 33.)  During this period, starting in 2018, the Chinese government began to regulate and crackdown on the after-school tutoring industry by, *inter alia*, imposing licensing and qualification requirements; implementing early class end times; and banning practices such as holding academic competitions, prohibiting homework, exceeding the prescribed curriculum for a specific grade level in certain subjects, and collecting prepaid tuition fees for more than three months.  (*Id.* ¶¶ 57–61.)  These regulatory developments "noticeably decreased the number of elementary and middle school students" in after-school tutoring institutions, with "nearly 12,000 tutoring companies ceas[ing] their operations" in 2019 and "over 9,600 tutoring companies shut[ting] down or disappear[ing]" in 2020.  (*Id.* ¶¶ 62–63.)

### C.     Events During the Class Period (March 5–July 23, 2021)

The events during the Class Period took place over several months in 2021 and are presented below in chronological order.  On March 4, one day before the start of the Class Period, the National People's Congress and the Chinese People's Political Consultative Conference ("CPPCC") commenced its annual "Two Sessions" parliamentary deliberations, which lasted until March 11.  (*Id.* ¶ 66.)  The "central topic" in the deliberations "revolved around the regulation of the after-school tutoring industry."  (*Id.*)

On March 5, Gaotu held an earnings call with securities analysts to discuss its Q4 2020 earnings.  (*Id.* ¶ 143.)  During this call, when asked about future revenue growth, Defendant Chen expressed optimism for the industry, stating, "[W]e hope for 2021, the full-year growth rate is going to be in the range of 70% to 80%."  (*Id.*)  When asked for an update on the regulatory landscape, Defendant Shen stated, *inter alia*, that the Company would "probably support"

4

regulatory changes to the marketing campaign of the industry and that any changes would "benefit the whole industry in [the] long run" and be "good" for the Company "because [it is] a[n] operations-oriented company . . . not a traffic-oriented company."  (*Id.* ¶ 144.)

On March 6, President Xi Jinping publicly "criticized the after-school tutoring industry heavily," stating that "the problem can't be solved by the education authority alone, and all social aspects and related departments should make joint efforts to study and solve it."  (*Id.* ¶ 86 (internal quotation marks omitted).)

On March 8, "a CPPCC delegate and deputy director of Shanghai's municipal educational commission said in an interview with Beijing News . . . that proposed various regulations would be implemented in Shanghai.  The following day another CPPCC member told Tsinghua University News about a proposal for a ban on any after-school tutoring company providing courses in Chinese, Math, English, Physics, or Chemistry."  (*Id.* ¶ 87.)  Another news source, Caixin Global, "also reported that [m]ultiple representatives raised concerns that seven-days-a-week extracurricular classes hurt children's physical and mental health.  Some even suggested a ban on tutoring institutions."  (*Id.* (internal quotation marks omitted).)

On March 9, while the parliamentary deliberations on the DRR were still ongoing, a British Virgin Island company called Irefresh Future Limited ("Irefresh") "holding shares for Gaotu's employees upon their exercise of options granted under the Share Incentive Plan, filed a Form 144[7] to sell 1,335,000 [Gaotu] ADSs, which represented 890,000 Class A ordinary shares and had a market value of $137,304,750," constituting around 30% of Irefresh's holdings at that time. (*Id.* ¶¶ 107–08.)  Plaintiffs allege that Irefresh was "controlled by an advisory committee

---

[7] A Form 144 is a "Notice of Proposed Sale of Securities" pursuant to Rule 144 under the Securities Act of 1933.  *See* 17 C.F.R. § 230.144; *see also* U.S. Sec. & Exch. Comm'n, Form 144, https://www.sec.gov/files/form144.pdf (last visited Feb. 4, 2025).

consisting of Gaotu executives, specifically Defendant Shen and Gaotu Vice Presidents Xiuping Qi and Wei Liu." (*Id.* ¶ 107.)  On the same day, Gaotu's Investor Relations Manager Sandy Qin made a statement in Deutsche Bank's 29th Annual Media, Internet & Telecom Conference that Gaotu "was expecting sales and marketing spending to decrease in response to increased government . . . concerns on unhealthy marketing campaigns." (*Id.* ¶ 108 (alteration in original) (internal quotation marks omitted).)  Following her comments, Gaotu's stock declined from $88.62 per share on March 9 to $81.01 per share on March 10, a decline of approximately 8.58%. (*Id.*)

On March 10, "two offices within the Beijing Ministry of Education produced a document demanding that all academic-based and language after-school training be suspended." (*Id.* ¶ 88.) Beijing education authorities further "ordered all in-person training classes to postpone reopening (following a closure for COVID) and conduct inspection and rectification." (*Id.*)  Caixin Global reported that, Chu Feng, a "chief executive of a Beijing K-12 training company," said that "[a]ny institution has to go through two rounds of inspections and meet all requirements in the checklist before they can reopen[.]" (*Id.*)

On March 31, the Ministry of Education "announced a measure to limit the amount of online learning for primary and secondary school students." (*Id.* ¶ 89.)  That same day, "the Chairman of [a lobbying group for companies like Gaotu] delivered a speech telling companies to proactively transform their business models and extend services to other segments." (*Id.* (internal quotations omitted).)

On April 26, Gaotu filed its 2020 Form 20-F, containing two risk disclosures. (*Id.* ¶ 146.) These risk disclosures warned, *inter alia*, that "[u]ncertainties exist in relation to new legislation" and that "[f]ailure to renew requested licenses or permits in a timely manner or obtain newly required ones due to adverse changes in regulations or policies could have a material adverse

impact on our business." (*Id.* ¶¶ 146, 148.) The risk disclosures also stated that "the newly promulgated implementation rules and interpretations, if any, that governs the online private education industry would create substantial uncertainties regarding the legality of our business operation, which create risks that we may be found to violate the existing laws and regulations." (*Id.* ¶ 146.)

On May 7, the Secretary of Beijing Municipal Committee of the Communist Party of China Cai Qi "held a meeting with several public-school principals and leading after-school tutoring institutions, including Gaotu[,] . . . [during which Cai Qi] issued directives regarding the [DRR]." (*Id.* ¶ 90.) An article in the Beijing Daily reported Cai Qi as stating that "[a]lthough off-campus training is an enterprise-run education, the original intention should be consistent with that of public schools, which is to implement the party's education policy, adhere to the public welfare attributes of education, and become a useful supplement to socialist education." (Dkt. 41-6 at ECF 3.[8]) Plaintiffs allege that, in this meeting, "Cai Qi relayed to the companies . . . [Xi Jinping's] directive, as manifested in the [DRR], which mandated the transformation of after-school academic subject tutoring institutions into non-profit entities and prohibited them from being listed on any stock market or seeking capital funding." (Am. Compl. ¶ 91.)

On May 21, during the 19th Session of the Central Comprehensive Deepening Reform Committee, the Chinese government adopted the DRR, but did not publish the full text of the regulations until July. (*Id.* ¶ 70.) These regulations, *inter alia*, "mandated the transformation of after-school academic subject tutoring institutions into non-profit entities and prohibited them from being listed on any stock market or seeking capital funding." (*Id.* ¶ 91.) Caixin Media later

---

[8] A translated and certified copy of the Beijing Daily article was attached to Defendants' memorandum of law in support of their motion to dismiss and is incorporated into the Amended Complaint by reference, for the reasons stated *supra*.

quoted an employee of the Haidian Branch of the Beijing Municipal Education Committee ("Haidian Branch")—which has jurisdiction over Gaotu's principal executive office—as saying that "immediately" after the adoption of the DRR, the "Beijing Municipal Education Commission 'transmitted the spirit of' the [regulations] to after-school tutoring companies." (*Id.* ¶¶ 92, 94.)

On May 23, the Haidian Branch reportedly conducted a meeting to discuss the DRR. (*Id.* ¶ 94.) Later that same day, a person who worked in the after-school industry and had knowledge of the meeting "shared in a group chat message that the Haidian Branch . . . had announced during the meeting that . . . by the end of July [2021] at the latest, three 'no's' will be introduced' : . . . after-school tutoring institutions are not allowed to hold classes during school breaks, . . . go public on stock markets, [or] . . . engage in advertising." (*Id.* (cleaned up).) Screenshots of the group chat were shared on social media by the next day, and independently-relayed accounts of the "widely-circulated" chat record were reported on by Caixin a couple of days later. (*Id.* ¶¶ 95–96.) The Caixin article also reported that "three prominent investment firms, Tiger Global Management, Hillhouse Group, and Greenwoods Asset Management, who held significant stock in Chinese after-school tutoring companies, including Gaotu, sold most or all of their holdings during the first quarter of 2021," around the same period as the Irefresh sales. (*Id.* ¶ 97, *see also id.* ¶107.)

On May 26, Gaotu held a conference call with securities analysts to discuss Q1 2021 earnings. (*Id.* ¶ 164.) During this call, when asked about the impending impact of the DRR on the industry, Defendant Shen stated that the Company had not yet "received the specific account" of the new regulations. (*Id.*) Defendant Chen further stated, "I am very optimistic about the future of online education and I believe . . . this sector will have a very long term and sustainable development." (*Id.*)

Starting around May 28, several online platforms—including government websites—published the full text of the DRR on their websites before it was officially published. (*Id.* ¶¶ 98–101.) Plaintiffs point to similar leaks for two other recently-published Chinese regulations[9] and allege that "it is not uncommon for regulations drafted under the Ministry of Education's guidance during that same period to be leaked through unofficial channels before their official publication." (*Id.* ¶ 102.)

On July 23, a day before the official publication of the DRR, various English and Chinese news outlets reported on "an unverified document, circulating among investors" with details on the forthcoming regulations. (*Id.* ¶¶ 124–28.) On the same day, "all Chinese education stocks on the U.S. market tumbled," with Gaotu's shares falling by 63%, its "most significant percentage decrease since its IPO." (*Id.* ¶¶ 72, 79.) Gaotu issued a press release stating, "[t]he regulations have not been published, and the Company has not received official notification of the regulations. It is the Company's policy not to comment on market speculations." (*Id.* ¶ 168.)

On July 24, 2021, the Chinese government published the full text of the DRR, after which Chinese education stocks "continued to plummet," with Gaotu's stocks falling by an additional 29%. (*Id.* ¶¶ 70–73.)

## II.   Procedural History

Plaintiffs filed their initial Complaint in this action on December 30, 2022. (Dkt. 1.) On August 16, 2023, the Court appointed Plaintiff TCP Diversified Technology Fund as Lead Plaintiff upon its motion. (8/16/2023 Mem. & Order, at 10.) Plaintiffs filed their Amended Complaint on

---

[9] Specifically, Plaintiffs point to the fact that the full text of both the "Regulation on the Implementation of the Law on the Promotion of Private Schools" and the "Implementation Opinions on Regulating the Development of Private Compulsory Education" were leaked before their official publication in May 2021. (Am. Compl. ¶ 102.)

October 16, 2023.  (Am. Compl., Dkt. 31.)  Defendant Gaotu moved for a pre-motion conference in advance of a motion to dismiss on December 15, 2023.  (Dkt. 32.)  The Court denied Gaotu's motion as unnecessary and directed parties to file a joint proposed briefing schedule.  (1/11/2024 Dkt. Order.)  On June 20, 2024, the Individual Defendants joined Defendant Gaotu's motion to dismiss.  (Dkt. 47.)  The instant motion was fully briefed on June 20, 2024.  (*See* Dkts. 40–42, 48.)

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (citation omitted).

"Determining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679 (citation omitted); *see also Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013).  In addressing the sufficiency of a complaint, courts are required to accept the well-pleaded factual allegations contained within the complaint as true, *see Bldg. Indus. Elec. Contractors Ass'n v. City of New York*, 678 F.3d 184, 187 (2d Cir. 2012), but "need not credit conclusory statements unsupported by assertions of facts or legal conclusions and characterizations presented as factual allegations," *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 404 (S.D.N.Y. 2001) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  Additionally, "a court need not feel

constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice." *Id.* at 405–06 (citing, *inter alia*, *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1095 (2d Cir. 1995)).

## DISCUSSION

## I.      Plaintiffs' Section 10(b) and Rule 10b-5 Claim

Plaintiffs assert claims under Section 10(b) and Rule 10b-5 of the Exchange Act, alleging that Defendants made material misrepresentations or omissions in various public documents and statements disseminated by Gaotu during the Class Period.  (*See* Am. Compl. ¶¶ 189–98.)

### A.      Legal Standard

Under Section 10(b) of the Exchange Act, it is unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of [the] rules and regulations" that the SEC prescribes.  15 U.S.C. § 78j(b).  Rule 10b-5 implements Section 10(b), *see Diehl v. Omega Protein Corp*., 339 F. Supp. 3d 153, 160 (S.D.N.Y. 2018), and makes it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5; *see also Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 212 (2d Cir. 2020).

To survive a motion to dismiss under Section 10(b)/Rule 10b-5 thereunder, a plaintiff must plausibly allege: "(1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Singh v. Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019) (alteration omitted). "Relatedly, to state a claim under Section 20(a), Plaintiffs must, at a minimum, plead a plausible 'primary violation' of Section 10(b)." *Schaffer v. Horizon Pharma PLC*, No. 16-CV-1763 (JMF), 2018 WL 481883, at *3 (S.D.N.Y. Jan. 18, 2018) (collecting cases).

Claims under Section 10(b) and Rule 10b-5 are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and PSLRA. *See In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 629 (S.D.N.Y. 2017) (citing *Novak v. Kasaks*, 216 F.3d 300, 306–07 (2d Cir. 2000)). Federal Rule of Civil Procedure 9(b) "requires that the complaint 'state with particularity the circumstances constituting fraud.'" *Id.* "To satisfy that requirement, the complaint must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Id.* (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd. ("ATSI")*, 493 F.3d 87, 99 (2d Cir. 2007)). Similarly, the PSLRA requires complaints brought under the Exchange Act to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1)(B). "The PSLRA further requires that the complaint 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind' with respect to each alleged misstatement or omission." *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d at 629 (quoting 15 U.S.C. § 78u–4(b)(2)). "A complaint will survive

under that heightened standard 'only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007)).

Defendants move to dismiss the Section 10(b) claims, arguing that Plaintiffs have failed to plead (1) material misrepresentation, (2) a strong inference of scienter, or (3) loss causation. The Court considers each of these arguments in turn.

### B.    Material Misrepresentation and Omissions

Plaintiffs allege that, prior to the official publication of the DRR, "Gaotu became aware of [the regulations'] adverse contents and began implementing mitigating measures while publicly denying any knowledge of the regulation." (Am. Compl. ¶ 104.) At issue are six statements made by Defendants during the Class Period.

#### 1.    March 5, 2021: Earnings Call

Two of the six statements were made on a March 5 earnings call, where Defendants expressed optimism for the future of the industry, stating, "[W]e hope for 2021, the full-year growth rate is going to be in the range of 70% to 80%." (*Id.* ¶ 143.) When asked for an update on the regulatory landscape, Defendant Shen stated, *inter alia*, that the Company would "probably support" regulatory changes to the marketing campaign of the industry and that any changes would "benefit the whole industry in [the] long run" and be "good" for the Company "because [it is] a[n] operations-oriented company . . . not a traffic-oriented company." (*Id.* ¶ 144.) Plaintiffs further point to the contents of a Financial Times article from November 6, 2021, which stated that, during

the March 5 earnings call, Defendant Chen "express[ed] confidence in his business, promising at the end of March to buy $50m of shares with his own money." (*Id.* ¶ 138.[10])

Plaintiffs argue that Defendants' show of optimism about the future of the industry was misleading because, at the time the statements were made, the CPPCC's annual Two Sessions for 2021 "had already commenced." (*Id.* ¶ 145.) However, this allegation, without more, fails to establish a plausible claim of material misrepresentation, especially given that Defendants made these statements not only before the DRR were adopted on May 21, 2021, but even before Xi Jinping publicly spoke against the industry on March 6, 2021. In this context, Defendants' statements constitute "expressions of puffery and corporate optimism," which "do not give rise to securities violations." *See Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004); *see also Robeco Cap. Growth Funds SICAV v. Peloton Interactive, Inc.*, 665 F. Supp. 3d 522, 540 (S.D.N.Y. 2023) (dismissing claim of material misstatement because statements about future growth of the company were "'textbook cases' of corporate optimism" (quoting *Schaffer*, 2018 WL 481883, at *9)). Accordingly, the Court finds that the two March 5, 2021 earnings call statements are inactionable as a matter of law.

### 2. April 26, 2021: Risk Disclosures

The third and fourth statements that Plaintiffs rely on were made as risk disclosures in Gaotu's 2020 Form 20-F filed on April 26, 2021. These statements warned, *inter alia*, that "[u]ncertainties exist in relation to new legislation" and that "[f]ailure to renew requested licenses or permits in a timely manner or obtain newly required ones due to adverse changes in regulations or policies could have a material adverse impact on our business." (Am. Compl. ¶¶ 146, 148.)

---

[10] *See also* Ryan McMorrow, Eleanor Olcott, and Andy Lin, *How China's Tech Bosses Cashed Out at the Right Time*, Financial Times (Nov. 6, 2021), https://www.ft.com/content/41ec575f-d8ee-45d4-b604-fe66566a8c5c.

The risk disclosures also stated: "[T]he newly promulgated implementation rules and interpretations, if any, that governs the online private education industry would create substantial uncertainties regarding the legality of our business operation, which create risks that we may be found to violate the existing laws and regulations." (*Id.* ¶ 146.)

Plaintiffs argue that these risk disclosures were materially false and misleading because Defendants failed to disclose "the DRR and associated material risk that it would be reasonably likely (and ultimately did) eviscerate Gaotu's after-school tutoring business." (Pls.' Mem., Dkt. 42, at 12.) Plaintiffs argue that Defendants' knowledge of "the DRR and the associated material risk," (*id.*), is evidenced by the fact that Defendants had "sold a significant quantity of Gaotu shares through Irefresh" on March 9, 2021, (Am. Compl. ¶¶ 107, 149). They further cite to the Financial Times article on the Irefresh sales, which states that, "one person close to [Gaotu] said its leaders were aware at the time of the trade that Beijing was considering stricter regulations on the industry." (*Id.* ¶ 138.)

"[A] risk disclosure can itself be a material misrepresentation . . . where the company warns only that a risk may impact its business when that risk has already materialized." *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 230 (S.D.N.Y. 2022) (internal quotation marks omitted). "'In all cases, [ ] the court must keep in mind' that the test is whether a 'reasonable investor could have been misled about the nature of the risk when he invested.'" *In re Mylan N.V. Sec. Litig.*, No. 16-CV-7926 (JPO), 2018 WL 1595985, at *9 (S.D.N.Y. Mar. 28, 2018) (quoting *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002)). "Where allegedly undisclosed material information is in fact readily accessible in the public domain, the Second Circuit has found that a defendant may not be held liable for failing to disclose this information."

*In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003) (citing *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978)).

Defendants argue that Plaintiffs could not have been misled by Gaotu's risk disclosures in its 2020 Form 20-F because they came after several public statements predicting a downturn in the after-school tutoring market, which Plaintiffs themselves identify in the Amended Complaint: (1) Xi Jinping's public criticism of the after-school industry on March 6, 2021, (Am. Compl. ¶ 66); (2) several public reports by news sources—including Beijing News, Tsinghua University News, and Caixin Global[11]—of a potential regulatory crackdown on the industry between March 8–29 2021, (*id.* ¶ 87); (3) Gaotu's own Investor Relations Manager Sandy Qin's public statement that Gaotu "expect[ed] [its] sales and marketing spending to decrease in response to increased government [regulations]" on March 9, 2021, (*id.* ¶ 108 (internal quotation marks omitted)); and (4) the Ministry of Education's announcement of measures to limit the amount of online learning for school students on March 31, 2021 (*id.* ¶ 89).  And Defendants also seize on the same fact that Plaintiffs rely on to show Defendants' knowledge of the DRR and their consequences—Gaotu's sale of their stocks through Irefresh, on March 9, 2021, (*id.* ¶ 107)—to argue that Plaintiffs could not have been misled by Defendants' April, 26, 2021, risk disclosures since the Irefresh sale was publicly disclosed in the Form 144 a month earlier, in March 2021.

Defendants' argument, however, is largely inapposite because "the allegedly undisclosed material" at issue here is not the general anticipation of increased government regulations and a

---

[11] Though the Amended Complaint quotes directly from the Caixin Global article, (Am. Compl. ¶ 87), it does not mention the article's publication date.  The Court notes that this article was published on March 29, 2021.  *See* Ding Jie, Huang Huizhao, and Denise Jia, *Cover Story: Where's the Pressure on Schoolkids Coming From?*, Caixin Global (Mar. 29, 2021), https://www.caixinglobal.com/2021-03-29/cover-story-wheres-the-pressure-on-schoolkids-coming-from-101681656.html.  For reasons stated *supra*, the Court treats this article as incorporated into the Complaint by reference.

corresponding downturn in the market, but rather the "specific nonpublic information about the forthcoming [DRR's] detrimental impact on the after-school tutoring sector." (Am. Compl. ¶ 147.) It is this information that Plaintiffs allege Defendants knew and had a duty, but failed to, disclose in April 2021. *See In re Didi Glob. Inc. Sec. Litig.*, No. 21-CV-5807 (LAK), 2024 WL 1119483, at *8 (S.D.N.Y. Mar. 14, 2024) ("[G]eneric warning[s] . . . will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability." (alterations in original) (quoting *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014)). Furthermore, this specific information about the contents of the DRR and their potentially devastating impact on Gaotu's business was not publicly known at the time of Gaotu's April 2021 risk disclosures. Though Tshinghua University News and Caixin Global both reported on the possibility of a forthcoming "ban" on after-school tutoring courses, (Am. Compl. ¶ 87), the full contents of the DRR—and thus their true severity—were not leaked to the public until after April 26, 2021, (*id.* ¶¶ 98–101). Since the devastating effect of the DRR on Gaotu's business was not "readily accessible in the public domain" ahead of the April 26 risk disclosures, it can be plausibly inferred that Plaintiffs were misled by Defendants' non-specific and less dire risk disclosures. Thus, Plaintiffs' Section 10(b)/Rule 10b-5 claims do not warrant dismissal on this ground.

Further, for reasons explained below, Plaintiffs have sufficiently alleged Defendants' scienter. Defendants' additional arguments that there were three "unrelated" investment firms who also sold their stocks at the same time and that allegations based on anonymous news sources are not sufficiently particularized to support a Section 10(b) claim are both discussed *infra* in Discussion Section I.C. Accordingly, the Court finds the April 26 risk disclosures actionable under Section 10(b)/Rule 10b-5 as a matter of law.

3.    May 26 and July 23, 2021 Statements

On May 26, five days after the DRR were adopted, Gaotu held a conference call with securities analysts to discuss Gaotu's Q1 2021 earnings.  During that conference call, Defendant Shen stated that the Company had not yet "received the specific account" of the new regulations. (*Id.* ¶ 164.)  Defendant Chen further stated, "I am very optimistic about the future of online education and I believe . . . this sector will have a very long term and sustainable development." (*Id.*)  Gaotu made a similar comment in a press release on July 23, a day before the official publication of the DRR, stating, "[t]he regulations have not been published, and the Company has not received official notification of the regulations.  It is the Company's policy not to comment on market speculations."  (*Id.* ¶ 168.)  Defendants contend that "Plaintiffs fail to plead that either statement was inaccurate."  (Defs.' Mem. at 15.)

Under Rule 10b-5, "once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer*, 761 F.3d at 250.  "The law is well settled that so called 'half truths'—literally true statements that create a materially misleading impression—will support claims for securities fraud." *SEC v. Nutra Pharma Corp.*, 450 F. Supp. 3d 278, 289 (E.D.N.Y. 2020) (citation omitted). "[T]he proper inquiry requires an examination of defendants' representations, taken together and in context." *Meyer*, 761 F.3d at 250 (citation omitted).  Here, Defendants' May and July 2021 statements were made *after* the Haidian Branch had relayed the "spirit" of the regulations— described by Plaintiffs as the "the essential core or essence of a . . . document that both government officials and the general public should comprehend"—to the after-school tutoring companies "immediately" after the DRR were adopted on May 21, 2021.  (Am. Compl. ¶ 92.)  Considered in combination with Plaintiffs' additional allegations regarding Defendants' scienter—which, for reasons explained *infra* Discussion Section I.C., the Court finds to be sufficient—it can be

plausibly inferred that Defendants' May 26 and July 23 statements were knowingly and materially misleading and thus actionable under Section 10(b)/Rule 10b-5 as a matter of law.

### C.    Scienter

A complaint may satisfy the scienter pleading requirement by alleging facts either "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99.  The first showing requires the plaintiff to allege that the defendant "benefitted in some concrete and personal way from the purported fraud." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (quoting *Novak*, 216 F.3d at 307–308).  The second showing "requires allegations of either actual intent or 'conscious recklessness—*i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence.'"  *In re Bristol-Myers Squibb Co. CVR Sec. Litig.*, 658 F. Supp. 3d 220, 230 (S.D.N.Y. 2023) (quoting *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015)).  Moreover, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs*, 551 U.S. at 310.  For an inference of scienter to be strong, "a reasonable person [must] deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

### 1.    Motive and Opportunity

The parties do not dispute that Defendants, as the corporation and its corporate officers, had the opportunity to make material misrepresentations and omissions.  The relevant question is therefore whether Plaintiffs have adequately alleged Defendants' motive to do so.

Plaintiffs advance several bases for Defendants' motive.  First, as discussed above, Plaintiffs point to the sale of Gaotu stocks through Irefresh on March 9, 2021.  (Am. Compl. ¶ 108.) As a general matter, "[t]he mere fact that insider stock sales occurred does not suffice to establish

scienter." *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d at 381 (alteration in original) (quoting *Ressler v. Liz Claiborne, Inc.*, 75 F. Supp. 2d 43, 58 (E.D.N.Y. 1999)).  For insider sales to raise an inference of improper motive and thus scienter, they must be "suspicious" or "unusual."  *Id.* "Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling."  *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74–75 (2d Cir. 2001).

The Court agrees with Plaintiffs that the sale of Gaotu stocks through Irefresh was "unusual" and "suspicious."  The stock sale comprised almost $140 million worth of Gaotu ADSs, representing 30% of the total holdings of Irefresh, a private company that was "controlled" by an advisory committee that included Defendant Shen.  (Am. Compl. ¶ 107.)  Defendants are correct that "the Complaint does not allege that Defendant Shen or any other Individual Defendant traded any of their own shares or benefitted from Irefresh's trading decision." (Defs.' Mem. at 21.)  But as Plaintiffs point out, since Gaotu is a foreign private issuer exempt from Section 16 of the Exchange Act, "prior to discovery, Plaintiffs have no practical means to identify the sales of registered Gaotu shares by Individual Defendants . . . .  Instead, only Gaotu executives who planned to sell *unregistered* shares of the Company's stock have to file Form 144s with the SEC." (Am. Compl. ¶ 107 (emphasis in original).)  This is notably distinguishable from the facts of other actions brought by shareholders of U.S.-listed Chinese education companies after the passage of the DRR.  Though Defendants point to *Banerjee*, *Haping*, and *Dagan* as examples of similar cases that have been dismissed on the pleadings, (*see* Defs.' Mem. at 11), none of those cases alleged stock sales made through a corporate entity that was ostensibly "controlled" by one of the defendants and worth almost $140 million, only a few weeks before the relevant risk disclosures

were filed, *see generally Banerjee v. Zhangmen Educ. Inc.*, No. 21-CV-9634 (JPO), 2023 WL 2711279 (S.D.N.Y. Mar. 30, 2023); *Haping v. 17 Educ. & Tech. Grp. Inc.*, No. 22-CV-9843 (LAK) (SDA), 2023 WL 8716895 (S.D.N.Y. July 20, 2023), *R. & R. adopted* (S.D.N.Y. Nov. 8, 2023); *Dagan Invs., LLC, v. First High-Sch. Educ. Grp. Co.*, No. 22-CV-3831 (JGK), 2023 WL 8452223 (S.D.N.Y. Dec. 6, 2023). "[S]center determinations often are highly factual." 3 Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 12.53 (2024). Based on the facts presented here, the Court concludes that Plaintiffs have sufficiently pled that the stock sales were "unusual."

The timing of the Irefresh sale also gives rise to a plausible inference that the sale was "suspicious." Investor Relations Manager Sandy Qin made cautionary comments about forthcoming regulations at a public conference on the same day as the Irefresh sale, following which the stock price declined by 8.58%. (Am. Compl. ¶ 108.) Though Plaintiffs' Complaint does not explicitly specify the exact timing of the stocks sale vis-à-vis Ms. Qin's announcements (beyond stating that they both happened on "the same day"), their opposition brief argues that the sale took place "contemporaneously" with Ms. Qin's comments and that "[b]y selling when they did, [Defendants] managed to avoid an 8.5% decline in the ADS price that ensued in response to Ms. Qin's comments." (Pls.' Mem., Dkt. 42, at 6–7, 21.) Accepting Plaintiffs' non-conclusory factual allegations as true, as the Court must at this stage, these allegations sufficiently establish that the Irefresh sale of Gaotu stock was "suspicious" and supports an inference that Gaotu knew about the DRR's contents and their likely impact on Gaotu's business prior to March 9, 2021.

Further, Defendants' exculpatory explanation as to the Irefresh sales is inapposite. Defendants point to several other "prominent investment firms not alleged to be controlled by any Defendant [that] also sold most or all of their holdings in Chinese after-school tutoring companies

during the first quarter of 2021." (Defs.' Mem. at 22 (internal quotations and citation omitted).) But notably, Plaintiffs' allegations as to these investment firms arise within the context of a May 25, 2021, Caixin Media article that suggested that the other investment firms in question may also have been trading on non-public information. (Am. Compl. ¶ 97.) A complaint adequately pleads scienter "only if a reasonable person would deem the inference of scienter cogent and at least as likely as any plausible opposing inference." *Tellabs*, 551 U.S. at 324. Here, Plaintiffs' allegations at the pleadings stage regarding Gaotu's motive are at least as likely as the plausible opposing inference that Defendants have put forward.

Second, in support of their argument that Gaotu's scienter about the DRR is sufficiently pled, Plaintiffs point to news reports that government officials "immediately" relayed the "spirit" of the DRR to Gaotu on or about May 21, 2021, and that Gaotu implemented several company-wide measures to mitigate the impact of the regulations ahead of the official publication of the DRR. This further support the inference of Defendants' scienter. Plaintiffs cite to a news report by the media company 36Kr84, which stated that, according to unidentified sources, Defendant Chen held an internal meeting "several days" before May 28, 2021—the day the full text of the DRR was leaked onto several online platforms—that resulted in Gaotu's plan to lay off 30% of its workforce starting that week. (Am. Compl. ¶ 114.) As Defendant Chen later stated in a September 2021 earnings call, Gaotu had halted advertising to new students since the second quarter of 2021, (*id.*)—a measure that was "unusual" and "suspicious" because it "align[ed] precisely with the bans outlined in the [DRR]," and because "after-school tutoring institutions heavily relied on advertising as their primary customer acquisition channel." (*Id.*) Moreover, as these new measures fell into place, the Company also began newly emphasizing sources of revenue that served as alternatives to its K-9 tutoring program, including the introduction of an adult education platform,

subject tutoring unrelated to K-9 subjects, and a Gaotu mobile app that focused on professional education services.  (*Id.* ¶¶ 115–17.)  Plaintiffs argue that these business changes were Gaotu's efforts at proactively countering the forthcoming restrictions on K-9 tutoring and are therefore indicative of Defendants' knowledge of the specific contents of the DRR.  (Pls.' Mem., Dkt. 42, at 16–17.)

Third, Plaintiffs offer several anonymized statements by former Gaotu employees that speak to Defendants' scienter.  A former employee who worked as the manager of a Gaotu subsidiary stated that on July 25, 2021—a day after the full text of the DRR was published— Defendant Chen "summoned" the heads of all operating centers to Beijing and announced the immediate closure of eleven centers by July 31.  (Am. Compl. ¶ 120.)  Another former Gaotu employee responsible for reviewing financial statements stated that "most of [the] employee[s,] including senior management[,] were aware of the general situation of [the DRR] policy" before its publication on July 24, 2021.  (*Id.* ¶ 121.)  Yet another former employee who worked as a product operator stated that a "stamped" version of the DRR—considered to be the finalized and official copy—was available on the online professional networking platform Maimai as of mid-July, where it was viewed by both him and his colleagues at Gaotu.  (*Id.* ¶ 122.)  Plaintiffs argue that these accounts are strongly indicative of Gaotu's knowledge before May 28, 2021, of the DRR's contents and impact on the company because "it would have been administratively and logistically implausible for the Company to swiftly close down 67% of its operations, involving over 10,000 employees, within a mere 7 days following the official publication of the new regulation."  (*Id.* ¶ 135.)  Plaintiffs also point to a Financial Times article, which stated that, "one person close to [Gaotu] said its leaders were aware at the time of the [Irefresh] trade that Beijing was considering stricter regulations on the industry."  (*Id.* ¶ 138 (first alteration in original).)

Defendants take issue with Plaintiffs' reliance on anonymous or unidentified sources to allege facts in the Complaint. (Defs.' Mem. at 14–15.)  While it is true that courts are critical of anonymous sources relied upon in securities fraud complaints, and will "dismiss[] some [complaints]" on that basis, courts "*generally sustain[] others* where independent factual allegations corroborated the factual allegation in the complaint drawn from [anonymized] reports." *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020) (emphasis added).  Here, Plaintiffs have done more than just repackage the facts from news sources that cite to anonymized sources; Plaintiffs have included accounts from former Gaotu employees about Defendants' specific and concrete actions leading up to the official announcement of the DRR.  These firsthand accounts, although anonymous for now, are consistent with the news reports upon which Plaintiffs also rely.  The heightened pleading standard of Federal Rule of Civil Procedure 9(b), "can be served without requiring plaintiffs to name their confidential sources as long as they supply sufficient specific facts to support their allegations." *Novak*, 216 F.3d at 314.  Plaintiffs have done so here.

"The inquiry on scienter 'is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'"  *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 196 (S.D.N.Y. 2010) (quoting *Tellabs*, 551 U.S. at 323).  "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'"  *Tellabs*, 551 U.S. at 324 (citations omitted).  Here, considering all of the alleged facts as a whole, the Court finds that Plaintiffs have sufficiently alleged Defendants' scienter.  Defendants' motion to dismiss Plaintiffs' Section 10(b)/Rule 10b-5 claims on these grounds is therefore denied.

2.     Conscious Misbehavior or Recklessness

Since the court has found that Plaintiffs have sufficiently alleged the "motive and opportunity" prong of the scienter requirement, it need not analyze the "conscious misbehavior or recklessness" prong.  *See ECA, Loc. 134 IBEW Joint Pension Tr. of Chi.*, 553 F.3d at 198 (explaining that scienter can be established by showing "either" of the two prongs); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 170 (2d Cir. 2000) ("[I]f the court decides on remand that the Complaint successfully pleaded the defendants engaged in conscious or reckless misbehavior, it need not also consider the motive and opportunity prong of scienter.").

**D.     Loss Causation**

To establish loss causation in a Section 10(b)/Rule 10b-5 action, "a plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered."  *Suez Equity Invs., L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001); *accord, e.g., Lentell v. Merril Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).  A plaintiff can do one of two things to sufficiently allege loss causation:

> "Where the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss," a plaintiff may plead that it is "the materialization of the undisclosed condition or event that causes the loss."  Alternatively, a plaintiff may identify particular "disclosing event[s]" that reveal the false information, and tie dissipation of artificial price inflation to those events.

*Catton v. Def. Tech. Sys., Inc.*, No. 05-CV-6954 (SAS), 2006 WL 27470, at *5 (S.D.N.Y. Jan. 3, 2006) (quoting *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 298, 307 (S.D.N.Y. 2005)).

Here, Plaintiffs allege:

> [D]uring the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Gaotu's regulatory risk and exposure, [which] had the cause and effect of creating and/or maintaining in the market an unrealistically positive assessment of the Company and its operations, thus causing the Company's stock to be overvalued and artificially inflated at all relevant times.  The materially false and/or misleading statements made by Defendants named in this Action during the Class Period resulted in Plaintiffs and

other members of the Class purchasing the Company's ADSs at artificially inflated prices, thus causing the damages complained of herein.

(Am. Compl. ¶ 172.)   The Court finds these allegations sufficient to support an inference of causation.  *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015) (explaining that a plaintiff's burden to plead loss causation is "not a heavy one"); *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (quoting Fed. R. Civ. P. 8(a)(2) and requiring only "short and plain statement of the claim showing that the pleader is entitled to relief").[12] Accordingly, the Court finds that Plaintiffs have adequately alleged loss causation.

## II.    Plaintiffs' Section 20(a) Claims

Plaintiffs also bring claims against the Individual Defendants under Section 20(a) of the Exchange Act, which imposes liability on individuals who control any person or entity that violates Section 10(b).  *See* 15 U.S.C. § 78t(a).  "To assert a *prima facie* case under Section 20(a), a plaintiff

---

[12] Plaintiffs also allege that the decline in Gaotu stock prices was "caused by Gaotu's commentary about the prospects for additional government regulation . . . on March 9, 2021, and widespread reporting about the highly restrictive [DRR] after the Chinese government officially published it on July 24, 2021."  (Am. Compl. ¶ 174; *see id.* ¶ 108 (Gaotu's Investor Relations Manager Sandy Qin made a public statement on March 9, 2021 that Gaotu "was expecting sales and marketing spending to decrease in response to increased government . . . concerns on unhealthy marketing campaigns" (alteration in original)).)  However, Defendants rightly point out that price drops caused by "widespread reporting" of the regulations are a "market-wide development" that typically cannot be used to allege losses caused by defendants' alleged misconduct.  (Defs.' Mem. at 25 (citation omitted).)  The Court also notes *sua sponte* that, if Defendants' March 9 commentary caused a steep price drop, that could suggest that the commentary sufficiently disclosed the risk of the DRR restrictions and their impact, *i.e.*, that Gaotu investors sold *because of* Ms. Qin's March 9 statements—which seems at odds with Plaintiffs' theory of liability.  Nonetheless, despite the potential deficiencies of these allegations, the Court finds that Plaintiffs' allegations, in sum, sufficiently allege that Defendants' misrepresentations and/or omissions about the true impact of the DRR caused Gaotu's stock price to remain artificially high throughout the Class Period, thereby causing Plaintiffs' losses.  That Defendants' March 9 commentary might have caused a price drop at the beginning of that period might, as noted, be evidence relevant to whether Defendants' statements were materially misleading and to the amount of loss attributable to Defendants' allegedly illegal conduct, but it does not provide a basis for finding Plaintiff's allegations regarding loss causation insufficient.

must show a primary violation by the controlled person and control of the primary violator by the targeted defendant, and show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person." *In Re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 369 (S.D.N.Y. 2015) (internal quotation marks and citation omitted).  Here, Plaintiffs have sufficiently alleged Defendants Chen, as Gaotu's Chief Executive Officer, and Shen, Gaotu's Chief Financial Officer, were, in effect, the alleged "primary violator[s]" and "culpable participant[s] in the [alleged] fraud." *Id.*  And because the Court has found that Plaintiffs have adequately alleged a primary Section 10(b) violation, Defendants' motion to dismiss Plaintiffs' Section 20(a) claims is denied.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is denied, except with respect to Plaintiffs' claims based on the March 5, 2021, earnings call statements, which are not actionable.

SO ORDERED.

/s/ Pamela K. Chen
Pamela K. Chen
United States District Judge

Dated: February 6, 2025
Brooklyn, New York

27